# In the United States Court of Federal Claims

**No. 11-564C**
**September 30, 2013**

```
* * * * * * * * * * * * *   *
```
**MICHAEL ETCHEGOINBERRY, et al.,**                *

                              *          **Fifth Amendment Takings;**
               **Plaintiffs,**              *          **Motion to Dismiss; Subject**
        **v.**                      *          **Matter Jurisdiction; Statute of**
                              *          **Limitations; Stabilization**
**UNITED STATES,**                        *          **Doctrine; Justifiable**
                              *          **Uncertainty.**
               **Defendant.**              *
                              *
```
* * * * * * * * * * * * * *   *
```

      **Lily N. Chinn**, Beveridge & Diamond, P.C., Washington D.C., for the plaintiffs. With her were **Katherine T. Gates** and **Gus B. Bauman**, Beveridge & Diamond, P.C., Washington D.C., **Ryan R. Tacorda**, Beveridge & Diamond P.C., San Francisco, CA, and **William A. Kershaw** and **Lyle W. Cook**, Kershaw, Cutter & Ratinoff, Sacramento, CA.

      **E. Barrett Atwood**, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington D.C., for the defendant.  With him was **Robert G. Dreher**, Acting Assistant Attorney General, Environment & Natural Resources Division, Washington, D.C.  **Shelly Randel**, Attorney, Office of the Solicitor, United States Department of the Interior, Washington, D.C., of counsel.

# O P I N I O N

**HORN, J.**

      Plaintiffs, a group of landowners in the Westlands Water District (the Westlands) within the San Luis Unit of the Central Valley Project, have filed claims in the United States Court of Federal Claims, under the Fifth Amendment to the United States Constitution, alleging that the government's failure to comply with its statutory obligation to provide drainage to plaintiffs' farmlands has led to a physical invasion of their property, without just compensation.  There are four named plaintiffs in the above captioned case, Michael Etchegoinberry, Erik Clausen, Barlow Family Farms, L.P., and Christopher Todd Allen.  The named plaintiffs filed their complaint as a class action

under Rules of the United States Court of Federal Claims (RCFC) 23(b) (2013) on behalf of the following class:[1]

> All landowners located within the Westlands Water District ("Westlands" or "District") and served by the San Luis Unit of the Central Valley Project whose farmlands have not received the necessary drainage service the United States is required to provide under the San Luis Act (Pub. L. No. 86-488, 74 Stat. 156 (1960)).

Plaintiffs allege that defendant has abandoned its statutory obligation and its plan to provide drainage to the San Luis Unit. The United States District Court for the Eastern District of California held, and the United States Court of Appeals for the Ninth Circuit, which affirmed the District Court opinion, found that defendant has an unexcused statutory duty to provide drainage to the San Luis Unit under the San Luis Act of 1960, Pub. L. No. 86-488, 74 Stat. 156 (San Luis Act). Without the drainage, plaintiffs allege that, "wastewater settles beneath these lands, resulting in high water tables and the accumulation of saline groundwater," leaving the land unsuitable for farming. Because plaintiffs' farmlands allegedly never have received drainage services from the United States as contemplated by the San Luis Act, plaintiffs now seek certification of a class action, just compensation in an amount that exceeds $10,000.00, interest, as well as attorneys' fees and costs. Defendant has filed a motion to dismiss plaintiffs' claims for lack of subject matter jurisdiction, arguing that the statute of limitations has run or, alternatively, that plaintiffs lack standing.[2]

---

[1] The court defers the issue of class certification until a later date. This opinion focuses solely on the question of whether plaintiffs' taking claims is barred by the statute of limitations, 28 U.S.C. § 2501 (2006).

[2] Although a motion to dismiss, typically, would not require such a detailed factual recitation, this case is anything but typical. The limited description of the past history, described below, only scratches the surface of the intricacies of all that has occurred related to the San Luis Unit, including the long, difficult, and complicated history of inconsistency, inaction and refusal on the part of a federal agency, in the face of both a statutory duty to provide drainage to the Westlands and multiple court orders to take concrete steps toward fulfilling that statutory duty. In addition, there has been extensive litigation regarding the San Luis Act and Westlands, in multiple venues, involving a large revolving cast of individual landowners, water districts, state agencies, and federal agencies and officials, with claims under various federal and state laws, all of which bear on the above captioned case. In order to determine whether the statute of limitations has run and whether plaintiffs' claims are barred, it is necessary to analyze the robust history of defendant's actions and inactions regarding the Westlands. Recognizing the level of relevant, detailed history, the parties filed a comprehensive, joint stipulation of facts and a joint appendix of related documents to assist the court.

# FINDINGS OF FACT

## Construction and Subsequent Closure of the San Luis Drain (1956-1986)

The Central Valley Project is a United States Department of the Interior (DOI), Bureau of Reclamation water project, which was initiated in the 1930s and designed to provide irrigation to California's Central Valley by storing surplus water in the northern half of the state and transferring it to the more arid Central Valley region. In the 1940s, landowners on the west side of the San Joaquin Valley, the area of the Central Valley that lies to the south of the Sacramento-San Joaquin River Delta, petitioned the Fresno County Board of Supervisors to form a water district in order to facilitate delivery of Central Valley Project water to their farmlands. The Fresno County Board of Supervisors formed the Westlands Water District, referred to below as Westlands, in 1952, encompassing approximately 400,000 acres in the San Joaquin Valley. In order to convey water from Central Valley Project facilities to Westlands, new infrastructure would have to be constructed.

The San Joaquin Valley historically has faced problems with drainage and salt accumulation, which are exacerbated by irrigation. The parties have stipulated that when fresh water is brought in to irrigate an agricultural area, salty water, which remains after crops have been irrigated, must be carried back out in order to avoid a build-up of salt in the soil. As early as the 1890s, large swaths of the San Joaquin Valley became challenging for farming because of salt accumulation resulting from a lack of adequate drainage. Improved drainage technology allowed much of the land to be re-cultivated in the mid-twentieth century. Salt management and drainage problems, however, have continuously plagued the region.

In 1956, the Bureau of Reclamation delivered to the United States Congress, "A Report on Feasibility of Water Supply Development" for the San Luis Unit (the 1956 Feasibility Report), which recommended constructing a group of water management facilities, called the San Luis Unit, as an addition to the Central Valley Project, in order to bring irrigation waters to an area of approximately 496,000 acres in the San Joaquin Valley, including most of the Westlands,[3] at an estimated cost of $229,143,000.00. The 1956 Feasibility Report indicated that the State of California also was trying to implement a long-range water plan, the California Water Plan, and that the State and federal plans for the San Luis area were similar, with both "propos[ing] a pumping diversion from the Sacramento-San Joaquin Delta, use of San Luis Reservoir site and a high-level canal from the reservoir to convey water throughout the service area." According to the 1956 Feasibility Report, the San Luis Unit's service area relied solely on ground water for crop irrigation, but about five times as much water was being pumped out each year, as was being naturally replaced, so a supplemental water supply was needed to maintain current levels of farming.

---

[3] The proposed San Luis Unit would also impact two other water districts, the San Luis and Panoche districts.

The 1956 Feasibility Report recommended that the Bureau of Reclamation build, and the State of California operate and maintain, a series of structures, pumps, and pumping facilities to deliver water from existing Central Valley Project infrastructure to the San Luis Unit service area. The proposed facilities would be able to deliver 1,126,000 acre-feet of water annually to provide irrigation for approximately 440,000 acres per year.  The 1956 Feasibility Report indicated that the federal government would be repaid for the costs of building the San Luis Unit and that could be accomplished by charging water users an annual rate of $7.50 per acre-foot, "a rate well within the ability of the water users to repay." In addition, the 1956 Feasibility Report claimed "a portion of the Central Valley Project power revenues would be made available to assist San Luis Unit repayment."

The 1956 Feasibility Report also discussed the drainage problem in the San Luis Unit service area, stating:

> Soils of the area which will be served by the San Luis Unit contain salts which will be dissolved and carried by the percolating water into the soils in the lower parts of the service area.  If left undrained evaporation and transpiration of the percolating waters would concentrate the salts and make these soils unsuitable for irrigation use.  The construction of a drainage system will lower the ground-water table and prevent the concentration of salts.

The 1956 Feasibility Report recommended building a drainage system for at least the lower 96,000 acres of the San Luis Unit service area, consisting of a series of tile pipe drains connected to open drains, which would transfer "saline water unsuitable for reuse" to an interceptor drain, a proposed one hundred and ninety-seven mile earthen channel to carry drainage waters from the service area to the Sacramento-San Joaquin Delta.  According to the 1956 Feasibility Report, this proposed system could handle a volume of about 127,000 acre-feet of drainage waters annually.  The 1956 Feasibility Report acknowledged that other drainage methods "may prove feasible," but indicated that other methods would increase the operation and maintenance costs, and, therefore, carrying water to the Sacramento-San Joaquin Delta for disposal was the preferred method.  The 1956 Feasibility Report stated that the main features of the drainage system for the San Luis Unit could be constructed within five-and-one-half years, but that the drainage system would not be built "until after the project is in operation and definite requirements have been established."

In 1960, Congress passed the San Luis Act, Pub. L. No. 86-488, 74 Stat. 156 (1960).  Section 1(a) of the San Luis Act established the statutory obligation of the Secretary of the Interior to provide drainage for the San Joaquin and Sacramento River Delta and to "construct, operate, and maintain the San Luis unit as an integral part of the Central Valley Project," for the purpose of furnishing water to approximately 500,000 acres in the San Joaquin Valley.  See id. § 1(a).  The San Luis Act continued:  "The principal engineering features of said unit shall be a dam and reservoir at or near the San Luis site, a forebay and afterbay, the San Luis Canal, the Pleasant Valley Canal,

and necessary pumping plants, distribution systems, drains, channels, levees, flood works, and related facilities . . . ."  Id.  The San Luis Act anticipated that some of the San Luis Unit facilities, including "the dam and reservoir at or near the San Luis site, forebay and afterbay, pumping plants, and the San Luis Canal," would be "joint-use facilities" for use by both the federal government and the State of California.  Thus, the San Luis Act instructed DOI to construct those facilities "to the capacities necessary to serve both the Federal San Luis unit service area and the State's service area," or to construct them "so as to permit future expansion."  Id.  The State of California was responsible for paying an equitable portion of the cost of constructing such joint-use facilities by making annual payments to DOI, proportionate to the state's share of the costs of using the facilities.  Id. § 3(b).  The State of California also was responsible for making annual, equitable payments for the operation, maintenance, and replacement costs for joint-use facilities.  Id. § 3(d).

The San Luis Act also conditioned construction of the San Luis Unit on DOI securing water rights and, significantly, on the provision of adequate drainage facilities, stating:

> Construction of the San Luis unit shall not be commenced until the Secretary has (1) secured, or has satisfactory assurances of his ability to secure, all rights to the use of water which are necessary to carry out the purposes of the unit and the terms and conditions of this Act, and (2) received satisfactory assurance from the State of California that it will make provision for a master drainage outlet and disposal channel for the San Joaquin Valley, as generally outlined in the California water plan, Bulletin Numbered 3, of the California Department of Water Resources, which will adequately serve, by connection therewith, the drainage system for the San Luis unit or has made provision for constructing the San Luis interceptor drain to the delta designed to meet the drainage requirements of the San Luis unit as generally outlined in the report of the Department of the Interior, entitled "San Luis Unit, Central Valley Project," dated December 17, 1956 [the 1956 Feasibility Report].

Id. § 1(a).  Congress, in passing the San Luis Act, initially made available $290,430,000.00 for the facilities comprising the San Luis Unit, excluding distribution and drainage systems, and an additional amount, not to exceed $192,650,000.00, for construction of distribution and drainage systems.  Id. § 8.

On June 21, 1961, California notified the Secretary of Interior that the State would not provide a master drain.  In response, in January 1962, the Secretary of Interior reported to Congress that DOI would construct the San Luis Drain.[4]  The Bureau

---

[4] The master drain for the San Luis Unit is referred to interchangeably throughout the Administrative Record as the interceptor drain and the San Luis Drain.  The court uses San Luis Drain because plans for the drain evolved over time to consider alternatives other than the interceptor drain originally proposed.

of Reclamation planned to construct a drain which would extend two hundred and seven miles, from Kettleman City in the southern San Joaquin Valley, to a discharge point in the Sacramento-San Joaquin Delta.

Before construction began, several water districts filed suit in the Southern District of California on December 20, 1962, against the United States, seeking an injunction against construction of the San Luis Unit until provision was made for construction of the San Luis Drain.  In Central California Irrigation District, et al. v. United States, No. 2356-ND (S.D. Ca. 1962), the court denied the water districts' request for a preliminary injunction, based on the Secretary of Interior's representation to the court that provision had been made for constructing the San Luis Drain, and that "required drainage will be provided by the time water is furnished to the Federal San Luis Unit area."

The following year, the United States and Westlands entered into a forty-year contract (the 1963 Contract) for water services, providing that defendant would annually supply a certain amount of water to Westlands.[5]  The 1963 Contract also stated that defendant would provide "an interceptor drain designed to meet the drainage requirements of the San Luis Unit," and that local drainage facilities in the Westlands could be connected to the interceptor drain, as mutually agreed upon by the parties. The 1963 Contract provided that Westlands' rate of payment for water deliveries, which was not to exceed eight dollars per acre-foot of water, "shall include a drainage service component of not to exceed Fifty Cents ($0.50) for the interceptor drain," beginning the year following the date that drainage service became available.  The 1963 Contract was effective from 1967, when Westlands began receiving water deliveries from the San Luis Unit, until December 31, 2007.

Westlands and the United States entered into a second contract, the "Contract Between the United States and Westlands Water District Providing for the Construction of a Water Distribution and Drainage Collector System," on April 1, 1965. (the 1965 Contract).  The 1965 Contract stated that Westlands "desires that a water distribution and drainage collector system be constructed for the District by the United States," and that "the United States is willing to undertake the construction of the aforementioned water distribution and drainage collector system" under the terms of the contract.  The 1965 Contract provided that the federal government would spend up to $157,048,000.00, which Westlands would repay over time, to construct a distribution and drainage system to serve approximately 400,000 acres in the Westlands.  The facilities comprising the distribution and drainage collection systems would be constructed in phased groups, and "Construction group 1 shall include substantially all of the water distribution facilities, drainage collector facilities, and works for the integration of ground with surface water . . . ."   Construction groups 2 and 3 were to be constructed beginning no later than June 30, 1974, and June 30, 1979, respectively. Under the 1965 contract, the federal government and Westlands were to work together

---

[5] The 1963 Contract provided a detailed schedule of water deliveries for different years throughout the contract period.  Because the volumes of water provided are not relevant to the resolution of the statute of limitations issue, that schedule is not included.

in drawing up plans and designs for the distribution and drainage system and in overseeing the contracting process for construction.  The 1965 Contract stated that Westlands was to repay defendant for the cost of constructing the distribution and drainage collection systems, and as each phased group of facilities was built, "accept the care, operation, and maintenance of such group . . . ."

While the San Luis Drain was still in the planning stages, concerns arose about the potential effect of draining untreated, irrigation waters into the Sacramento-San Joaquin Delta and the San Francisco Bay.  Reflecting those concerns, on October 22, 1965, Congress passed Public Law 89-299, 79 Stat. 1096 (1965), which contained an appropriations rider prohibiting selection of a final discharge point for the San Luis Drain until certain conditions were met, including completion of a pollution study and development of a plan to mitigate damage from drainage water on the San Francisco Bay.  The parties have stipulated that a similar appropriations rider was included in nearly every yearly appropriations act after 1965, until at least 2000, prohibiting DOI from determining a terminus point for the San Luis Drain.[6]  Despite the fact that an environmental standard has never been established, keeping the appropriation riders in force, portions of the drain were constructed, as discussed below, using lump-sum congressional appropriations for Bureau of Reclamation projects.

Defendant began delivering water to Westlands in 1967, and began constructing the San Luis Drain in March 1968.  As part of the San Luis Drain system, defendant began constructing the Kesterson Reservoir, which was originally intended to serve as a

---

[6] The parties' stipulation is a reference to the United States Court of Appeals for the Ninth Circuit's 2000 decision in Firebaugh Canal Co. v. United States, 203 F.3d 568 (9th Cir. 2000), which stated: "The 1965 Public Works Appropriation Act, Pub. L. No. 88–511, 78 Stat. 778, 782 (1964), contained a provision prohibiting selection of a final point of discharge for the drain until certain conditions were met. An appropriations rider with similar, but not identical language, has been included in nearly every annual appropriations act since 1965." Id. at 571.  In a footnote the Ninth Circuit noted that:

> With the exception of FY 94, FY 95, FY 96, and the continuing resolution years of FY 83 and FY 79, Congress has placed nearly identical limits on funds provided to the Bureau of Reclamation. The most recent rider states, "None of the funds appropriated or otherwise made available by this Act may be used to determine the final point of discharge for the interceptor drain for the San Luis Unit until development by the Secretary of the Interior and the State of California of a plan, which shall conform with the water quality standards of the State of California as approved by the Administrator of the Environmental Protection Agency, to minimize any detrimental effect of the San Luis drainage waters."  Pub. L. No. 105–62, § 510(a), 111 Stat. 1320, 1340 (1997).

Firebaugh Canal Co. v. United States, 203 F.3d at 571, n.1.

reservoir that would regulate water flows in the San Luis Drain prior to their discharge into the Sacramento-San Joaquin Delta, but which instead became the temporary terminal disposal site for the San Luis Drain.  By 1975, approximately eighty-three miles[7] of the San Luis Drain and the first stage of the Kesterson Reservoir had been completed.  At that time, however, the Bureau of Reclamation suspended construction of the San Luis Drain, citing public "concerns."

Despite the suspension of construction of the San Luis Drain, the central component of the planned drainage system for the San Luis Unit, defendant continued to move forward with building out the overall drainage collection system by contracting for the construction of sub-surface drains for 42,000 acres of land within the Westlands. The sub-surface drainage collection system discharged drainage water from farmlands in the Westlands into the San Luis Drain, which carried the water to the Kesterson Reservoir, where it was disposed of through evaporation.  Drainage service for those 42,000 acres in the Westlands began in 1976.  Those 42,000 acres are the only portion of the Westlands that, as of 2011, have ever been supplied with drainage services and, as discussed below, even those drainage services were short-lived.

On June 15, 1977, Congress passed an appropriations act (the 1977 Act), which raised the appropriations ceiling for construction of the distribution system and the San Luis Drain by $31,050,000.00, to a total of $223,700,000.00.  The 1977 Act provided, however, that those funds could not be expended until Westlands and any other affected water districts pledged to DOI that the districts would repay those additional costs. The 1977 Act also required that DOI establish a task force to review the management and operations of the San Luis Unit, and specifically instructed the task force to report back to Congress on "the fiscal and future environmental impacts of the completion, under current plans, of the San Luis interceptor drain north of the Kesterson Reservoir, and recommendations as to the feasibility of implementing alternative uses of waste water such as reclamation for agricultural or industrial re-use."

In compliance with the 1977 Act, the Bureau of Reclamation established  the first of many task forces, called the Special Task Force on the San Luis Unit, which submitted a report to Congress in 1978 (the 1978 Task Force Report).  The 1978 Task Force Report indicated that the San Joaquin Valley faced a growing problem with saline drainage waters, which threatened to lower the quality of ground water supplies and decrease the productivity of agricultural land in the area.  The 1978 Task Force Report went on to explain that there were numerous problems associated with constructing the San Luis Drain, and that, even if the San Luis Drain were completed as planned, it would "not be a valleywide solution."  The 1978 Task Force Report stated that, as of October 1977, approximately eighty-two miles of the San Luis Drain had been completed south of the Kesterson Reservoir, but another twenty-six miles were needed to reach the planned starting-point at Kettleman City, California.   Meanwhile, no

---

[7] Other documents in the record, for example the Task Force Report discussed below, estimate the length at eighty-two miles.  Defendant represented, in the <u>Sumner Peck</u> litigation, also discussed below, that this eighty-plus mile stretch of the San Luis Drain constructed in the 1970s represented forty-one percent of the planned interceptor drain.

construction had occurred north of the Kesterson Reservoir, so approximately seventy-five miles still had to be built to reach the planned discharge point in the Sacramento-San Joaquin Delta.  The 1978 Task Force Report also indicated that, in order for the San Luis Drain to maximize its capacity, on-farm tile drains and collector drains had to be installed throughout the San Luis Unit service area.  The Bureau of Reclamation's plans for completing construction of the San Luis Unit drainage system called for building ninety-one collector drains in the Westlands.  As of 1977, however, only eight had been completed, and estimates included in the 1978 Task Force Report showed that the system of "on-farm" tile drains and collector drains would not be fully operational until 2080.  The 1978 Task Force Report stated that, "a minute amount of subsurface agricultural return flow is thus presently reaching the San Luis Drain.  Theoretically, therefore, it can be said to be in operation, but as a practical matter it has only barely begun to function."

The 1978 Task Force Report also evaluated the costs and environmental impact of completing the San Luis Drain as planned, versus the implications of not building a drain, as well as potential alternative drainage solutions.  The 1978 Task Force Report found that, while the 1956 Feasibility Report estimated that the San Luis Drain would cost $7,232,000.00 to construct, by 1978 it was estimated to cost $185,320,000.00, and that the cost could rise as high as $275,004,803.00 if the discharge point was moved farther west.  In addition, although the 1956 Feasibility Report had indicated that approximately 96,000 acres of the San Luis Unit would require drainage, whereas by 1978 it was calculated that approximately 270,000 acres would require drainage.  Without adequate drainage the 1978 Task Force Report predicted that, eventually, 230,000 acres of the San Luis Unit would go out of production, resulting in losses of nearly $100 million per year.  The 1978 Task Force Report further indicated that the United States Environmental Protection Agency, which was responsible for issuing permits for discharge of pollutants into navigable waters, had not yet established pollution control requirements for the discharge point of the San Luis Drain.  The 1978 Task Force Report recommended that the Bureau of Reclamation "proceed with securing the necessary appropriations from Congress to assure completion of the San Luis Interceptor Drain from its point of origin near Kettleman City to Kesterson Reservoir," but that "[n]o construction or land asquisition [sic] activities associated with completing the San Luis Interceptor Drain north of Kesterson Reservoir should be undertaken until" four things happened: 1) agreement had been reached with the State of California as to the final point of disposal and treatment of drainage water, 2) the federal Bureau of Reclamation had completed a final environmental impact statement, 3) a repayment method and timeline had been agreed upon by the federal government and the State, and/or water districts, and 4) full consideration had been given to the possibility of granting State of California and others joint use of the existing San Luis Drain.

Throughout the 1970s, however, water deliveries continued and drainage services were being provided to the 42,000 acres of land in the Westlands.  In 1977, the United States demanded various modifications to its existing agreements with Westlands in order to continue delivery of Central Valley Project water to the district.  In

order to keep water flowing to the area, Westlands entered into a series of annual, temporary water service contracts with the United States in 1978, 1979, 1980, and 1981.  Ongoing negotiations between the United States and Westlands over delivery of water and drainage services continued over multiple years.

Between 1975 and 1979, a joint federal-state project was launched to "find an economically, environmentally, and politically acceptable solution to San Joaquin Valley drainage problems."  Named the San Joaquin Valley Interagency Drainage Program,[8] this collaboration between the Bureau of Reclamation, the California Department of Water Resources, and the California State Water Resources Control Board, recommended, in the late 1970s, that the San Luis Drain be completed to a terminus point at the Sacramento-San Joaquin Delta.  Based on that recommendation, the Bureau of Reclamation initiated a study, named the San Luis Unit Special Study, in order to move forward with permitting for the San Luis Drain.

When the Kesterson Reservoir was established in 1970, approximately 5,900 acres around the reservoir had been designated as a National Wildlife Refuge. Beginning in 1982, federal authorities noticed problems with the wildlife in the Kesterson Wildlife Refuge, and subsequent laboratory reports of fish from the Kesterson Reservoir "revealed extremely high levels of selenium" in their tissue.  Studies conducted in 1983 showed high rates of mortality and embryonic deformities among birds in the Wildlife Refuge and testing, once again, found high concentrations of selenium in both adult birds and bird eggs.  On February 5, 1985, California's State Water Resources Control Board issued a cleanup and abatement order, requiring the Bureau of Reclamation either to present to the State board a plan to clean up the Kesterson Reservoir, or to shut it down as a drainage facility by February 1988.  In March of 1985, the DOI issued a statement saying that it would begin shutting down the Kesterson Reservoir by plugging the San Luis Drain and stopping delivery of irrigation waters to the areas which drained into the Kesterson Reservoir.  In April 1985, however, Westlands and the Bureau of Reclamation entered into an agreement, whereby the Bureau of Reclamation agreed to continue supplying water to Westlands in exchange for Westlands agreeing to immediately begin closing the San Luis Drain and Kesterson Reservoir, to "proceed expeditiously to design, install, and operate alternative means for disposal of drain water from Westlands" so that no drain water would flow to into the San Luis Drain by June 1986, and to submit to the federal government by June 1985 plans for the installation of a chosen alternative drainage program.

---

[8] In 1984, a joint federal-state program called the San Joaquin Valley Drainage Program was established to study possible solutions to the drainage problems in the area, as detailed below.  The Bureau of Reclamation also formed the San Luis Unit Drainage Program in 1989 to "provide a long-term solution to the agricultural drainage problem in San Luis Unit of the Central Valley Project."  Despite having similar names, the San Joaquin Valley Interagency Drainage Program, the San Joaquin Valley Drainage Program, and the San Luis Unit Drainage Program are three separate initiatives.  None to date have arrived at a long term solution to the drainage problem in the San Luis Unit.

By June 1986, twenty-six years after the San Luis Act was passed and twenty-four years after the Secretary of Interior had promised the District Court for the Eastern District of California that "required drainage will be provided by the time water is furnished to the Federal San Luis Unit area," the drains in the Westlands had been plugged and the only portion of the San Luis Drain that was ever open, the eighty-plus mile stretch south of Kesterson Reservoir, also had been closed.  The Bureau of Reclamation continued to deliver water to Westlands, absent the drainage service that was supposed to be a prerequisite for the construction of the San Luis Unit.  The 42,000 acres of lands in the Westlands that had been receiving drainage service since 1976, therefore, lost the drainage service in 1986.  The parties have stipulated that no other area in the Westlands has, at any time between 1960 and the filing of the above captioned case, received drainage services as originally contemplated in the San Luis Act.   The few named plaintiffs' properties are all outside of the 42,000 acres that received drainage from 1976 to 1986, and, therefore, that plaintiffs' properties have never received drainage service from the federal government as originally contemplated in the San Luis Act.

The closure of the Kesterson Reservoir, however, did not mark the end of defendant's efforts to provide drainage services to the San Luis Unit.  On March 15, 1985, the Secretary of Interior recognized in his statement announcing the closing of the Kesterson Reservoir:

> The Department [of Interior] also recognizes it has responsibilities to those with whom it has contracted for the delivery of irrigation water. Irrigated agriculture clearly is important to the economy of California and the Nation.  We have been and we will continue to diligently seek scientific solutions to this issue . . . .   The Secretary [of Interior] remains committed to seeking a permanent solution.

Moreover, defendant represented in litigation in the 1990s that, after the closure of the Kesterson Reservoir, "the United States has supported efforts made to provide for drainage while at the same time fulfilling its other statutory responsibilities to protect the environment."

**Barcellos Litigation**

On April 26, 1979, a group of landowners and water users within the Westlands filed suit against the Westlands in the District Court for the Eastern District of California, Barcellos & Wolfson, Inc. v. Westlands Water District, No. CV-79-106, claiming that the plaintiffs' lands had been granted priority rights over other areas in the water district to both quantities of, and prices for, water, but that Westlands' annual water service contracts with the United States for "1978, 1979 and future years" adopted uniform rates and allocations for the whole water district, which deprived the plaintiffs of their "priority guarantee."  The District Court ordered the plaintiffs to add to the litigation "the Federal Defendants," including the United States, DOI, the Bureau of Reclamation, and various officials at DOI and the Bureau of Reclamation, as well as landowners in other portions

of the Westlands.  In the third amended complaint in the Barcellos litigation, the plaintiffs asserted claims against Westlands, other landowners in the Westlands, and the federal defendants relating to water services, rates, and state and federal reclamation law.

On July 24, 1981, Westlands filed suit against the United States in the Eastern District of California, Westlands Water District v. United States, No. CV-81-245, alleging that the United States has repudiated various contracts and agreements with the District, including the annual water contracts the parties signed in 1978, 1979, 1980, and 1981, and seeking a preliminary injunction against a 1981 threat by the federal government to terminate water delivery on January 1, 1982, as well as a declaration of rights and obligations between Westlands and the United States under contract and federal reclamation law.

On September 18, 1981, the District Court for the Eastern District of California partially consolidated the Barcellos and Westlands litigation, consolidating all claims in the Westlands litigation and those claims in the Barcellos case that pertained to the rights and obligations of the Westlands and the United States under contract and federal reclamation law.   The consolidated action was captioned Westlands Water District, et al., v. United States, et al.; Barcellos & Wolfson, et al., v. Westlands Water District, et al., No. CV-F-81-245.

The parties in the consolidated Westlands/Barcellos case, No. CV-F-81-245, entered into a Stipulated Judgment (Barcellos Judgment) on August 29, 1986, which was enforced by the court pursuant to a December 30, 1986 Order. The Barcellos Judgment first stated that the 1963 Contract between Westlands and the United States was "a valid, enforceable and implementable contract entitling the District through the end of 2007 to water and other service by the United States," and requiring Westlands and the United States to perform on the 1963 Contract.   With regard to drainage services, the Barcellos Judgment stated that the federal defendants, "shall develop, adopt and submit to the District by December 31, 1991, a Drainage Plan for Drainage Service Facilities . . . ."   The Drainage Plan was required to provide plans for facilities that could "transport, treat as necessary, and dispose of" at least 60,000 acre-feet, but not more than 100,000 acre-feet, of water by December 31, 2007, and was to be "Cost Effective and financially feasible," as well as "capable of construction, acquisition and operation in compliance with all applicable law."   The Drainage Plan was to "contain a schedule for the initiation and completion of each Drainage Service Facility by the United States," although recognizing that compliance with the schedule was dependent upon approvals by the Executive Branch and Congress.   At all times since the December 30, 1986 Order, the United States has been under federal court order to expeditiously implement a plan to provide drainage services to the Westlands.

The Barcellos Judgment also established a "Drainage Trust Fund" "[t]o aid in funding costs of Drainage Service Facilities and to encourage and expedite United States' construction or acquisition thereof."   Westlands was to establish the Drainage Trust Fund, and beginning in 1988, to levy $5 million per year in assessments on lands within the water district to deposit into the fund, until sufficient funds were deposited into

the fund to meet Westlands' payment obligations to the federal government for construction of drainage facilities. Funds from the Drainage Trust Fund were to go toward an annual "progress payment of 35 percent of the estimated Costs of Construction by the United States during that fiscal year of Drainage Service Facilities," not to exceed $500,000.00 per facility or $15 million total for each year, and $100 million in the aggregate. Money in the Drainage Trust Fund would be released back to Westlands if any of the following occurred, subject to the parties' waiver: 1) the federal defendants failed to develop and submit to Westlands a Drainage Plan by December 31, 1991, 2) Congress failed to authorize funds for construction of Drainage Service Facilities described in the Drainage Plan, 3) the federal defendants failed to commence construction of at least one of the facilities included in the Drainage Plan by December 31, 1996, 4) Congress failed for any two consecutive years to appropriate necessary funds for construction of drainage facilities, 5) the federal defendants failed to "diligently pursue construction or acquisition" of drainage facilities once funds were appropriated, 6) the federal defendants did not complete construction of all drainage facilities by the date provided in the Drainage Plan, 7) the federal defendants stated that they would not implement the Drainage Plan, or 8) Congress conditioned future appropriations on cost-sharing arrangements other than those provided for in the instant agreement.[9]   In addition, the Barcellos Judgment specifically reserved "[a]ny claim against the United States of the right to drainage service or Drainage Service Facilities."

### The Bureau of Reclamation's Drain-Related Activities from 1989-1993

After the December 30, 1986 Order by the District Court for the Eastern District of California enforcing the Barcellos Judgment in 1986, the Bureau of Reclamation appeared, for several years, to be on a path toward formulating and implementing a drainage plan in compliance with the Judgment. In 1989, in response to the Barcellos Judgment, the Bureau of Reclamation formed the San Luis Unit Drainage Program. The purpose of the San Luis Unit Drainage Program was "to identify and implement an agricultural drainage plan for the San Luis Unit" that "will, at least, address agricultural drainage needs through the year 2007 . . . ." In March 1990, the Bureau of Reclamation issued the "San Luis Unit Drainage Program Plan of Study," which stated:

The goal of the program [San Luis Unit Drainage Program] is to identify and implement a long-term solution to the drainage problem of the SLU [San Luis Unit] of the Central Valley Project which is compatible with protection and improvement of fish and wildlife habitat and populations. Long-term, in this case, denotes an equilibrium condition where there is no buildup of water or salts occurring in the agricultural environment, so that irrigated agriculture is indefinitely viable.

---

[9] The record before this court does not contain information on whether the Drainage Trust Fund was ever implemented or whether the United States has ever returned money to the Westlands for failure to comply with the Barcellos Judgment, nor is it critical to resolving the statute of limitations issue.

The 1990 Plan of Study indicated that, "[c]omprehensive planning studies will be needed to identify and select a feasible, long-term drainage plan that meets project needs, is consistent with Reclamation law and Central Valley Project authorization, and is compatible with other possible drainage plans for serving the San Joaquin Valley." Since the Barcellos Judgment required the Bureau of Reclamation to implement a drainage plan by 1991, and because "there are currently no feasible out-of-valley drainage disposal alternatives, the focus of the initial activities will be on in-valley alternatives." The 1990 Plan of Study further indicated that "it is possible that meeting the schedule of the judgment [the Barcellos Judgment] will involve planning and implementing facilities that provide only short or intermediate term drainage service, while long-term solutions are being developed." The 1990 Plan of Study included a schedule of planned work activities for 1990 and 1991, which indicated that the Bureau of Reclamation would issue an Alternative Plans Formulation Report and a Draft Environmental Study by September 1991, with a Final Environmental Impact Study to follow after December 1991.

Before the Bureau of Reclamation completed its planned next steps, however, a new joint federal-state program issued a report that seemed to shift the focus away from completing the originally-planned interceptor drain, which, as described, would have carried drainage water out of the San Luis Unit for disposal into the Sacramento-San Joaquin River Delta, and toward an "in-valley" solution. In response to the problems discovered at the Kesterson Reservoir in the mid-1980s, the Governor of California and the Secretary of Interior had launched the San Joaquin Valley Drainage Program in 1984 to investigate the drainage problems in the San Luis Unit and possible solutions. The San Joaquin Valley Drainage Program issued a final report in September 1990, which became known as the "Rainbow Report." The 1990 Rainbow Report presented a plan for managing the drainage problems in the west San Joaquin Valley from 1990 to 2040. While the 1990 Rainbow Report was initially supposed to look at all possible drainage solutions, the study ended up looking solely at in-valley solutions.[10] The preface to the 1990 Rainbow Report explained:

> A comprehensive study of agricultural drainage and drainage-related problems on the westside San Joaquin Valley has resulted in the management plan presented in this final report of the Federal-State interagency San Joaquin Valley Drainage Program.

---

[10] The Bureau of Reclamation later stated that the decision to limit the Rainbow Report to in-valley management solutions was a "policy decision" based on a recommendation from a citizens' advisory committee. Plaintiff alleges that defendant's purported "policy decision" was merely a litigation posture in the Firebaugh/Sumner Peck case, and that, at the time, there was no indication to the public that defendant was making a marked shift in its plans for how to provide a comprehensive drainage solution to the San Luis Unit. For the purposes of the statute of limitations accrual date analysis, defendant's representations to the public are important. The excerpts of the Rainbow Report provided to this court, do not specifically refer to a "policy decision," although the 1990 Rainbow Report does describe only in-valley drainage solutions, as discussed below.

Understandably, some may be disappointed that no single, sure, and lasting solution to the drainage problem has been put forward. Rather, the management plan presented is complex and includes risks that could be costly. Moreover, it may be only the first step in solving the salt accumulation problem. Virtually everyone involved in examination of the drainage problem agrees, however, that there is no single solution and no easy answer to the problem.

But it is also generally agreed that the drainage problem is manageable and that this management logically begins in the valley with a broadly shared effort to reduce the amount of drainage water, to place the remaining water under control, and to contain and isolate toxicants such as selenium.  Such actions would largely correct present problems of waterlogging of farmlands and could greatly reduce adverse impacts on fish and wildlife.

The in-valley actions recommended in the plan would also be necessary for any eventual export of salt from the San Joaquin Valley. The recommended actions would provide a regional drainage infrastructure that now exists only in scattered pieces. If the plan proposed here is implemented, a salt export decision need not be made for several decades.

The 1990 Rainbow Report clarified that the recommended plan presented was not a blue-print for construction of any new facilities, stating:

The plan is not site-specific, and, without more detailed analysis, it is not a plan from which structures may be built. Rather, it should be considered as a framework that will permit the present level of agricultural development in the valley to continue, while protecting fish and wildlife and helping to restore their habitat to levels existing before direct impact by contaminated drainage water.

The 1990 Rainbow Report recommended a combination of in-valley management solutions, including: source control in order to reduce the overall amount of irrigation waters that had to be drained, a system of drainage water reuse on more salt-tolerant plants, drainage water evaporation ponds, land retirement to stop irrigation on lands that were more difficult to drain, ground-water management, discharge to the San Joaquin River, protection and provision of substitute water supplies for wildlife habitats, and institutional changes such as changing the pricing and delivery of water and forming regional water management organizations.  The 1990 Rainbow Report suggested, however, that completion and usage of the San Luis Drain was still a viable option, and made no mention of a decision or shift in focus by the Bureau of Reclamation to permanently cancel the plans for the construction of the San Luis Drain. Elaborating on the above strategies, the 1990 Rainbow Report discussed various ways

of disposing of drainage water, including "[d]ischarge to the San Joaquin River without dilution (including use of portions of the San Luis Drain to convey drainage water to treatment or disposal areas)." Although the 1990 Rainbow Report focused on in-valley management solutions, there was no indication in the report that the plan to build the San Luis Drain had been or was being abandoned by DOI.

In December 1991, four federal agencies, the Bureau of Reclamation, the U.S. Fish and Wildlife Service, the U.S. Soil Conservation Service, and the U.S. Geological Survey, as well as four California agencies, the Department of Water Resources, the Department of Fish and Game, the Department of Food and Agriculture, and the State Water Resources Control Board, signed a "Memorandum of Understanding for Implementation of the San Joaquin Valley Drainage Program's Recommended Plan," (the 1991 Memorandum) The 1991 Memorandum stated that all of the parties would use the management plan described in the 1990 Rainbow Report "as the principal guide for remedying subsurface agricultural drainage and related problems." The 1991 Memorandum further indicated that all parties would develop an action plan and determine a schedule for implementing all components of the Rainbow Report's plan. The 1991 Memorandum did not directly address plans to construct the San Luis Drain.

In 1991, the Bureau of Reclamation's San Luis Unit Drainage Program released a Draft Environmental Impact Statement on December 20, 1991, which "buil[t] upon and propose[d] to implement site-specific actions based upon the recommendations in the" 1990 Rainbow Report. The 1991 Draft Environmental Impact Statement evaluated four action alternatives,[11] as well as a "no action alternative." None of the four action alternatives, nor the no action alternative, addressed completion of the San Luis Drain. The 1991 Draft Environmental Impact Statement indicated that there were other action alternatives that had been considered for implementation, but eliminated, including a "delta disposal alternative." The 1991 Draft Environmental Impact Statement explained:

> The delta disposal alternative, as planned when the San Luis Drain was authorized, would also be a complete and effective alternative. Because the alternative was once considered cost effective and authorized, it is reasonable to conclude that this alternative would still be cost effective. However, the social and environmental unacceptability of the alternative precludes further consideration at this time. Questions continue to be raised about potential effects of untreated agricultural drainage on the water quality of the delta and San Francisco Bay. Therefore, the delta disposal alternative was also eliminated from detailed consideration for the scope of this document.

Instead of the "delta disposal alternative," the 1991 Bureau of Reclamation's Draft Environmental Impact Statement identified alternative 4, source control and new

---

[11] The 1991 Draft Environmental Impact Statement was the first of many Bureau of Reclamation documents to identify "action alternatives" for implementing a drainage plan, another in a dizzying list of constantly-shifting alternatives put forth over the years by the Bureau of Reclamation.

technologies, as the preferred action alternative. The 1991 Bureau of Reclamation's Draft Environmental Impact Statement stated that, alternative 4 "concentrates on source control, monitoring, and demonstration programs of new technologies to collect, treat, and ultimately dispose of concentrated brines and salts." The 1991 Draft Environmental Impact Statement further explained that alternative 4 "was designed to recognize and accommodate technologies that appear promising and implementable within the timeframe of the Barcellos Judgment but may be unproven and, therefore, could not be proposed for full-scale implementation at this time." The 1991 Draft Environmental Impact Statement asserted that alternative 4 fulfilled the <u>Barcellos</u> Judgment because it provided "an implementable drainage plan by December 31, 1991, for drainage service for the Westlands Water District to the year 2007." The 1991 Draft Environmental Impact Statement acknowledged, however, in a section titled Unresolved Issues: "The proposed action treats drainage water avoided through alternative land use and source control programs as alternatives to the San Luis Drain. The issue is that parties to the judgment have not necessarily agreed to this interpretation." It appears from the 1991 Draft Environmental Impact Statement, therefore, that by 1991, the Bureau of Reclamation had decided to pursue an approach to drainage in the San Luis Unit that did not include construction of a master drain and had asserted that such alternatives complied with the <u>Barcellos</u> Judgment, but without consensus from all of the affected parties.

In October 1992, Congress passed the Reclamation Wastewater and Groundwater Study Act of 1992, Pub. L. No. 102-575, §§ 1601-1617, 106 Stat. 4600, 4663, which directed the Secretary of the Interior to:

> [U]ndertake a program to investigate and identify opportunities for reclamation and reuse of municipal, industrial, domestic, and agricultural wastewater, and naturally impaired ground and surface waters, for the design and construction of demonstration and permanent facilities to reclaim and reuse wastewater, and to conduct research, including de-salting, for the reclamation of wastewater and naturally impaired ground and surface waters.

With respect to the San Luis Unit, however, the 1992 Act limited the Secretary of Interior to investigating projects that were recommended in the 1990 Rainbow Report, stating:

> The Secretary shall not investigate, promote or implement, pursuant to this title, any project intended to reclaim and reuse agricultural wastewater generated in the service area of the San Luis Unit of the Central Valley Project, California, except those measures recommended for action by the San Joaquin Valley Drainage Program in the report entitled A Management Plan for Agricultural Subsurface Drainage and Related Problems on the Westside San Joaquin Valley (September 1990) [the Rainbow Report].

The Bureau of Reclamation indicated that its 1990 Plan of Study that its Draft Environmental Impact Statement, issued in 1991, would be followed by a Final Environmental Impact Statement, however, no Final Environmental Impact Statement was ever issued.  Between 1991 and 2000, the Bureau of Reclamation, Westlands, and various groups of landowners were engaged in a period of protracted litigation over the issue of drainage in the San Luis Unit service area.  There is no information in the record regarding the development of new contracts for drainage facilities during that time.  It appears from the record that, whatever plans there were to construct new drainage facilities in Westlands were put on hold during that time, while the federal government attempted to argue in federal court that its statutory duty to provide drainage to the San Luis Unit had been excused by intervening circumstances.

**Firebaugh Canal and Sumner Peck Litigation**

On December 7, 1988, following the earlier closure of the Kesterson Reservoir and the plugging of the San Luis Drain, Firebaugh Canal Company, a private water company, and the Central California Irrigation District, a water district downslope of the San Luis Unit (the Firebaugh plaintiffs), filed a complaint in the District Court for the Eastern District of California. In Firebaugh Canal Co. v. United States, No. CV-F-88-634, the Firebaugh plaintiffs alleged several tort claims under the Federal Tort Claims Act, 28 U.S.C. § 2671, and violations of the Administrative Procedure Act (APA), 5 U.S.C. § 702, against the United States, DOI, the Bureau of Reclamation, and the Secretary of the Interior, together the "federal defendants," and sought general and special damages, as well as an injunction compelling the defendants to cease delivery of water to Westlands until adequate drainage facilities were in place and operating.

On January 31, 1991, a group of one hundred and thirty-five landowners from the Westlands (the Sumner Peck plaintiffs) filed a complaint against DOI, the Bureau of Reclamation, Westlands, the California Department of Water Resources, and the State Water Resources Control Board in the District Court for the Eastern District of California.  In Sumner Peck Ranch v. Bureau of Reclamation, No. CV-F-91-048, the Sumner Peck plaintiffs sought both equitable and monetary relief, including declarations that the federal defendants had violated their duties under the San Luis Act and the subsequent 1977 Appropriations Act, their various contracts with the Westlands, and the 1986 Barcellos Judgment, to provide drainage services to the San Luis Unit.  The Sumner Peck plaintiffs also brought claims of inverse condemnation against the federal government, Westlands, and the California agencies.  The Firebaugh and Sumner Peck cases were partially consolidated on May 26, 1992, "for purposes of determining the obligation imposed by the San Luis Act, Public Law 86-488, 74 Stat. 156, on the United States Department of Interior, Bureau of Reclamation, to provide drainage service." Westlands moved to dismiss the case and the federal defendants moved for summary judgment and judgment on the pleadings.  On May 28, 1993, Judge Oliver W. Wanger issued a Memorandum Opinion and Order (the 1993 Wanger Memorandum opinion) regarding the consolidated motions.  Relevant to the case currently before this court, the 1993 Wanger Memorandum opinion granted the federal defendants' motion for judgment on the pleadings regarding the Sumner Peck plaintiffs' inverse condemnation

claims, and found that the district court did not have jurisdiction because the takings claim exceeded $10,000.00.

After determining, in an opinion dated May 17, 1993 that the federal defendants had a statutory duty to provide drainage for the San Luis Unit, Judge Wanger held trial in <u>Firebaugh/Sumner Peck</u> case in August and September 1994 to determine whether that duty had been excused by factual or legal impossibility, the extent of the court's authority to order compliance with any existing duty, and whether the plaintiffs were due monetary relief. Judge Wanger issued his Findings of Fact and Conclusions of Law for the first phase of the trial on December 16, 1994. Judge Wanger determined that "[t]he 1960 San Luis Act required construction of necessary drains to remove salts and salty water from farm soils to maintain productivity." Judge Wanger further determined plaintiffs had a need for the drainage at issue for arability of the land, to dispose of drain water which contains containments and that "[i]f the government were excused from its drainage service obligation, some lands in the drainage service area might be reclassified as 'Class 6' lands, ineligible to receive CVP water." Judge Wanger also defined Westlands Water District as the only member of the San Luis Unit which presently does have drainage service. Judge Wanger made one hundred and thirty-four specific "Findings of Fact," including:

- "There is a need for drainage service in a large area of Westlands Water District (WWD). Drainage service is needed to maintain salt balance within the crop root zone. This need for drainage [in the San Luis Unit service area] has been created in large part by the Bureau's [of Reclamation] deliveries of CVP [Central Valley Project] water to San Luis Unit contractors."

- "The activities funded and undertaken by the Bureau since the mid-1980s have been directed at managing the drainage problem 'in-Valley' by reducing the volume of drainage water. Since the mid-1980s, the Bureau has not undertaken any efforts to complete the San Luis Drain in order to physically remove saline subsurface agricultural drainage water from the drainage service area."

- "The Federal defendants have failed to take necessary steps to provide drainage service for a number of years. The Bureau is unlikely to undertake efforts to provide drainage service unless ordered to do so by the Court."

- "Since May 1993, when the Court issued its order declaring that Section 1(a) of the San Luis Act required completion of a drain, the Bureau has not undertaken activities to complete the drain."

- "The Court finds that the federal agencies that have responsibility for providing drainage to the San Luis United have not effectively addressed

the serious problems of water-logging and salt accumulation that are destroying the plaintiffs' ability to farm their lands in the San Luis Unit."

- "Litigation by plaintiffs over San Luis Unit drainage was settled around 1983. By that settlement, the government had until 1993 to provide its plan for San Luis Unit drainage. It did so only in a December 1993 Report that further defers providing drainage."

- "Based on all of the evidence submitted, completion of the San Luis Drain to the Delta as contemplated by San Luis Act and its legislative history is not foreclosed by factual or legal impossibility."

- "The San Luis Act places the obligation to provide drainage to the San Luis Unit on the United States, not the plaintiffs."

- "In view of the actual, extensive, and continuing harm suffered by plaintiffs in the loss of productivity and value of their farmlands, when balanced against the potential threat to the environment the installation of drainage may have, and in further light of the extensive regulatory protections which will guard against environmental harm, the balance of hardships and the public interest favor injunctive relief for plaintiffs."

- "Plaintiffs are entitled to declaratory and injunctive relief."

Judge Wanger also issued twenty-six "Conclusions of Law." Among other findings, he found that the plaintiffs were entitled to declaratory and injunctive relief because the federal defendants had failed to prove that their statutory duty to provide drainage to the San Luis Unit was excused by "impossibility, supervening illegality, implied repeal or any other reason." Judge Wanger also concluded:

- "The Secretary of the Interior through the Bureau of Reclamation has made the policy decision not to complete the San Luis Drain, in violation of Section 1 of the San Luis Act. This action constitutes agency action unlawfully withheld."

- "The evidence establishes the Bureau will not undertake mandated efforts to provide needed drainage service without order of the Court."

- "By failing to provide drainage for the San Luis Unit in violation of law plaintiffs have been caused irreparable injury . . . ."

- California water law requires the issuance of a waste permit prior to the approval and construction of any drainage facilities.

- "The Federal defendants shall take all reasonable and necessary actions to apply for a discharge permit for the San Luis drain."

- "The Court retains jurisdiction to enforce compliance with this Order."

Judge Wanger declined to issue a more far-reaching order, instead finding that the Bureau of Reclamation "must be provided the opportunity to comply with the law to provide drainage to the San Luis Unit.  The Court will not presume that the Secretary will ignore the obligation identified by these findings."

Subsequently, Judge Wanger entered partial judgment on the consolidated Firebaugh/Sumner Peck case on March 12, 1995 (1995 Partial Judgment), summarized and quoted from his earlier findings and issued the following injunction:

> FURTHER ORDERED that the Secretary of the Interior, the United States Department of Interior, the United States Bureau of Reclamation, and each of them, and their officials and employees, shall, without delay, take such reasonable and necessary actions to promptly prepare, file, and pursue an application for a discharge permit for the San Luis Drain to comply with section 1(a) of the San Luis Act to provide drainage to the San Luis Unit.

(capitalization in original).  Judge Wanger's 1995 Partial Judgment, therefore, ordered the federal government to expeditiously move forward with implementing the original plan for constructing the San Luis Drain and discharging drainage water into the Delta.

On February 10, 1995, the federal defendants appealed Judge Wanger's December 16, 1994 Findings of Fact and Conclusions of Law to the United States Court of Appeals for the Ninth Circuit.  The Ninth Circuit did not issue a decision until February 4, 2000.  On February 4, 2000, the Ninth Circuit agreed with Judge Wanger that the federal defendants had an unexcused statutory duty to provide drainage service to the San Luis Unit service area, and that the Bureau of Reclamation had made a policy decision not to provide drainage service in violation of that statutory duty.  The Ninth Circuit also found, however, that Congress, in legislation subsequent to the San Luis Act of 1960, had granted DOI discretion "in creating and implementing a drainage solution."  By ordering DOI to apply for a discharge permit for the San Luis Drain, the Ninth Circuit found, the district court "preclude[d] other, non interceptor-drain, solutions to the drainage duty created by the San Luis Act."   The Ninth Circuit emphasized:

> The Bureau of Reclamation has studied the problem for over two decades. In the interim, lands within Westlands are subject to irreparable injury caused by agency action unlawfully withheld.  Now the time has come for the Department of Interior and the Bureau of Reclamation to bring the past two decades of studies, and the 50 million dollars expended in pursuing an "in valley" drainage solution, to bear in meeting its duty to provide drainage under the San Luis Act.

The Ninth Circuit, "affirm[ed] the district court's conclusion that the Government must act promptly to provide drainage service, but reverse[d] that part of the judgment that forecloses non-interceptor drain solutions." The Ninth Circuit remanded the case to the district court for further proceedings.

In compliance with the Ninth Circuit's opinion, on December 18, 2000, Judge Wanger modified his March 12, 1995 Partial Judgment to state:

> FURTHER ORDERED that the Secretary of the Interior, the United States Department of the Interior, the United States Bureau of Reclamation, and each of them, and their officials, and employees, shall, without delay, provide drainage to the San Luis Unit pursuant to the statutory duty imposed by section 1(a) of the San Luis Act. The Secretary of the Interior, the United States Department of Interior, the United States Bureau of Reclamation, and each of them, shall no later than January 29, 2001, submit to this court a detailed plan describing the action or actions, whether short term or long term, they will take to promptly provide drainage to the San Luis Unit, which plan shall contain a schedule of dates by which the action or actions described in the plan will be accomplished.

After the Ninth Circuit's decision and Judge Wanger's modification, the Firebaugh/Sumner Peck litigation continued, although, in 2002, two groups of plaintiffs settled with the federal defendants, relieving the government of its duty to provide drainage to approximately 37,000 acres of land in the Westlands.[12] The two groups of plaintiffs, designated the Britz plaintiffs and the Peck plaintiffs, comprised all of the Sumner Peck plaintiffs. The Sumner Peck Ranch, Inc., et al. v. Bureau of Reclamation case, No. CV-F-91-048, was dismissed on March 12, 2003, however, the partially consolidated Firebaugh/Sumner Peck litigation proceeded, with only the Firebaugh plaintiffs pursuing further remedies.

The Firebaugh plaintiffs filed their fifth amended complaint on June 1, 2004, alleging the following claims: 1) continuing negligence, 2) continuing nuisance as to the water districts and as to the federal defendants, 3) continuing trespass, 4) inverse condemnation, 5) a violation of the APA by the federal defendants, and, 6) declaratory relief that the water districts also violated the APA. The fifth amended complaint indicated that claims one and three had been dismissed with prejudice, claim two had been dismissed as against the water districts, and claim four had been transferred to the United States Court of Federal Claims,[13] leaving claims two, five, and six as against

---

[12] The record before this court does not indicate what if anything the Britz plaintiffs received in exchange for settling their claims against the federal defendants.

[13] As described below, on December 16, 2003, the Firebaugh plaintiffs' claim for inverse condemnation was transferred to the United States Court of Federal Claims and the Firebaugh Canal Water District and Central California Irrigation District subsquently filed a transfer complaint in the Court of Federal Claims on January 27, 2004. In Firebaugh Canal Water District, et al. v. United States, No. 03-2790L, the Firebaugh plaintiffs'

the federal defendants, left for resolution by the District Court in the second phase of the litigation.

### The Bureau of Reclamation's Actions From 2001-2009

In order to comply with the Ninth Circuit's ruling and the district court's modified injunction in the Firebaugh/Sumner Peck case, on April 18, 2001, the Bureau of Reclamation issued a "Plan of Action for Drainage to the San Luis Unit Central Valley Project" (2001 Plan of Action), which stated that the Bureau of Reclamation "will initiate immediately a detailed review of all reasonable alternatives for providing drainage service to lands within the San Luis Unit."  The Bureau of Reclamation explained that the review process would involve a Feature Re-evaluation and an environmental review, "result[ing] in a decision on how to proceed with providing drainage service within the San Luis Unit."  The 2001 Plan of Action stated that, while new "innovative and promising techniques" were being explored,

> the only proven technologies that have been identified to date to provide drainage and achieve sustainable salt balance on drainage-affected, irrigated lands in Westlands Water District are disposal of salts out of valley such as through completion and operation of the San Luis Drain, or disposal to evaporation ponds . . . . Whether these methods can be implemented in an affordable or environmentally permissible way remains to be determined, however, and Reclamation cannot prejudge the outcome of the analysis nor predict the ultimate viability of those alternatives.

The 2001 Plan of Action included as an attachment an excerpt of a 1984 report on "Completion of the San Luis Drain Alternative," but indicated that every aspect of possible completion of the San Luis Drain would have to be reevaluated since nearly two decades had passed.  The 2001 Plan of Action included a schedule, listing when certain "milestones" would be completed.  The schedule indicated that formulating alternative options for providing drainage would take twenty months, evaluation of those action alternatives, and the filing of a Draft Environmental Impact Statement would be completed within three years, and issuing a Final Environmental Impact Statement and a Record of Decision would take four years, meaning a Record of Decision could be issued by June 2005.

Between 2001 and 2007, the Bureau of Reclamation appeared to be complying with its Plan of Action, although the process got behind schedule by about two years. Initially, the Bureau of Reclamation issued the "San Luis Unit Drainage Feature Re-evaluation Preliminary Alternatives Report" (2001 Preliminary Alternatives Report) in December 2001.  The 2001 Preliminary Alternatives Report indicated that the Bureau of Reclamation had reviewed previous studies regarding the drainage problems in the San Luis Unit and possible solutions to develop "preliminary options and alternatives" for

---

inverse condemnation claim was dismissed for lack of jurisdiction under 28 U.S.C. § 1500 (2000).

providing drainage service,[14] and had begun to evaluate various action alternatives. The 2001 Preliminary Alternatives Report identified a range of action alternatives that could be pursued in order to provide drainage services to the San Luis Unit, however, limited the proposed alternatives to ones which both met the Firebaugh/Sumner Peck courts' orders and utilized proven technology.  The 2001 Preliminary Alternatives Report stated that "Reclamation is developing and refining alternatives by combining treatment and disposal methods for three drainage service concepts:" in-valley disposal, out-of-valley disposal, and beneficial and/or commercial use.[15]  The 2001 Preliminary Alternatives Report included the following description of each of these three broad concepts and subdivided each concept into sub-alternatives that could be stand-alone action alternatives for providing drainage, or could be combined with other alternatives:

> **In-Valley Disposal:** disposal of drain water and salts in or near the drainage-affected area, possibly with prior treatment to remove selenium or other constituents.
>
> • Drainage based on current irrigation technology going to the evaporation ponds and ultimately disposed in landfills
>
> • Drainage after enhanced irrigation management going to the evaporation ponds and ultimately disposed in landfills
>
> • Drainage after integrated drainage management going to evaporation ponds and ultimately disposed in landfills
>
> • Land retirement with drainage from the remaining acres based on current irrigation technology going to evaporation ponds and ultimately disposed in landfills
>
> • Drainage based on current irrigation technology with disposal of drainage using deep well injection

---

[14] The 2001 Preliminary Alternatives Report stated that, "drainage service is defined as removing water from irrigated fields to maintain long-term, sustainable salt and water balance in the root zone of irrigated lands."

[15] Although the Out-of-Valley Disposal approach had been abandoned as a viable option for managing drainage waters in the early 1990s, it was reintroduced in the 2001 Preliminary Alternatives Report.  The "beneficial and commercial use" concept appears to be a new approach not previously discussed by the Bureau of Reclamation prior to 2001.

**Out-of-Valley Disposal:** transport of drain water to the Pacific Ocean, Delta, or San Joaquin River, possibly with treatment to remove selenium or other constituents.

• Delta

    o  Drainage based on current irrigation technology going to selenium treatment and ultimate disposal in the Delta

    o  Drainage after enhanced irrigation management going to selenium treatment and ultimate disposal in the Delta

    o  Drainage from integrated drainage management going to selenium treatment and ultimate disposal in the Delta

• Ocean Disposal

    o  Drainage based on current irrigation technology with ultimate disposal going to the Ocean

    o  Drainage after enhanced irrigation management with ultimate disposal going to the Ocean

    o  Drainage from integrated drainage management with ultimate disposal going to the Ocean

    o  Land retirement with drainage from the remaining acres using current irrigation technology with ultimate disposal going to the ocean

**Beneficial and/or Commercial Use:** use of treated drain water for irrigation, municipal, or other uses and potential commercial use of removed salts.

• Drainage based on current irrigation technology going through reverse osmosis treatment with the brine to evaporation ponds and ultimately disposed inland fills

• Drainage based on enhanced irrigation management going through reverse osmosis treatment with the brine to evaporation ponds and ultimately disposed in landfills and the clean product water going to a beneficial use

• Drainage from integrated drainage management going through reverse osmosis with the brine to evaporation ponds and ultimately disposed in landfills and the clean product water going to a beneficial use

• Land retirement with drainage from the remaining acres using current irrigation technology going through reverse osmosis treatment with the brine to evaporations and ultimately disposed in landfills and the clean product water going to a beneficial use

• Drainage from integrated drainage management going through reverse osmosis treatment with the brine to evaporation ponds, with the dried salts going to a beneficial use and the clean product water going to a beneficial use

(emphasis in original).  Each of these alternatives was evaluated for effectiveness and cost.  The 2001 Preliminary Alternatives Report explained that, through 2002, the Bureau of Reclamation would "evaluate and refine the preliminary alternatives identified in this Report," and that in 2003 and 2004, the Bureau of Reclamation would "complete detailed evaluation of the alternatives."

One year later, in December 2002, the Bureau of Reclamation issued the "San Luis Drainage Feature Re-Evaluation Plan Formulation Report" (the 2002 Re-Evaluation Plan Formulation Report), which narrowed the set of action alternatives for providing drainage services that were being evaluated by the Bureau of Reclamation to five, including a no action alternative.  The 2002 Re-Evaluation Plan Formulation Report began by describing four "Major Findings" that formed the basis of the agency's evaluation of the four action alternatives, as follows:

• By 2050, approximately 379,000 acres would need drainage service (343,000 acres in the Unit and 36,000 acres in the Northerly Area outside the Unit).

• Cost-effective, on-farm and in-district drainwater reduction measures and regional drainwater reuse could reduce drainage volumes by nearly 80 percent.

• For land retirement scenarios, it appears that the expected costs of purchasing and retiring lands is greater than the cost of providing drainage service to these lands.

• Implementing any drainage service plan would require further congressional action to increase the authorized appropriation cap under the San Luis Act.

The 2002 Re-Evaluation Plan Formulation Report described the "drainage study area" being evaluated by the Bureau of Reclamation as consisting primarily of the San Luis Unit, which encompassed the entire Westlands, as well as several other water districts, but also an adjacent area called the Grasslands Drainage Area, which was included "because the [Grasslands Drainage Area's] drainage systems are closely interrelated

with the lands in the [San Luis] Unit and Section 5 of the San Luis Act authorizes participation of adjacent lands in San Luis Unit drainage facilities."[16]   The 2002 Re-Evaluation Plan Formulation Report stated that the Bureau of Reclamation had developed four action alternatives for providing drainage services, and also examined a No Action Alternative.  The 2002 Re-Evaluation Plan Formulation Report expanded on the 2001 Preliminary Alternatives Report and the four action alternatives in the 2002 Re-Evaluation Plan Formulation Report included: an In-Valley Disposal Alternative, an Ocean Disposal Alternative (Point Estero), and two Delta Disposal Alternatives (Chipps Island and Carquinez Strait).  The four action alternatives involved several common elements, including on-farm measures, such as drainwater recycling, groundwater management, and seepage reduction, as well as land retirement, drainwater collection, regional reuse facilities, and drainwater treatment and disposal.

The In-Valley Alternative "include[d] a drainwater collection system, regional drainwater reuse facilities, selenium treatment, reverse osmosis treatment for the Northerly Area, and evaporation ponds for salts disposal."  For the In-Valley Alternative, drainwater from the Northerly Area would be conveyed to a proposed treatment plant, where reverse osmosis would be used to remove salts and other contaminants, leaving clean water that could then be blended with California Valley Project water and used again for crop irrigation.  Drainwater from the Westlands would be collected in a closed regional collection system and then used to irrigate salt tolerant crops.  After reuse, drainwater from the Westlands would be sent to a selenium treatment facility, where it would be put into aerated lagoons and treated for "biological removal of selenium."  The treated drainwater then would be conveyed to two regional evaporation ponds, where the water would be evaporated off and any salt precipitates would "require periodic excavation and burial of accumulated salts."

The Ocean Disposal Alternative and the two Delta Disposal Alternatives differed from the In-Valley Alternative in that drainwater from both the Westlands and the Northerly Area would be collected and reused to irrigate salt tolerant crops, but would then be transported by pipeline to either the ocean or the Sacramento-San Joaquin

---

[16] The 2006 Final Environmental Impact Statement, addressed below, indicated that the 2002 Re-Evaluation Plan Formulation Report also subdivided the drainage study area into the Westlands Water District and the Northerly Area.  The Northerly Area included all of the Grasslands Drainage Area.  The Westlands was further broken down into three sub-units, north, central, and south.  While maps in the 2002 Re-Evaluation Plan Formulation Report reflect the divisions between the Westlands, Northerly Area, and Grasslands Drainage Area, the portion of the 2002 Re-Evaluation Plan Formulation Report provided to the court does not lay out the above description of the drainage study area, nor does it indicate that the Westlands had been sub-divided into three sub-units for the purposes of the Bureau of Reclamation's study of drainage needs in the San Luis Unit.  The court, therefore, is unclear on where the boundary lines are for each of these areas within the Westlands and where plaintiffs' property falls within these sub-units.  This is problematic because, as discussed below, the Bureau of Reclamation's drainage strategy eventually was broken down by sub-units.

River Delta for disposal.  In addition, the Bureau of Reclamation indicated it was required by statute[17] to evaluate a No Action Alternative, which examined what conditions would exist if no additional drainage service were provided to the San Luis Unit between 2001 and 2050.

Based on these findings, the 2002 Re-Evaluation Plan Formulation Report stated that the Bureau of Reclamation had identified the In-Valley Alternative as the "Proposed Action" for providing drainage services because it "has the lowest cost, the shortest time to implement, greatest flexibility to adjust to new technology or changing conditions, and fewest potential impacts to aquatic resources."  The 2002 Re-Evaluation Plan Formulation Report indicated that the next steps were for the Bureau of Reclamation to publish an Environmental Impact Statement to evaluate the environmental effects of various alternatives for providing drainage service.  The Bureau of Reclamation planned to release a Draft Environmental Impact Statement by June 2005 and a Final Environmental Impact Statement by June 2006, but also intended to begin work on acquiring the necessary permits for the In-Valley Alternative in January 2003 "due to the long lead time required for permitting such a complex project and the need to provide prompt drainage service."

In July, 2004, however, the Bureau of Reclamation changed course and, rather than moving forward with the environmental analysis of the five action alternatives described in the 2002 Re-Evaluation Plan Formulation Report, issued an Addendum to the 2002 Re-Evaluation Plan Formulation Report (the 2004 Addendum).  The 2004 Addendum explained that, in May 2003, stakeholders in the region, including several water districts, put forth the Westside Regional Drainage Plan.  The Westside Regional Drainage plan called for implementation of a mix of water management methods, including land retirement[18] of up to 200,000 acres.  The 2004 Addendum stated that, based on this input from local organizations and stakeholders, the Bureau of Reclamation had decided to "expand[] the scope of the San Luis Drainage Feature Re-evaluation . . . to include land retirement among the alternatives for providing drainage service."  The 2004 Addendum indicated that the Bureau of Reclamation had submitted to the Firebaugh/Sumner Peck court an "Amended Plan of Action for Drainage to the San Luis Unit," which stated that the Bureau of Reclamation would "continue to refine and evaluate all five alternatives described in the PFR [2002 Re-Evaluation Plan Formulation Report] for inclusion in the EIS [Environmental Impact Statement]," but that the Bureau of Reclamation would also "formulate alternative(s) that use land retirement as a method to control drainage . . . ."  Although the original 2002 Re-Evaluation Plan Formulation Report had stated as one of its "Major Findings" supporting its evaluation of various action alternatives that, "[f]or land retirement scenarios, it appears that the

---

[17] The Plan Formulation Report stated: "The No Action Alternative is required under the National Environmental Policy Act (NEPA) [, Pub. L. 91-190, § 2, 83 Stat. 852 (1970),] and is formulated to provide a comparative baseline for evaluation of drainage service alternatives in the upcoming EIS [Environmental Impact Statement]."

[18] The 2004 Addendum defined land retirement as "a measure that removes land from irrigated agricultural production."

expected costs of purchasing and retiring lands is greater than the cost of providing drainage service to these lands," the 2004 Addendum reversed that basic assumption and made land retirement a major component of the Bureau of Reclamation's approach to managing drainage in the San Luis Unit.

According to the 2004 Addendum, the Bureau of Reclamation had developed and selected three land retirement alternatives for evaluation in the Environmental Impact Statement.   Under each of the three land retirement alternatives, designated amounts of land, ranging from 92,600 acres to 308,000 acres, would be retired or taken out of agricultural production.     For the land remaining in agricultural production, drainwater would be collected, treated, and disposed of in the same manner provided for under the In-Valley Alternative described in the original 2002 Re-Evaluation Plan Formulation Report, using a drainwater collection system, regional drainwater reuse facilities, selenium treatment, reverse osmosis treatment for the Northerly Area, and evaporation ponds for salts disposal. Because all three land retirement alternatives built upon the In-Valley Alternative, all three were labeled "In-Valley/Land Retirement" alternatives.  The In-Valley/Groundwater Quality Land Retirement Alternative called for retiring all lands in the Westlands with a selenium concentration above a certain measurement, which totaled 92,600 acres, while remaining drainage-impaired lands would be provided with drainage service.  The In-Valley/Water Needs Land Retirement Alternative "would retire enough lands to balance internal water use needs of the San Luis Unit (194,000 acres)," while remaining drainage-impaired lands would be provided with drainage service.  The In-Valley/Drainage-Impaired Area Land Retirement Alternative called for retiring all drainage-impaired lands in the Westlands, which totaled 308,000 acres.      Under the In-Valley/Drainage-Impaired Area Land Retirement Alternative, "[w]ater made available from this alternative would exceed the agricultural water demand by the remaining lands within the Unit, and would be available for reallocation to other purposes."    The three In-Valley/Land Retirement Alternatives addressed in the 2004 Addendum were added to the five alternatives identified in the original 2002 Re-Evaluation Plan Formulation Report, the In-Valley Disposal Alternative, Ocean Disposal Alternative, two Delta Disposal Alternatives, and No Action Alternative, none of which involved a land retirement component, for evaluation of environmental impact in the Bureau of Reclamation's Environmental Impact Statement.

The Bureau of Reclamation's Draft Environmental Impact Statement was issued in May 2005, and "provide[d] information on the environmental effects of seven action alternatives for providing drainage service to the San Luis Unit (the Unit)," as well as a No Action Alternative, "and provide[d] the public and interested agencies an opportunity for review and comment." (brackets in original).  The 2005 Draft Environmental Impact Statement concluded that one of the three In-Valley/Land Retirement Alternatives, or some combination of in-valley disposal and land retirement, would be the Bureau of Reclamation's Preferred Action Alternative because they were the most flexible alternatives and also had the greatest net economic benefit.   The 2005 Draft Environmental Impact Statement indicated that the public would be given sixty days to review the report, after which time the Bureau of Reclamation would issue a Final Environmental Impact Statement.   The 2005 Draft Environmental Impact Statement

explained that the Bureau of Reclamation would identify a Preferred Alternative in the Final Environmental Impact Statement, however, a final decision regarding which alternative should be implemented would not be made until a Record of Decision was issued.

The Bureau of Reclamation did not issue the Final Environmental Impact Statement until May 2006, more than ten months after the sixty-day period previously announced by the Bureau in the 2005 Draft Environmental Impact Statement. The 2006 Final Environmental Impact Statement offered an explanation for two of the months of delay, indicating that the public comment period on the Draft Environmental Impact Statement had been extended from July 2005 to September 2005 because of the amount of public feedback. The 2006 Final Environmental Impact Statement stated: "The entire drainage study area (including the lands to the north and outside of the Unit, 40,440 acres) totals approximately 730,000 acres. Of these 730,000 acres, approximately 379,000 acres[19] would be drainage-impaired and constitute the drainage service area." The 2006 Final Environmental Impact Statement described each of the action alternatives assessed, beginning with elements that were common to all evaluated alternatives. Under each alternative, the federal government would construct the following facilities, although their size and the volume of drainwater processed through them varied with each alternative: 1) a closed collection system to collect and convey drainwater from on-farm tile drains to regional reuse facilities, 2) Firebaugh Sumps,[20] which would collect water and be connected to a proposed Delta-Mendota Canal, a pipeline system that would convey water from the sumps to the Northerly Area reuse facility, and 3) sixteen regional reuse facilities, where water would be used to irrigate more salt-tolerant crops and then reused drainwater would be collected and conveyed either to a treatment facility or a disposal facility.

The 2006 Final Environmental Impact Statement indicated that the Bureau of Reclamation had selected the In-Valley/Drainage-Impaired Area Land Retirement Alternative as its Preferred Alternative for providing a drainage solution. As indicated

---

[19] The 2006 Final Environmental Impact Statement provided a chart breaking down the location of the 379,000 acres within the drainage study area, as follows:

| Districts | Area (acres) |
|---|---|
| Westlands North | 102,000 |
| Westlands Central | 104,000 |
| Westlands South | 92,000 |
| **Subtotal** (Westlands Water District) | 298,000 |
| Northerly San Luis Unit Districts | 45,000 |
| Northerly Area Outside of San Luis Unit | 36,000 |
| **Subtotal** (Northerly Area) | 81,000 |
| **Total** | **379,000** |

[20] A sump is pit that collects water, and the Final Environmental Impact Statement indicates that in 2006 there were existing sumps in the Firebaugh water district region.

above, the In-Valley/Drainage-Impaired Area Land Retirement Alternative called for retiring 308,000 acres, all of the drainage-impaired lands in the Westlands, meaning "[d]rainage collection, treatment, and disposal facilities would not be needed in the Westlands drainage-impaired areas," but only in drainage-impaired area in the Northerly Area.  The 2006 Final Environmental Impact Statement indicated that, in addition to the common elements described above, the In-Valley/Drainage-Impaired Area Land Retirement Alternative would involve construction of one selenium treatment plant in the Northerly Area.  Drainwater from the Northerly Area reuse facility would be conveyed to the selenium treatment plant, treated for selenium removal, and then waste water from the plant would be discharged to an evaporation basin also located in the Northerly Area.  The 2006 Final Environmental Impact Statement estimated that the facilities for the In-Valley/Drainage-Impaired Area Land Retirement Alternative could be completed by 2009, and that the cost would be $857,500,000.00.  According to the Bureau of Reclamation's analysis, the In-Valley/Drainage-Impaired Area Land Retirement Alternative was "the alternative with the greatest net benefit (benefits minus costs) to the United States as a whole."

The 2006 Final Environmental Impact Statement also recognized the In-Valley/Water Needs Land Retirement Alternative as "having distinct advantages."  The 2006 Final Environmental Impact Statement stated: "The In-Valley/Water Needs Land Retirement Alternative would retire lands such that the water needs of the lands remaining in production could be met by the Unit's foreseeable water supply from its CVP contracts and groundwater resources," estimated at 194,000 acres. Under the In-Valley/Water Needs Land Retirement Alternative, the lands remaining in agricultural production would be divided up into four areas: the Northerly Area, the Westlands North area, the Westlands Central area, and the Westlands South area.  Like all of the other action alternatives, the In-Valley/Water Needs Land Retirement Alternative would include a collection system, the Firebaugh Sumps/Delta-Mendota Canal feature, and sixteen regional reuse facilities, but in addition it would include four reverse osmosis treatment plants and four selenium treatment plants, one of each for each of the four drainage areas.  Reused drainwater from the sixteen regional reuse facilities would be conveyed to the four reverse osmosis treatment plants, where the drainwater would be treated "to produce high-quality product water that could be blended with CVP water for irrigation."  The "concentrate stream" leftover after the reverse osmosis process would be conveyed to the four selenium treatment plants for selenium removal and then to evaporation basins in each of the four drainage areas for disposal.  The 2006 Final Environmental Impact Statement estimated that the facilities for the In-Valley/Drainage-Impaired Area Land Retirement Alternative could be completed by 2010 and that the cost would be $773,100,000.00. The 2006 Final Environmental Impact Statement indicated that the Bureau of Reclamation would wait at least thirty days and then complete a Record of Decision, stating the action that would be implemented.

In March 2007, two years after the Bureau of Reclamation's earlier proposed schedule, the Bureau of Reclamation issued a Record of Decision, indicating that the Bureau of Reclamation had chosen the In-Valley/Water Needs Land Retirement Alternative as the action alternative that would be implemented to meet defendant's

statutory duty to provide drainage to the San Luis Unit, despite the fact that the 2006 Final Environment Impact Statement had concluded that the In-Valley/Drainage-Impaired Land Retirement Alternative was the Preferred Alternative.[21]   The 2007 Record of Decision explained that the In-Valley/Water Needs Land Retirement Alternative was selected over the In-Valley/Drainage-Impaired Land Retirement Alternative, despite the fact that the latter was the environmentally preferred plan in the 2006 Final Environmental Impact Statement, because: 1) the In-Valley/Water Needs Land Retirement Alternative would retain 100,000 more acres of land for continued agricultural production which would retain more farm jobs in small Central Valley communities with high unemployment, 2) it was the closest alternative to the Westside Regional Drainage Plan put forth by local stakeholders and "more likely deemed to constitute 'drainage service' as required under the Court Order," and 3) it would still retire enough land to balance water needs for lands remaining in agricultural production.

The 2007 Record of Decision stated that the selected alternative would meet the requirements in Judge Wagner's decision in Firebaugh/Sumner Peck, and affirmed by the Ninth Circuit, but that "[i]mplementation of this Project would likely require new authorizing legislation to increase the appropriations ceiling for funding beyond what was authorized by the San Luis Act . . . ."  According to the 2007 Record of Decision, the Bureau of Reclamation was in the process of finalizing cost estimates to confirm whether new legislation would be required, and if new legislation was required, the Bureau of Reclamation indicated it would be required to develop a legislative proposal for Congress.  According to the 2007 Record of Decision, construction of the necessary facilities would proceed in phases with initial construction beginning in the Northerly Area, while

> [i]n Westlands, the land retirement component will be implemented and initial construction efforts will focus on the collection and reuse components. While proceeding simultaneously with the Northerly Area, implementation of the Westlands components will take longer because no significant drainage system currently exists in Westlands and the drainage system will extend over a large area.

The 2007 Record of Decision did not include a schedule for implementing the chosen drainage alternative, but instead simply indicated that the Bureau of Reclamation was in the process of finalizing cost proposals and that implementation would likely require appropriation of additional funds by Congress and apportionment of such funds by the Office of Management and Budget.

The existing contract for water delivery between the United States and Westlands expired in 2007, and, therefore, in December 2007, the two parties signed a new Interim Contract (the 2007 Interim Contract).   The 2007 Interim Contract provided that the United States would continue to deliver water to Westlands until 2010, at which

---

[21] The 2007 Record of Decision noted that the In-Valley/Drainage-Impaired Land Retirement Alternative was the Preferred Alternative because it "requires the least amount of evaporation ponds and associated treatment systems."

point the contract could be renewed at the request of Westlands.  The 2007 Interim Contract reiterated that the United States "intends, to the extent appropriated funds are available, to develop and implement effective solutions to drainage problems in the San Luis Unit," and that "such drainage solutions may involve actions not originally contemplated and/or the construction or use of facilities, other than the San Luis Drain."

Once the Bureau of Reclamation issued its 2007 Record of Decision identifying the In-Valley/Water Needs Land Retirement Alternative as the action alternative to be implemented, a new feasibility study on the San Luis Drainage Feature was required in order to "determine if the proposed action is feasible and warrants Federal implementation."  The Bureau of Reclamation issued a new Feasibility Report titled, "The San Luis Drainage Feature Re-Evaluation," in March 2008 (the 2008 Feasibility Report), and transmitted the 2008 Feasibility Report to Congress on July 8, 2008.  The 2008 Feasibility Report "re-examine[d] the Federal interest" in implementing a drainage solution in the San Luis Unit, and estimated the costs of doing so.  The 2008 Feasibility Report stated that about 379,000 out of 730,000 acres in the western San Joaquin Valley were "drainage-impaired," but that the Bureau of Reclamation projected installation of sub-surface drainage systems in two-thirds of the area within a fifty-year period would maintain all 379,000 acres as arable farmlands.  The 2008 Feasibility Report evaluated both the In-Valley/Drainage-Impaired Land Retirement Alternative, identified as the environmentally preferred action alternative in the 2006 Final Environmental Impact Statement, and the In-Valley/Water Needs Land Retirement Alternative, the alternative selected in the 2007 Record of Decision.

The 2008 Feasibility Report explained that "Federal interest is established either by legislation or through an evaluation of a proposed action relative to the agency's mission" and that, to be federally implementable, an action "must be feasible as defined by the *Economic and Environmental Principles and Guidelines (Principles and Guidelines).*  The *Principles and Guidelines* require Federal actions contribute to the national economic development (NED)."  The 2008 Feasibility Report continued:

> The San Luis Act of 1960 as amended establishes the Reclamation's Federal interest in the proposed action. This interest was reaffirmed by the Federal District Court Order dated November 29, 2000.
>
> However, the requirement for a net positive contribution to the Nation's economy cannot be met by either of the two action alternatives.

The 2008 Feasibility Report concluded that although the Bureau of Reclamation's proposal was mandated by statute and court order, the action alternative selected by the Bureau was not appropriate for implementation according to the government's own accepted standards.  The 2008 Feasibility Report also recommended the adoption of legislation in order to implement the action alternative selected by the Bureau of Reclamation.

The 2008 Feasibility Report addressed the costs and time-frame for implementing both the In-Valley/Drainage-Impaired Land Retirement Alternative and the In-Valley/Water Needs Land Retirement Alternative, respectively.  According to the 2008 Feasibility Report, the San Luis Unit had been authorized with two appropriation ceilings which, combined, totaled $428,674,777.00.[22]  The estimated cost of the In-Valley/Drainage-Impaired Land Retirement Alternative in 2008 was estimated at $2.24 billion, while the estimated cost of the In-Valley/Water Needs Land Retirement Alternative in 2008 was estimated at $2.69 billion, meaning that either alternative would significantly exceed the cost ceiling.  The Bureau of Reclamation predicted that it would take approximately six years to complete construction of the first phase of the In-Valley/Drainage-Impaired Land Retirement Alternative in the Northerly Area and that, after a five-year monitoring period, a second construction phase would be initiated.  The In-Valley/Water Needs Land Retirement Alternative would take approximately ten years to construct because it involved facilities in both the Northerly Area and Westlands and that, after a one-year monitoring period,[23] a second phase of facilities could be implemented.

The 2008 Feasibility Report further described why the Bureau of Reclamation had determined that neither the In-Valley/Drainage-Impaired Land Retirement Alternative nor the In-Valley/Water Needs Land Retirement Alternative were feasible, first defining feasibility as follows:

> Project feasibility consists of four parts–technical, environmental, economic, and financial. Technical feasibility consists of engineering, operations, and constructability analyses verifying that the project can be constructed, operated, and maintained. Environmental feasibility consists of analyses verifying that constructing or operating the project will not result in unacceptable environmental consequences to endangered species, cultural, Indian trust, or other resources. Economic feasibility consists of analyses verifying that constructing the project is an economically sound investment of capital (i.e., that the project would result in positive net benefits or the project's benefits would exceed the costs). Financial feasibility consists of (1) an allocation of costs to project purposes, (2) determination of reimbursable and non-reimbursable costs, (3) commitment on the part of project beneficiaries to pay the reimbursable costs, and (4) a determination of project beneficiaries' ability to pay their allocated costs, including capital costs and long-term operation, maintenance, and replacement costs.

---

[22] As indicated above, the San Luis Act allocated two different dollar values for the water delivery facilities and the distribution and drainage system, $290,430,000.00 and $192,650,000.00, respectively, which total $483,080,000.00.  In addition, the 1977 Act raised the appropriations ceiling for the drainage system by $31,050,000.00, to a total of $223,700,000.00, in combination with the San Luis Act.

[23] The 2008 Feasibility Report did not explain why the monitoring periods were different for the two alternatives.

The 2008 Feasibility Report indicated that both the In-Valley/Drainage-Impaired Land Retirement Alternative and the In-Valley/Water Needs Land Retirement Alternative were considered "technically feasible, constructible, and can be operated and maintained," and also considered environmentally feasible.  The 2008 Feasibility Report, however stated, "[n]either action alternative is economically feasible," "and do not justify warrant [sic] the expenditure of Federal funds." The Bureau of Reclamation acknowledged that the No Action Alternative failed to comply with the <u>Firebaugh/Sumner Peck</u> court's Order.

The 2008 Feasibility Report recommended implementing  the In-Valley/Water Needs Land Retirement Alternative, the same alternative selected in the 2007 Record of Decision, despite 2008 Feasibility Report's conclusion of lack of economic and financial feasibility.   The 2008 Feasibility Report detailed the steps "it would require to" implement the In-Valley/Water Needs Land Retirement Alternative, including: 1) amend the 1960 San Luis Act to designate the In-Valley/Water Needs Land Retirement Alternative as a distribution systems and drains component of the San Luis Unit and increase the construction cost ceiling for the distribution systems and drains by $2.69 billion, 2) provide relief from the Reclamation Extension Act of 1914, (the Act of Aug. 13, 1914, 38 Stat. 686) which requires full payment of the operation and maintenance costs for water delivery and authorize federal appropriations to cover the portion of operation and maintenance costs related to implementation of the In-Valley/Water Needs Land Retirement Alternative that affected water districts would be unable to pay, 3) authorize the Secretary of Interior to defer, without interest, payments of capital and operation and management costs associated with implementation of the In-Valley/Water Needs Land Retirement Alternative until the Secretary determines that repayment is not unduly burdensome for water users, and 4)  direct the Secretary of Interior to keep separate accounts of the capital, operation and management costs associated with implementation of the In-Valley/Water Needs Land Retirement Alternative, versus capital and operation and management costs incurred to construct and operate and implement the In Valley/Water Needs Land Retirement Alternative and the pre-existing Central Valley Project facilities.  The 2008 Feasibility Report indicated that the action alternative selected by the Bureau of Reclamation, after a six-year evaluation process, was extremely problematic because it was too expensive for the water districts to afford to repay the federal government, as required by the San Luis Act, and the Bureau itself found that it did not "justify warrant [sic] the expenditure of Federal funds."

### Developments From 2009 and 2012

On July 22, 2009, Judge Wanger issued a Scheduling Conference Order in the <u>Firebaugh/Sumner Peck</u> case, and indicated his frustration at the slow pace of the federal defendants' implementation of drainage services.    The Order indicated that the federal defendants had reported at a recent status conference that the changeover in administrations meant that a new Secretary of Interior and other relevant appointees had recently taken office, and that federal defendants were unprepared to provide a current report on implementation of drainage service to the San Luis Unit.  The court

ordered the federal defendants to provide within ninety days, "a report to the Court identifying what specific actions will be taken to provide drainage to the San Luis Unit and a specific time table to implement drainage."   Judge Wanger's Order stated: "The parties have been provided notice that no further delay shall be permitted in this case and that in the event the Federal Defendants continue to fail and refuse to provide the drainage long ago ordered by the Courts, this case shall proceed to an enforcement of judgment stage."

The federal defendants' timely filed, required report stated that defendants "have identified specific actions for providing drainage service within the San Luis Unit that can be implemented during federal fiscal year 2010," and which "can be funded, in whole or in part, by Reclamation."   Those measures included "a project to treat contaminated groundwater within Westlands," and a suite of water conservation projects designed to reduce and manage drainage source water, which together were estimated to cost $7.2 million. In addition, the Bureau of Reclamation reported that it was continuing efforts to provide drainage service to the Northerly Area and had allocated $6.4 million to fund projects in that area.   The federal defendants' report said, however, that the federal defendants' proposals for implementation of drainage services after 2010 would require appropriations from Congress.   The report indicated that Congress had so far "not acted on the Feasibility Report recommendations, and it is unclear when congressional action on the Feasibility Report is likely."   The federal defendants stated that the Bureau of Reclamation would "seek appropriations in future years through the annual federal budget process," and proposed to keep the court informed about their progress through periodic status reports.   The federal defendants' report to Judge Wanger also indicated that negotiations between the various interested parties to find an alternative solution to the drainage problems had failed.   The federal defendants' report indicated that officials at DOI had drafted legislation and were "actively engaged in evaluating the draft legislation and expect to continue discussions with the affected parties this fall, with a goal of finalizing the elements of a proposal that the Administration can support by the end of this calendar year."

Between November 2009 and April 2012, the Firebaugh/Sumner Peck parties submitted status reports to the court every six months, detailing what steps were being taken toward resolution of the drainage issue.  In the parties' November 18, 2009 status report, the federal defendants indicated that the Bureau of Reclamation would "commence implementation of Reclamation's Record of Decision" by taking steps to provide drainage service to one sub-unit of the Westlands, the northern sub-unit.   The federal defendants stated in their November 18, 2009 status report status report that the Bureau of Reclamation could construct "fully functional, self-sustaining drainage service facilities within existing appropriations ceilings" for the northern sub-unit of the Westlands.   An attached Control Schedule indicated that those facilities could be completed by 2018.  Although the defendant's portion of the November 18, 2009 status report status report indicated it would develop a legislative proposal on a long-term drainage strategy and seek additional appropriations, the status report did not mention what would be done to implement drainage service in the rest of the Westlands or San Luis Unit service area.  Because the Westlands would be required to repay the federal

government for construction and operation and maintenance of any drainage facilities, the status report indicated that the Bureau of Reclamation would initiate negotiations of a repayment contract with Westlands.   In addition to those actions, the federal defendants stated that they would finalize a legislative proposal on a long-term drainage solution by the end of 2009.

The Westlands and the United States renewed their contract for water services on February 26, 2010.  The 2010 Interim Renewal Contract stated that the parties "have made significant progress in their negotiations of a long-term renewal contract . . . and mutually commit to continue to negotiate to seek to reach agreement, but anticipate that the environmental documentation necessary for execution of any long-term renewal contract will be delayed until March 2011."   Therefore, the 2010 Interim Renewal Contract would be effective through February 29, 2012, and could be renewed if a long-term renewal contract was not executed before that date.

On April 1, 2010, the federal defendants in the Firebaugh/Sumner Peck litigation filed another status report with the court. The federal defendants stated that steps toward construction of drainage facilities in the northern sub-unit of the Westlands were being taken, including efforts to secure appropriations from Congress, commencement of site-specific and regulatory activities needed to begin construction, and negotiations of a repayment contract with Westlands. The April 1, 2010 status report also indicated that the Bureau of Reclamation had finalized a legislative proposal on a long-term drainage strategy that it would discuss with local authorities, and then transmit to Congress.

On September 1, 2010, the Bureau of Reclamation transmitted its finalized legislative proposal to Congress via a letter from the Bureau of Reclamation's Commissioner, Michael L. Connor to Senator Dianne Feinstein (the 2010 Connor Letter).  The 2010 Connor Letter provided a brief summary of the history of attempts to implement drainage services for the San Luis Unit, and indicated that "the Department remains committed to working with you in the advancement of a long term solution to drainage in the unit and water supplies in California."   The 2010 Connor Letter also stated that the Bureau of Reclamation had indicated to the Firebaugh/Sumner Peck court that although the Bureau of Reclamation would be able to construct drainage facilities in the northern sub-unit of the Westlands, beyond that sub-unit, the Bureau of Reclamation would need "additional Congressional authorization."[24]

The 2010 Connor Letter indicated that, in 2007 and 2008, the affected parties had worked on a legislative proposal, but that they were unable to come up with a consensus draft bill and that "there appears to be no consensus among the groups as to the appropriate path forward."   Therefore, in the 2010 Connor Letter the Bureau of

---

[24] Although the 2010 Connor Letter to Senator Feinstein indicated that in the November 2009 status report to the Firebaugh/Sumner Peck court beyond "construction of a fully functional self-sufficient subunit, "the Department [of the Interior] will be unable to proceed without additional Congressional authorization," the defendant's words in that report were not quite so explicit.

Reclamation offered its own long-term legislative strategy.  The 2010 Connor Letter indicated that an approach was necessary that would promote continued sustainable agricultural activity, improve environmental quality, and increase the reliability of water supply to the Central Valley of California "by providing for locally-controlled, timely, and effective irrigation drainage management in the Unit . . . ."  The Bureau of Reclamation then stated: "We believe that the best way to accomplish those goals is to transfer responsibility for irrigation drainage to local control, subject to state and local regulation, and to provide corresponding adjustments in financial obligations or otherwise provide financial incentives to the districts."

The 2010 Connor Letter went on to lay out thirteen "key elements of a long-term legislative drainage strategy . . . that the Administration would support in legislation," which summarized, and included among others the following: 1) "**Transfer irrigation drainage responsibility to local control:** Drainage service should be the responsibility of the individual Unit contractor pursuant to a drainage management plan that complies with applicable state and federal standards."  (emphasis in original).  Other key elements mentioned in the 2010 Connor Letter included, but were not limited to: 2) requiring water districts to prepare a comprehensive drainage management plan, 3) directing the Bureau of Reclamation to stop delivery of Central Valley Project water to the water districts unless they met certain performance goals, 4) requiring Westlands to permanently retire a minimum of 200,000 acres of the most drainage impaired lands as part of the required drainage management plan, 5) decreasing the amount of Central Valley Project water delivered to the Westlands after the 200,000 acres had been retired, 6) reducing, relieving or reforming some of the water districts' remaining payment and repayment obligations to the federal government for existing Central Valley Project facilities in light of the districts assuming upfront responsibility for drainage management, 7) recognizing the potential changes to water supply reliability and environmental requirements that may result from the Bay Delta Conservation Plan, 8) passing legislation which makes clear that there is no liability for the United States if the full amount of contracted water cannot be made available, 9) ending the ongoing litigation between the water districts, residents, and the federal government with the legislation that "must require that the Unit contractors and exchange contractors waive any past, current, or future drainage claims against the U.S.," and 10) possibly transferring title of federally owned water facilities to the water districts.  The 2010 Connor Letter indicated that, while affected stakeholders continued to meet to discuss a long-term legislative strategy, "[t]here continues to be no consensus among the groups as to the appropriate path forward."  The Bureau of Reclamation felt, however, that the long-term strategy outlined in the 2010 Connor Letter "represent[s] a reasonable approach for providing long-term drainage service to the CVP [Central Valley Project] Unit . . . ."

In their October 1, 2010 and April 1, 2011 status reports to the court, the <u>Firebaugh/Sumner Peck</u> federal defendants indicated that they were complying with the Control Schedule, submitted to the court in November 2009, for building drainage facilities in the northern sub-unit of the Westlands.

On April 7, 2011, Westlands' General Manager, Thomas Birmingham sent Senator Feinstein a letter responding to those issues and to the Department of Interior's 2010 Connor Letter (the 2011 Birmingham Letter).  The 2011 Birmingham Letter began by stating that the "Westlands Water District does not support and would vigorously oppose legislation along the lines described by Commissioner Connor."  After a brief history of the controversy and litigation surrounding the San Luis Drain, the 2011 Birmingham Letter continued, "[p]rior to adoption of the Record of Decision, Reclamation approached Westlands about the potential of finding alternative means of addressing the San Luis Unit drainage issue because it had become apparent to Reclamation that it would cost in excess of $2.6 billion to implement the alternative that it was likely to adopt."  The 2011 Birmingham Letter indicated that Westlands and the other water districts agreed to engage in a collaborative process with the Bureau of Reclamation to develop a proposal for contractor managed drainage service, and not the federal government.  According to the 2011 Birmingham Letter, a proposal was negotiated, which, dependent on certain conditions, called for each San Luis contractor to assume the obligation for drainage service in its service area, and to relieve DOI from any further obligation to provide drainage service.  When this proposal was made public, however, according to the 2011 Birmingham Letter, "the reaction from other agencies and non-governmental organizations was swift and negative." The 2011 Birmingham Letter detailed the discussions between the Bureau of Reclamation and the water districts and listed the concessions that Westlands had made in those negotiations in an effort to be "flexible."   The 2011 Birmingham Letter indicated, however, "if there was consensus on anything, it was that not everyone involved in your process would agree on the content of the draft legislation."

The 2011 Birmingham Letter went on to state that Westlands was firmly opposed to the elements of the legislative strategy put forth in the 2010 Connor Letter not in the Joint Proposal, including those that called for Westlands to retire at least 200,000 acres of land and the repayment method put forth in the 2010 Connor Letter, because, under that method, "Westlands would be required to spend in excess of $800,000,000.00, with the potential that at the end of the repayment period of its debt, its water supply could be terminated." As stated in the 2011 Birmingham Letter regarding the latter, "[n]o reasonable person would accept this potential."   The 2011 Birmingham Letter summed up the 2010 Connor Letter as follows:

> Westlands has a judgment against the Secretary [of the Interior] ordering him to provide drainage.  The government estimates that it will cost $2.6 billion to comply with that order.  But as an alternative, Reclamation proposes: (1) that the obligation to provide drainage be transferred to Westlands; (2) that if Westlands does not perform this obligation (something Reclamation has been unable to do for 40 years) its water supply will be reduced; (3) that Westlands must retire 200,000 acres of land at its expense; and (4) that for the privilege of undertaking these obligations and risks, Westlands will give up 400,000 acre-feet of contract supply.

The 2011 Birmingham Letter concluded that the proposal put forth in the 2010 Connor Letter was "unacceptable," but stated that Westlands was "committed to finding a viable solution that serves the interests of all interested parties." There is no evidence in the record before this court, the Bureau of Reclamation responded to the 2011 Birmingham Letter.

In June 2011, Westlands filed a motion in the Firebaugh/Sumner Peck case seeking the court's permission to allow the federal defendants to change the Control Schedule regarding construction of drainage facilities in the northern sub-unit of the Westlands. The motion stated that, "for reasons of practicality, efficacy and cost Westlands desires to have construction of drainage facilities begin in the central sub-unit rather than its northern sub-unit as described in the Control Schedule." The United States District Court for the Eastern District of California granted Westlands' motion in July of 2011, giving the federal defendants one hundred and twenty days to evaluate the feasibility of beginning construction in the central sub-unit, rather than the northern sub-unit, and instructing the federal defendants to promptly report any changes to the Control Schedule to the court.

On September 30, 2011,[25] Judge Wanger issued a Memorandum Decision (2011 Memorandum Decision) regarding the parties' cross-motions for summary judgment in the Firebaugh/Sumner Peck case. Plaintiffs' motion sought judgment that: 1) the United States had unlawfully withheld drainage service for the San Luis Unit, 2) the United States' duty to provide drainage service extended to plaintiffs' land that was outside of, but contiguous to, the San Luis Unit, 3) the United States' failure to construct drainage facilities constituted agency action unlawfully withheld under APA § 706(1), and 4) the United States had acted arbitrarily and capriciously in refusing to construct adequate drainage facilities in violation of APA § 706(2). The federal defendants' cross-motion for summary judgment sought judgment that 1) the federal defendants had no duty to provide drainage service outside of the San Luis Unit, 2) the United States was complying with its duty to provide drainage under the San Luis Act, and 3) the drainage plan put in place by the Bureau of Reclamation's 2007 Record of Decision was not arbitrary or capricious. The court found in the 2011 Memorandum Decision that, although the federal defendants had a statutory duty to provide drainage within the San Luis Unit, the San Luis Act, as amended by later appropriations riders, did not "impose[] a mandatory duty to provide drainage to areas outside the San Luis Unit or to remediate adverse effects outside of the Unit's boundaries caused by operation of the Unit." The court, therefore, partially granted defendant's motion for summary judgment. The court also granted defendant's motion for summary judgment on plaintiffs' APA § 706(2) claim, holding that the Secretary of Interior's interpretation of the San Luis Act was reasonable. Regarding plaintiffs' claim of unreasonable delay under APA § 706(1), 5 U.S.C. § 706(1) (2006), the court noted that a failure to act claim "can succeed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is

---

[25] Plaintiffs filed the complaint in the above captioned case before this court on September 2, 2011. The rest of the events recounted occurred after the above captioned case was initiated, but are included as they could be relevant to the court's analysis of when plaintiff's takings claim accrued.

legally required to take."  Judge Wanger stated that, in their most recent status report, federal defendants had reported taking numerous steps towards implementing the 2007 Record of Decision.  Judge Wanger found that

> [t]he Department issued its ROD [Record of Decision] in 2007, its Feasibility Report in 2008, and its Control Schedule for implementing the drainage solutions identified in 2009; that a drainage system was not yet in place at the time Plaintiffs' [sic] filed their motion for summary judgment in October 2010 does not, under the totality of circumstances, constitute unreasonable delay in the context of this case.  It is undisputed that the Department [of the Interior] is complying with the Control Schedule, more than ten years after final judgment was entered in the Court of Appeal and fourteen years after final judgment in the trial court.

Therefore, Judge Wanger held that the plaintiffs were not entitled to summary judgment on their § 706(1) claim.  The plaintiffs appealed Judge Wanger's decision to the Ninth Circuit Court of Appeals.

The federal defendants submitted another status report to the District Court for the Eastern District of California in October 2011.  The October 1, 2011 status report indicated that, based on Westlands' request, and with the court's permission, the Bureau of Reclamation had begun evaluating the feasibility of constructing drainage facilities in the central sub-unit of the Westlands, rather than the northern sub-unit.  The Bureau of Reclamation was in the process of preparing cost estimates and evaluating funding, and stated that it would report back to the court in November 2011, with a revised Control Schedule, if appropriate.  In addition, the October 1,2011 status report stated that, in order to stay on track with the Control Schedule, the Bureau of Reclamation also was moving forward with the actions in the northern sub-unit should the parties decide to move forward with construction as originally planned, rather than in the central sub-unit.

In the fall of 2011, Judge Wanger retired and the <u>Firebaugh/Sumner Peck</u> litigation was transferred to Judge Lawrence O'Neill, also in the District Court for the Eastern District of California.  The federal defendants submitted a supplemental status report to the District Court in November 2011, regarding the feasibility of building drainage facilities in the central sub-unit of the Westlands.  The November 2011 supplemental status report referred to an attached declaration, not provided to this court, which apparently described "a proposed phased approach to the provision of drainage service in the central sub-unit of Westlands" and included a revised Control Schedule for construction of the proposed drainage facilities.  The federal defendants reported that Phase 1 of the proposed facilities would provide drainage service to approximately 24,000 acres of land in the central sub-unit of Westlands.  The Bureau of Reclamation had determined that the proposed approach for constructing drainage facilities in the central, rather than the northern sub-unit as previously planned, was feasible and, thus, the Bureau of Reclamation supported moving forward with Phase 1 construction in the central sub-unit.

On March 19, 2012, Judge O'Neill issued Final Judgment on the claims alleged in the plaintiffs' fifth amended complaint which, as indicated above were: 1) continuing negligence, 2) continuing nuisance as to the water districts and as to the federal defendants, 3) continuing trespass, 4) inverse condemnation, 5) a violation of the APA by the federal defendants, and 6) declaratory relief that the water districts also violated the APA.  Judge O'Neill issued judgment in favor of the federal defendants and the water districts on claims one, two, three, five, and six, and indicated that claim four already had been transferred to the United States Court of Federal Claims and the inverse condemnation claim was dismissed by the court dismissed for lack of subject matter jurisdiction under 28 U.S.C. § 1500 on March 29, 2006.  Judge O'Neill's Final Judgment did not alter Judge Wanger's 1995 Partial Judgment, as amended in 2000, on the first phase of claims, concerning the federal defendants' unexcused, statutory duty to provide drainage service to the San Luis Unit.  The Order issued by Judge Wanger which provided that the federal defendants "shall, without delay, provide drainage to the San Luis Unit pursuant to the statutory duty imposed by section 1(a) of the San Luis Act," therefore, remained in place.  The California District Court maintained jurisdiction over the case to enforce Judge Wanger's 2000 Partial Judgment.

The federal defendants' April 1, 2012 status report to Judge O'Neill indicated that "Reclamation is now proceeding in accordance with a Revised Control Schedule . . . ." The April 1, 2012 status report stated that, in order to collect data needed for final designs for Phase 1 of the construction of drainage facilities for the central sub-unit, the Bureau of Reclamation needed to "perform extensive field investigations."  Those investigations were scheduled to take place during Fiscal Year 2013.  The Bureau of Reclamation also decided to go ahead with construction of a treatment plant in the northern sub-unit of the Westlands, and the April 2012 status report indicated that the Bureau of Reclamation was moving forward on that project and anticipated awarding a construction contract in the fourth quarter of Fiscal Year 2012.

The Firebaugh plaintiffs also had appealed Judge Wanger's 2011 Memorandum Decision denying the plaintiffs' motion for summary judgment on its APA and Judge Wanger's earlier dismissal of the Federal Tort Claims Act (FTCA) claims to the Ninth Circuit.[26]  The Ninth Circuit issued an opinion on April 5, 2013 affirming Judge Wanger's ruling.  The Ninth Circuit stressed that, under APA § 706(1), a claim "'can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.'"  Firebaugh Canal Water Dist. v. United States, 712 F.3d at 1301 (quoting Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) (emphasis in original).  The Ninth Circuit explained that "required to take" means that the agency must be "compelled by law" to act, and that, even if an agency is "compelled by law to act within a certain time period, but the manner of action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the

---

[26] As noted by the Ninth Circuit, "[t]he district court dismissed the FTCA claim in 2004, holding (1) that water suppliers do not, under California law, have a duty to prevent water from draining onto downslope lands, and (2) that Interior's actions fell within the discretionary function exception to FTCA liability." Firebaugh Canal Water Dist. v. United States, 712 F.3d 1296, 1301 (9th Cir. 2013)

action must be." Id. With that standard in mind, the Ninth Circuit found that, although the federal defendants were obligated by law to provide drainage within the San Luis Unit, "Interior is neither withholding nor unreasonably delaying drainage within the Unit." Id. at 1303. The Ninth Circuit stated:

> And while Firebaugh's frustration with the pace of implementation is quite understandable, that pace is determined by the scope and cost of the project. Those obstacles are not, by and large, a product of Interior's inaction. For example, Interior can seek appropriations for drainage projects—and, indeed, has done so—but it is ultimately up to Congress to provide funds. Likewise, it is for Congress to decide whether to lift the current cap on construction costs or to excuse in-Unit districts from their obligation to eventually repay those costs.

Id. The Ninth Circuit also took issue with the fact that the Firebaugh plaintiffs were requesting that the court order defendant to take specific steps toward implementing its drainage obligation, indicating that "[w]hatever their merits, Firebaugh's proposals do not involve discrete actions that Interior is legally required to take; rather, they involve matters of discretion and, as such, are beyond the scope of § 706(1)." Firebaugh Canal Water Dist. v. United States, 712 F.3d at 1301. Because it found the plaintiffs had not identified a discrete action that defendant was required to take, but had failed to take, the Ninth Circuit affirmed Judge Wanger's denial of summary judgment on the plaintiffs' APA claim. The Ninth Circuit noted, however: "There is, to be sure, some point at which Interior's actions could become so sluggish that we could rightly say that the agency has entirely abandoned its legal duty to provide drainage within the San Luis Unit. The record before us does not now support that conclusion." Id. at 1304.

### Previous Litigation in the United States Court of Claims and United States Court of Federal Claims

#### A. The Claus, Schwab, and Freitas Litigations

Between 1985 and 1988, several groups of landowners filed complaints in the United States Court of Claims regarding leakage of drain water from the Kesterson Reservoir before it was shut down. In Claus v. United States, No. 270-85L, landowners in Ventura County, whose property abutted the Kesterson Reservoir, alleged that water from the Kesterson Reservoir had leaked onto their property causing a permanent taking of their property interest without just compensation. In Schwab v. United States, No. 292-85L, another group of landowners filed a claim for reverse condemnation based on leakage of waters from the Kesterson Reservoir, and in Freitas v. United States, No. 218-88L, still other landowners alleged that the United States had allowed dangerous chemical and other contaminants to flow onto the plaintiffs' property, as well as caused other property damage. Defendant represents in its current motion to dismiss before this court that all three of these lawsuits settled, with the United States paying over $5 million in total to the plaintiffs.

## B. Firebaugh/Sumner Peck Inverse Condemnation Claim

As indicated above, on December 16, 2003, the Firebaugh plaintiffs' claim for inverse condemnation was transferred to the United States Court of Federal Claims. Firebaugh Canal Water District and Central California Irrigation District filed a transfer complaint in the Court of Federal Claims on January 27, 2004, claiming that the failure of the United States to provide drainage service to the San Luis Unit had transferred additional drainage requirements onto their lands outside of the San Luis Unit service area, resulting in a partial taking.  In Firebaugh Canal Water District, et al. v. United States, No. 03-2790L, the Firebaugh plaintiffs' inverse condemnation claim was dismissed for lack of jurisdiction under 28 U.S.C. § 1500 (2000).  Firebaugh Canal Water District and Central California Water District filed a second complaint with the Court of Federal Claims on February 28, 2005, again alleging a claim for inverse condemnation.  That claim was also dismissed for lack of subject matter jurisdiction under 28 U.S.C. § 1500 (2000), in Firebaugh Canal Water District v. United States, No. 05-262L, on March 29, 2006.  In both cases, a Judge of the United States Court of Federal Claims decided that the inverse condemnation claim was the "same claim" as the tort claims that were previously brought in district court and that, because the tort claims were still pending in district court, Section 1500 barred the parties from bringing the inverse condemnation claim before this court.  No inverse condemnation claim against the United States based on the failure to provide drainage to the Westlands has ever been considered on the merits by this court or its predecessor.

## C. Westlands Water District v. United States

After this suit was filed, Westlands filed suit against the United States in the United States Court of Federal Claims on January 6, 2012, alleging breaches of various contractual obligations to provide drainage to Westlands.   A Judge of this court issued an opinion in Westlands Water District v. United States, on January 15, 2013, granting defendant's motion to dismiss.  See Westlands Water Dist. v. United States, 109 Fed. Cl. 177 (2013).  The Judge found that, contrary to the Westlands Water District's allegations, none of the 1963, 1965, 2007, nor 2010 contracts between Westlands the United States created a contractual obligation for the United States to provide drainage services to Westlands.  See id. at 193, 198, 200, 202.  Because all of the plaintiff's claims hinged on the existence of a contractual duty for defendant to provide drainage services to Westlands, the court also held that the plaintiff failed to plead sufficient facts to establish each of their other claims.  See id. at 208.  The Judge also held that the plaintiff's breach of contract claims in Westlands Water District were time-barred because they accrued outside of the six-year statute of limitations, see id. at 214-15, and that even those claims that may have survived the six-year statute of limitations must fail because the plaintiff had failed to establish any contractual drainage obligation.  See id. at 215-17.  Reaching the decision, the Judge rejected the plaintiff's argument that the 2010 Connor Letter to Senator Dianne Feinstein repudiated defendant's obligation to provide drainage services to Westlands.  The Judge found that the plaintiff did not establish

"that the Feinstein Letter [Connor Letter] constituted a repudiation" of defendant's contractual duty to provide drainage since plaintiff had failed to show that any contractual drainage obligation existed at all.  See id. at 216.[27]  The judge's decision did not address defendant's statutory duty to provide drainage to the San Luis Unit, nor did the plaintiffs in Westlands Water District bring a takings claim.

**Plaintiffs' Claims**

Plaintiffs filed their takings claim currently before this court on September 2, 2011.  Plaintiff Michael Etchegoinberry is a landowner in the Westlands and acquired his land on April 23, 2008.  Plaintiff Erik Clausen is the assignee for claims related to farmlands in the Westlands, which have been owned by the Jorgen and Kristine Clausen Family Trust since July 12, 2007, plaintiff Barlow Family Farms. L.P., has owned lands in the Westlands since December 10, 2007, and plaintiff Christopher Todd Allen is a trustee of a family trust, which has owned lands in the Westlands since October 16, 2007.  Plaintiffs allege that defendant has taken plaintiffs' land for public use without just compensation.  Plaintiffs allege that "[t]he properties taken include, but are not limited to, flowage and seepage easements upon Plaintiffs' lands."  Plaintiffs further allege that "[a]s a direct and proximate result of the high water tables and accumulation of saline groundwater beneath and upon their farmlands due to the actions and inactions of the United States, Plaintiffs' use of their properties has been impaired, and their properties have been substantially devalued and taken but uncompensated for in an amount as yet unascertained."  Specifically, plaintiffs claim that the damage to their farmlands includes, but is not limited to, "reduced crop yields, limited crop rotations, restrictions on the types of crops that can be grown, and changes to soil quality and conditions."  Plaintiffs are seeking certification of this matter as a class action for the described class, "[j]ust compensation in an amount that exceeds $10,000 on the claim for relief for Plaintiffs and all persons similarly situated," prejudgment interest on any judgment awarded, attorneys' fees and costs, and other relief the court deems proper.

Defendant has filed a motion to dismiss plaintiffs' claims.  Defendant argues that this court lacks subject matter jurisdiction over the Complaint because plaintiffs' claims are barred by the statute of limitations codified at 28 U.S.C. § 2501.  Alternatively, defendant seeks to dismiss the complaint on the ground that plaintiffs lack standing to bring their claim because they did not own their property at the time their claim allegedly accrued.[28]

---

[27] As discussed below, however, the court reached this determination when considered the breach of contract claims, and not takings claims.  The court's analysis below focuses of the effect of the 2010 Connor Letter in the context of a taking not a breach of contract, and therefore, does not consider if the 2010 Connor Letter was a repudiation.

[28] For the purposes of this opinion, as is required for a motion to dismiss, the court accepts plaintiffs' uncontested allegations regarding plaintiffs' property interests, including when they acquired those property interests, as true.  Therefore, plaintiffs'

**DISCUSSION**

**Standard of Review**

"Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case . . . ." Dow Jones & Co., Inc. v. Ablaise Ltd., 606 F.3d 1338, 1348 (Fed. Cir. 2010); see also Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251, 258 (2013) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998); Matthews v. United States, 72 Fed. Cl. 274, 278 (stating that subject matter jurisdiction is "an inflexible threshold matter that must be considered before proceeding to evaluate the merits of a case"), recons. denied, 73 Fed. Cl. 524 (2006)). "'[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). If the court finds that it lacks subject matter jurisdiction, it must dismiss the complaint in its entirety. See Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. at 258 ("'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (quoting Ex parte McCardle, 74 U.S. 506, 514 (1868))).

When deciding a case based on a lack of subject matter jurisdiction, this court must first assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007) (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002))); see also Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds sub. nom., Davis v. Scherer, 468 U.S. 183, reh'g denied, 468 U.S. 1226 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

---

proper standing will be assumed for the purposes of this opinion and the court's analysis in this opinion is limited to the statute of limitations issue.

28 U.S.C. § 1491(a)(1) (Supp. V 2011).  As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained.  See United States v. Navajo Nation, 556 U.S. 287, 290 (2009); see also United States v. Testan, 424 U.S. 392, 400 (1976); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).  It is well-established that the Tucker Act "'provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States'" for more than $10,000.00.  See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (quoting John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008)); see also Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000." (citing Palm Beach Isles Assocs. v. United States, 208 F.3d 1374, 1383 n.10 (Fed. Cir.), aff'd on reh'g, 231 F.3d 1354 (Fed. Cir.), reh'g en banc denied, 231 F.3d 1365 (Fed. Cir. 2000))).

**Statute of Limitations**

Pursuant to 28 U.S.C. § 2501, suits against the United States are subject to a general six-year statute of limitations:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues . . . .  A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

Id.  "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims."  John R. Sand & Gravel Co. v. United States, 457 F.3d at 1354; see also Mildenberger v. United States, 643 F.3d 938, 945 (Fed. Cir. 2011) ("Claims for compensation under the Tucker Act, which waived the sovereign immunity of the United States, are subject to a strict statute of limitations provision." (citing Lehman v. Nakshian, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied."))); Banks v. United States, 102 Fed. Cl. 115, 127 (citing 28 U.S.C. § 2501), sub. determination following, 102 Fed. Cl. 115 (2011).

Like other claims brought under the Tucker Act, takings claims typically accrue "'only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.'"  Casitas Mun. Water

Dist. v. United States, 708 F.3d at 1359 (emphasis in original) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); see also Navajo Nation v. United States, 631 F.3d at 1273-74 ("In general, a takings 'claim first accrues when all the events have occurred which fix the alleged liability of the [government] and entitle the plaintiff to institute an action.'" (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577 (citing Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 116 S. Ct. 2496 (1996))); John R. Sand & Gravel Co. v. United States, 457 F.3d at 1355-56. "'Therefore, a claim under the Fifth Amendment accrues when [the] taking action occurs.'" Navajo Nation v. United States, 631 F.3d at 1273-74 (brackets in original) (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (citations and internal quotation marks omitted)). For a physical taking, the act that causes the taking also causes the accrual of a takings claim. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1359 (citing Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs."), cert. denied, 130 S. Ct. 271 (2009)).

In the above captioned case, the plaintiffs have the burden of proving that this court has subject matter jurisdiction over their takings claim, including that their claim is timely. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); Sanders v. United States, 252 F.3d 1329, 1333 (Fed. Cir. 2001); Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Pursuant to 28 U.S.C. § 2501, under normal circumstances, for plaintiffs' claims to be timely, it must have accrued no earlier than September 2, 2005, or six years prior to September 2, 2011, the date plaintiffs filed their Complaint. Defendant argues that plaintiffs will be unable to meet that burden because their claim accrued "no later than the 1990s."[29]

**Stabilization Doctrine**

Plaintiffs argue, however, that the stabilization doctrine, and not the typical six year statute of limitations analysis, should apply in this case. Originating in United States v. Dickinson, 331 U.S. 745 (1947), "[t]he stabilization doctrine recognizes that determining the exact point of claim accrual is difficult when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government such as a condemnation or regulation." Mildenberger v. United States, 643 F.3d at 945 (citing Navajo Nation v. United States, 631 F.3d at 1273–74; see also Applegate v. United States, 25 F.3d 1579, 1581 (Fed. Cir.) (In Dickinson, a takings case involving flooding of plaintiffs' land, "[t]he Supreme Court set forth the standard for accrual in cases alleging takings of a continual nature."), reh'g and en banc sugg. declined (Fed. Cir. 1994). In Dickinson, the United States Army Corps of Engineers (Corps) constructed a dam, which impounded water and raised the water level of a river in successive stages, causing temporary, and eventually permanent, flooding of respondents' land. United States v. Dickinson, 331 U.S. at 746-47. The Dickinson

---

[29] As discussed below, defendant has put forth many alternative dates for the accrual date regarding plaintiffs' claims, but seems to have settled on the 1990s, as a range of preferred date.

Court stated that "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'— when they are born, whether they proliferate, and when they die." Id. at 748. When damage to a claimant's property, therefore, is incurred not by a single event, but by a continuous process, "procedural rigidities should be avoided." Id. at 749. The Dickinson Court held that, when the government effects a taking "by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" Id. Rather, the landowner may "postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck." Id. Dickinson, therefore, established the principle that for physical takings caused by a gradual, continuous, physical process, rather than a discrete event, accrual of a takings claim can be delayed until the circumstances have stabilized and it is clear that landowners can be compensated for their loss.

In United States v. Dow, 357 U.S. 17 (1958), the Supreme Court that the stabilization doctrine applies only in a narrow set of circumstances. The Dow Court stated: "The expressly limited holding in Dickinson was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use." Id. at 27. In Fallini v. United States, 56 F.3d 1378, the United States Court of Appeals for the Federal Circuit described the decision in Dow, as follows:

> [I]n Dow, the Supreme Court "more or less limited [Dickinson] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking." Accord Hilkovsky v. United States, 504 F.2d 1112, 1114, 205 Ct. 460 (1974) (Dow "distinguished the flooding situation in Dickinson from other types of Government taking because, in the slow flooding situation in Dickinson, the full extent of the Government taking could not be known until the high water mark of the flooding had been reached.").

Fallini v. United States, 56 F.3d at 1381-82 (emphasis added).[30]

After the ruling in United States v. Dow, although the United States Court of Claims has applied the stabilization doctrine most easily in flooding cases, the stabilization doctrine also has been applied to other fact contexts. See, e.g., Castro v. United States, 500 F.2d 436, 441, 205 Ct. Cl. 534, 544 (1974) (applying the stabilization concept when the government took private property in Saipan, Mariana Islands, for military purposes during World War II in 1944, and did not determine until 1968 that the land was no longer needed, holding that the claim did not accrue until 1968). The Castro court also cited Silverberg v. United States, 155 Ct. Cl. 436 (1961), which found

---

[30] This court notes that for the purposes of the analysis which follows regarding the Etchegoinberry case, the plaintiffs are faced with just such a slow impact on their land, quite analogous to a taking by flooding.

that a suit filed by slaughterers on June 1, 1951 for compensation for meat they were required to set aside for the armed services at wholesale prices, rather than sell at retail prices, from 1943 to 1946, was not time-barred because, "[i]t would not be reasonable to require plaintiffs to bring multiple suits for property taken pursuant to a continuing order, and it would be unreasonably burdensome on the United States to require it to defend such a multiplicity of claims.  Plaintiffs were entitled to defer action until they knew how much of their property would be taken pursuant to the set-aside order and then bring one suit for all of it."  Id. at 440; see also Oro Fino Consolidated Mines, Inc. v. United States, 92 F. Supp. 1016, 1017, 118 Ct. Cl. 18 (1950) (holding that a 1950 suit seeking just compensation for losses incurred from 1943 to 1945 due to a 1942 government order banning gold mining during the war was not time-barred because the order was not revoked until 1945 and, until that point, plaintiffs could not know exactly what was taken, and which the court stated, "while not exactly like the case at bar, the Dickinson case is pertinent because it recognized that the statute of limitations in taking cases does not necessarily begin to run at the first moment that the plaintiff could have brought suit"), cert. denied, 341 U.S. 948, reh'g denied, 71 S. Ct. 1015 (1951);  Avery v. United States, 330 F.2d 640, 165 Ct. Cl. 357 (1964) (citing to Dickinson, and applying the stabilization doctrine in cases involving avigation easements when the impairment of land use by overflights was progressive); Aaron v. United States, 311 F.2d 798, 801, 160 Ct. Cl. 295 (1963) (another avigation case in which the court cited Dickinson to extend the statute of limitations accrual date stating, "[b]efore that time they were uncertain just how serious the impairment would be or how long it would continue."); Aaron v. United States 340 F.2d 655, 167 Ct. Cl. 818 (1964) (another overflight case); Klein v. United States, 152 Ct. Cl. 221, 224 (citing Dickinson, extending the statute of limitations date and stating that plaintiffs' cause of action "did not fully accrue until such conditions had come to pass or the extent of the use and the consequent interference with plaintiffs' use and enjoyment of their property was known or ascertainable") cert. denied, 366 U.S. 936 (1961); see also Applegate v. United States, 25 F.3d at 1581-83 (describing the Court of Claims' application of the stabilization doctrine and applying the doctrine in a case in which the United States authorized a harbor project which interrupted the natural water flow and caused part of the shoreline to accrete and part to recede.  A sand transfer plant was authorized, but delayed and not built).   The Applegate court wrote: "Thus, due to both the very gradual nature of this particular continuous physical process and the Corps' promises to restore the littoral flow of sand, this taking situation had not stabilized by 1986 - six years before the landowners filed suit.  The statute of limitations does not bar this action."  Applegate v. United States, 25 F.3d at 1583.

The United States Court of Appeals for the Federal Circuit recognized that "in cases where the government leaves the taking of property to a gradual physical process, rather than utilizing the traditional condemnation procedure, determining the exact moment of claim accrual is difficult.  Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir.), reh'g denied and en banc suggestion declined, (Fed. Cir. 2000).  The Boling court continued,  "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined."  Id. at

1371.  The Federal Circuit emphasized that "the Supreme Court made clear" in <u>Dickinson</u> "that accrual principles should not be rigidly applied in cases involving environmental takings."  <u>Id.</u> at 1372 (citing <u>United States v. Dickinson</u>, 31 U.S. at 748). The Federal Circuit explained:

> [D]uring the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run.

<u>Id.</u> at 1371; <u>see also</u> <u>Mildenberger v. United States</u>, 91 Fed. Cl. 217, 235 (Fed. Cl. 2010), <u>aff'd</u> <u>in</u> <u>part</u>, 643 F.3d 938 (Fed. Cir. 2011); <u>Columbia Basin Orchard v. United States</u>, 88 F. Supp. 738, 739, 116 Ct. Cl. 348 (1950); <u>Nadler Foundry & Mach. Co. v. United States</u>, 143 Ct. Cl. 92, 94, 164 F. Supp. 249, 251 (1958).

Litigants have been cautioned that, when calculating the time at which stabilization occurred, the date "should not be too late, thus perpetually tolling the statute of limitations, <u>see</u>, <u>e.g.</u>, <u>Gustine [Land & Cattle Co. v. United States]</u>, 174 Ct. Cl. [556,] 656 [1966]; <u>Nadler [Foundry & Mach. Co. v. United States]</u>, 164 F. Supp. at 251, nor too early, before damage due to flooding assumes a certain, permanent nature, <u>see</u>, <u>e.g.</u>, <u>Boling [v. United States]</u>, 220 F.3d at 1372; <u>Applegate [v. United States]</u>, 25 F.3d at 1582-83; <u>Barnes [v. United States]</u>, 538 F.2d at 873."  <u>The George Family Trust ex rel. George v. United States</u>, 91 Fed. Cl. 177, 196 (2009).

Plaintiffs in the above captioned case argue that the stabilization doctrine should apply in this case, and that their claim did not stabilize until at least 2008, when defendant "made clear it will not provide drainage to their farmlands."  Not until then, plaintiffs argue, quoting <u>United States v. Dickinson</u>, 331 U.S. at 749, was the "extent of damage to Plaintiffs' lands reasonably foreseeable," such that "'final account [could] be struck.'"  Plaintiffs argue, therefore, that their claim did not accrue until well after September 2, 2005, six years before they filed their complaint.  Plaintiffs also argue that the "justifiable uncertainty" doctrine should apply in this case.  As further discussed below, the "justifiable uncertainty" doctrine builds upon the stabilization doctrine and holds that government promises to mitigate damage to a plaintiff's property, which otherwise would constitute a taking, can warrant application of the stabilization doctrine and delay the accrual of a takings claim.  <u>See</u> <u>Applegate v. United States</u>, 25 F.3d at 1582-83.  Plaintiffs rely on a combination of the two doctrines to argue that their claim did not accrue until at least 2008.

Plaintiffs also rely on <u>Nadler Foundry & Machine Co. v. United States</u>, 143 Ct. Cl. 92, 164 F. Supp. 249, a case in which the United States Court of Claims rejected the application of the principles announced in <u>Dickinson</u>.  In <u>Nadler</u>, the plaintiff alleged that the government took its property by dredging a ship canal too close to the plaintiff's land, causing the soil to cave in.  <u>See id.</u> at 250.  The government had been dredging the channel almost every year since 1905.  From 1926 to 1934, a large portion of the

plaintiff's land caved in, leading the plaintiff to erect a piling along the water's edge; however, the piling broke off within several years.  By 1950, the cave-in had accelerated and the plaintiff built a steel bulkhead across the edge of the property.  See id. at 250-51.  In 1954, the plaintiff filed a takings claim for the cost of constructing the bulkhead.  The court found that the Dickinson doctrine did not apply because the eventual cave-in of the plaintiff's land was foreseeable before 1934 and that there had been an extensive cave-in in 1934 that led the plaintiff to build a bulkhead at the time, although it was ineffective.  See id. at 252.  The court reasoned that the plaintiff knew at least by 1934 "what would happen to the land in the course of time," and "[t]he very same suit, on the same grounds and for the same damages, could have been brought by the plaintiff at least as long ago as 1934."  Id.

Defendant, however, argues that the stabilization doctrine does not apply in this case, and the normal six-year statute of limitations is controlling.  Citing United States v. Dickinson, 331 U.S. at 748-49, United States v. Dow, 357 U.S. at 17, Kabua v. United States, 212 Ct. Cl. 160, 546 F.2d 381 384 (1976), and Gustine Land & Cattle Co. v. United States, 174 Ct. Cl. 556, 656 (1966), defendant contends that the stabilization doctrine has been interpreted very narrowly by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, to apply only in circumstances involving a taking of property resulting from a gradual physical process. ().  In this case, according to defendant, the failure to provide drainage "is not a gradual physical process like that of flooding.  Rather, this failure is a distinct non-event."  Defendant also asserts, "the effect of the failure to provide drainage to Plaintiffs' farmlands is immediately knowable.  Thus, the reasoning behind the stabilization doctrine – that it takes time for the damage caused by gradual physical processes to become known to the landowner – is absent here, making the doctrine inapplicable."  Defendant argues that the appropriate standard to apply in this case is that plaintiffs' claims accrued """when all events [] occurred to fix the Government's alleged liability, entitling the claimant to demand payment.""" (quoting Sabree v. United States, 90 Fed. Cl. 683, 691 (2009) (quoting Martinez v. United States, 333 F.3d at 1303)).  Defendant contends that in this case, "[t]here can be little doubt that those events occurred well before September 2, 2005."

Defendant cites to John R. Sand & Gravel Co. v. United States, in which the United States Court of Appeals for the Federal Circuit indicated that "[b]oth the Supreme Court and our court have acknowledged that the Dickinson stabilization doctrine is only applicable in cases involving gradual physical processes."  John R. Sand & Gravel Co. v. United States, 457 F.3d at 1359 (citing United States v. Dow, 357 U.S. at 27; Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir.), cert. denied, 525 U.S. 823 (1998)).  In Ariadne Financial Services Pty. Ltd. v. United States, also cited by the defendant, the United States Court of Appeals for the Federal Circuit declined to extend the stabilization doctrine to a case in which three financial institutions brought breach of contract and constitutional claims against the government, reasoning that "[l]ater cases have essentially confined the stabilization doctrine to the class of flooding cases from which it originated."  Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d at 879 (citing United States v. Dow, 357 U.S. at 27; Fallini v. United States, 56 F.3d at

1381–82; <u>Applegate v. United States</u>, 25 F.3d 1579), although as discussed above, despite language in a number of cases to the contrary, the <u>Dickinson</u> line of reasoning has been applied in contexts other than takings by flooding.

Defendant also argues that, because the <u>Sumner Peck</u> plaintiffs filed an inverse condemnation claim against the federal government in 1991, plaintiffs' claims are analogous and barred by the decision in <u>Nadler Foundry & Machine Co. v. United States</u> and the stabilization doctrine should not apply.  The court disagrees.   While the <u>Sumner Peck</u> litigation did involve a group of landowners from the Westlands area who filed an inverse condemnation claim against the federal government because of its failure to provide drainage, plaintiffs' claims in the case at bar is not "the very same suit, on the same grounds and for the same damages," or brought by the same plaintiffs as was brought in the earlier 1991 case.  <u>See</u> <u>Nadler Foundry & Mach. Co. v. United States</u>, 143 Ct. Cl. 92, 164 F. Supp. at 252.  The court therefore found in <u>Nadler Foundry & Machine Co.</u>, the plaintiff attempted to build a bulkhead in 1934, for which he could have filed a takings claim in 1934.  <u>See</u> <u>id.</u> at 250-51.  The same plaintiff, however, waited another twenty years, while larger portions of the land were caving-in, and then erected a second bulkhead, for which plaintiff sought damages from the government.  <u>See</u> <u>id.</u> at 251-52.  Therefore, even if the government's actions caused the damage to the plaintiff's property and constituted a taking, "it occurred so long ago that any right of recovery is barred by the statute of limitations."  <u>Id.</u> at 251.

By contrast, the factual and legal landscape regarding the provision of drainage services to Westlands changed dramatically between 1991, when the <u>Firebaugh/Sumner Peck</u> plaintiffs filed suit, and 2011, when plaintiffs filed the above captioned case.  The intervening years saw defendant argue to both the trial court and the appellate court in <u>Firebaugh/Sumner Peck</u> that it should be excused from its statutory duty to provide drainage to the San Luis Unit.   Both the District Court for the Eastern District of California and Ninth Circuit rejected defendant's arguments and ordered defendant to implement a drainage plan.  Years of preparations and planning by defendant followed, but drainage services were not in place.  Plaintiffs had every right during the planning and preparations to expect that their government would follow its statutory and court ordered duties to provide drainage service.  Moreover, plaintiffs are not the same parties who filed suit in <u>Sumner Peck</u> in 1991, they do not allege the same facts, and they are not seeking the same relief, in this court, a takings claim.

In <u>Applegate v. United States</u>, however, the United States Court of Appeals for the Federal Circuit applied the stabilization doctrine to circumstances in which a gradual physical process was coupled with government promises to mitigate the damage attributable to its actions, causing "justifiable uncertainty" regarding the permanence of the physical invasion.  <u>Applegate v. United States</u>, 25 F.3d at 1583-84; <u>see also</u> <u>Boling v. United States</u>, 220 F.3d at 1372 (stating that "the critical element that delayed stabilization in <u>Applegate</u>" was "the justifiable uncertainty about the permanency of the taking").  The <u>Applegate</u> owners of shoreline property, brought a class action takings claim against the government in 1992 when a deep-water harbor project interrupted the

natural, littoral flow of sand, causing erosion of the shoreline, and permanently washing away and inundating portions of each of the landowners' property.  See Applegate v. United States, 25 F.3d at 1580.  The harbor project was completed and the erosion began in 1952.  In 1962, Congress passed a statute authorizing construction of a sand transfer plant, and in 1968 a Senate Committee and the State Department of Natural Resources approved a plan for the Army Corps of Engineers (Corps) to restore the beaches.  In 1971, however, the Corps announced a delay, which persisted until 1988, at which point the Corps issued a new proposal for a sand transfer plant.  By 1994, after the case had been decided by the Court of Federal Claims and appealed to the Federal Circuit, the sand transfer plant still had not been built.  See id. at 1580.  The Federal Circuit pointed out that the Corps had "held forth the promise" that the sand transfer plant would reverse the continuous erosion, and that the landowners would have been left with little, if any, permanent damage to their land.  Id. at 1582.  Under those circumstances, the court found, "[t]he slow physical process" of shoreline erosion was "not the only event inhibiting stabilization" of the claim, but rather that the government's repeated promise of building a sand transfer plant meant that landowners "did not know when or if their land would be permanently destroyed."  Id.  The Applegate court specifically found that the Dickinson doctrine shall be applied and "protected the landowners from the risks involved in bringing a suit for a taking prior to stabilization." Id. at 1583.  The Federal Circuit held that "due to both the very gradual nature of this particular continuous physical process and the Corps' promises to restore the littoral flow of sand, this taking situation had not stabilized by 1986 - six years before the landowners filed suit."  Id.  Instead, "precisely because of the Government's promises to build a sand transfer plant, the landowners remain[ed] justifiably uncertain about the permanency of the erosion and the taking," until at least 1986.  Id.  Thus, in Applegate, the court found that the government's promises to mitigate the damages caused by a gradual physical taking created "justifiable uncertainty" about the permanence of the taking, which supported application of the stabilization doctrine, sufficiently delaying accrual of plaintiffs' takings claim so that the claim was not time-barred.

The United States Court of Appeals for the Federal Circuit clarified the Applegate holding in Banks v. United States, 314 F.3d 1304 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 985 (2003).[31]  In Banks v. United States, the Court of Federal Claims had distinguished Applegate from the Banks case given the absence of repeated and clear promises by the Corps to cure the erosion problems and to cover the costs of the cure.  See id. at 1309 (citing Banks v. United States, 49 Fed. Cl. 806, 821 (2001)).  On appeal, however, the Federal Circuit indicated that the trial court's holding was a "misread[ing]" of Applegate, and that "Applegate did not create congressionally-imposed-duty or congressional-appropriation exceptions to the statute of limitations in gradual takings cases."  Id.  Rather, the Federal Circuit found that "Applegate applied and further explicated general accrual principles.  See Boling [v.

---

[31]  Subsequently, in 2011, the Court of Federal Claims, after the Federal Circuit had ruled on appeal that the stabilization doctrine applied to the plaintiffs' takings claims, applied the stabilization doctrine and found that the plaintiffs' claims had stabilized before the filing of the plaintiffs' complaint.  See generally Banks v. United States, 102 Fed. Cl. 115.

United States], 220 F.3d at 1371 (stating that Dickinson and its progeny recognize that gradual takings present special difficulties and 'represent an application of general accrual principles, rather than a broad exception to them')." The Banks court went on to indicate that Applegate applied the stabilization doctrine, as announced in Dickinson, and found that the "'critical element that delayed stabilization in Applegate [is] the justifiable uncertainty about the permanency of the taking.'" Id. (quoting Boling v. United States, 220 F.3d at 1372) (brackets in original). Thus, the Banks court found that the question to be analyzed under Applegate "is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts." Id. (brackets in original) (quoting Applegate v. United States, 25 F.3d at 1583).

The Federal Circuit in Banks applied the "justifiable uncertainty" doctrine to the facts presented by owners of shoreline property on Lake Michigan who had brought suit in 1999, claiming that the Corps' construction of jetties at a nearby harbor damaged the lakebed and interrupted sand flows to their property, resulting in permanent sand removal and erosion of the shoreline. See id. at 1306. The jetties were constructed in 1903, but had been upgraded between 1950 and 1989. The government admitted that, while erosion of the shoreline was natural, the jetties had significantly exacerbated the erosion since at least the 1970s. See id. In 1968 Congress passed legislation, leading to proposals to mitigate the erosion by implementing a beach nourishment plan that could have reduced the erosion back to natural levels. See Banks v. United States, 314 F.3d at 1306 (citing River and Harbor Act of 1968, 90 Pub. L. No. 90-483, § 111, 82 Stat. 731, 735 (1970)). The Corps executed the plan between the 1970s and the 1990s, however, three reports were issued in the 1990s, which the court found together established that the government's mitigation efforts had failed and the erosion of the landowners' property was permanent and irreversible. See id. at 1306-07. The Banks court found that the facts presented to it established an even stronger case of "justifiable uncertainty" than the circumstances in Applegate because, while in Applegate the government had made promises to mitigate the damage to landowners' property, in Banks, the Corps had performed mitigation efforts for several years. See id. at 1309-10. Therefore, the Banks court held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." Id. at 1310. The Banks court concluded that "[b]ecause the Court of Federal Claims misapplied the standard for claim accrual under Applegate, and because plaintiffs remained uncertain as to the permanent nature of the taking until the Corps reported that the erosion was permanent and irreversible," the plaintiffs' claims were not time-barred. See id. Under those circumstances, the court found, the statute of limitations did not begin to run until the 1996, 1997, and 1999 reports were issued, and that was within six years of the plaintiffs' filing of their 1999 complaint, so the claim was not time-barred. Id.

In Mildenberger v. United States, 643 F.3d 938, decided in 2011, eight years after Banks, , however, the Federal Circuit rejected the plaintiffs' argument that the government's actions created "justifiable uncertainty" about the permanence of damage

to their land, and found that the stabilization doctrine did not apply to the plaintiffs' claim. Id. at 949.  In Mildenberger v. United States, landowners with property along the San Lucie River in Florida filed a takings claim alleging that the government's discharge of pollutants into the St. Lawrence River constituted a taking of their "riparian right to use and enjoy the water."  Id. at 943.  The claim was based on the fact that, since the 1800s, the Corps had been periodically releasing water from Lake Okeechobee into a system of canals and levees in order to control the water level in the lake.  The water released from Lake Okeechobee flowed through the St. Lucie Canal to the St. Lucie River.  See id. at 941-42.  News organizations began reporting in the 1950s that water from Lake Okeechobee was causing "irreparable damage" to the San Lucie Canal.  See id. at 943.  The claimants filed suit in 2006, after unusually high releases from Lake Okeechobee led to a ban on fishing and swimming in the St. Lucie River and the destruction of oyster beds in the river.

The Mildenberger plaintiffs argued that the stabilization doctrine applied to their claim, and that the United States Army Corps of Engineers had promised to mitigate the damage to the St. Lucie River, therefore causing "justifiable uncertainty" and delaying the accrual of the claim.  See id. at 945, 947.  The Federal Circuit rejected the argument that the stabilization doctrine applied, finding that environmental degradation had been evident since the 1950s, thus the damage to the river "was foreseeable and manifested" decades before the complaint was filed in 2006.   Id. at 946.  In addition, the court concluded that the Corps never "undertook nor committed itself to any mitigation activities."   Id. at 947.   The claimants had cited local newspaper articles and declarations from members of a local community group as evidence of the Corps' alleged promises to mitigate.  The court noted that these sources were "not competent evidence of any Corps promises to mitigate damage."  Id.  Finally, one internal memorandum from the Corps, written in the 1970s, stated that damage was being done to the St. Lucie Canal by water released from Lake Okeechobee.  The Mildenberger court found that this internal document "reflect[ed] only one Corps official's views" and "did not notify the public of any potential Corps action and did not commit the Corps to any action . . . ."  Id.  The Mildenberger court noted that "[t]he Corps' consideration of potential projects to improve management of waterways in South Florida did not commit it to any mitigation activities."  Id. at 947-48.  Because claimants failed to identify any actions undertaken or promised by the Corps that constituted mitigation efforts, the court held that claimants failed to demonstrate that they were "justifiably uncertain" of the permanency of the damage to the St. Lucie River until the 2000s, as "the environmental damage was foreseeable and manifested prior to November 13, 2000," and thus, the claim was time-barred.  Id. at 946.  The Federal Circuit also noted that "[t]he Court of Federal Claims correctly found that the mitigation efforts cited by the Claimants could not resurrect their stale takings claims."  Id. at 948

In Northwest Louisiana Fish & Game Preserve Commission, 446 F.3d 1285 (Fed Cir.), reh'g and reh'g en banc declined (Fed. Cir. 2006), the Federal Circuit found that "justifiable uncertainty" existed so as to delay accrual of that plaintiff's claim.  In that case the Northwest Louisiana Fish & Game Commission brought a takings claim against the United States Corps of Engineers after a Corps project limited the

Commission's ability to control the growth of vegetation in the Black Lake, resulting in a portion of the lake becoming, as plaintiff alleged, "virtually useless." See id. at 1286. The Commission had previously controlled the growth of aquatic weeds by drawing down the lake into the Red River.  Pursuant to the River and Harbor Act of 1968, 90 Pub. L. No. 90-483, § 111, 82 Stat. 731, 735 (1970), the Act implicated in Banks, Congress authorized the Corps to assure year-round navigation of the Red River and, to accomplish this task, the Corps constructed a series of locks and dams.  The elevation of Pool 3, created by the third lock and dam of the Corps' system, directly affected the Commission's ability to draw down the water level in Blake Lake.  See id. Construction of the Corps' locks and dams began in 1988 and, by 1994, the elevation of Pool 3 had reached its planned level.  In 1996, growth of the aquatic weeds in Black Lake became problematic.  The Commission requested that the Corps adjust the water level in Pool 3, such that a further drawdown of Black Lake would be possible, but in January 1997, the Corps refused the requested drawdown.  See id. at 1287-88.  In 2001, he Commission filed a takings claim with the United States Court of Federal Claims.  The Court of Federal Claims granted defendant's motion to dismiss the claim, finding that the Commission's claim accrued no later than December 1994, when the planned elevation level for Pool 3 was reached, giving the Commission knowledge "about the damage that was going to occur as a result of raising the pool level." Id. at 1289.  The Federal Circuit however, reversed and held that "[t]he events that fixed the Corps' alleged liability occurred, at the earliest, in 1997," when the Corps refused the Commission's request to draw down Black Lake.  Id. at 1290.  The Federal Circuit indicated that the harm to the Commission was not apparent until the aquatic weeds "had grown, and had grown to harmful levels, and the Corps refused to drain the lake to alleviate the harm caused by the overgrowth of hydrilla [aquatic weeds]." Id. at 1291 (emphasis in original).  Noting Federal Circuit and Supreme Court precedent, the Northwest court stated:

> Dickinson established the principle that, "when the government allows a taking of land to occur by a continuing process of physical events, plaintiffs may postpone filing suit until the nature and extent of the taking is clear." Fallini, 56 F.3d at 1381.  Dickinson discouraged a strict application of accrual principles in unique cases involving Fifth Amendment takings by continuous physical processes. Applegate v. United States, 25 F.3d 1579, 1582 (Fed. Cir. 1994) (citing Dickinson, 331 U.S. at 749, 67 S. Ct. 1382). This court followed the Supreme Court's Dickinson mandate in Applegate, and held that the gradual character of the natural erosion process to the beach-front properties south of the Cape Canaveral harbor made accrual of the landowner's claim uncertain. 25 F.3d at 1583. Likewise, in Banks v. United States, 314 F.3d 1304 (Fed. Cir. 2003), this court also applied the stabilization doctrine to another shoreline erosion case.

Nw. La. Fish & Game Pres. Comm'n v. United States, 446 F.3d at 1291.  Applying the stabilization doctrine, the Federal Circuit reasoned that "[i]t did not become clear that the gradual process set in motion by the Corps had effected a permanent taking until the situation, i.e. the overgrowth of hydrilla, 'stabilized' in 1997."  Id.  Because the

permanent nature of the alleged taking did not stabilize until January 1997, the Federal Circuit found that the Commission's July 2001 complaint was not time-barred.  Id. at 1292.

Plaintiffs assert:

Any contention that the Government was not committed to drainage before September 2005 improperly disregards the Government's actual construction efforts on the ground in the 1960s and 1970s, its provision of drainage to certain farmlands through the mid-1980s, its commitment to devising a drainage solution for Plaintiffs' farmlands following the closure of Kesterson, its ongoing obligation to provide such drainage as confirmed by the United States District Court and affirmed by the Ninth Circuit, and its renewed efforts towards a drainage solution through 2010.

The case before the court presents an unusual, factual history given the Executive Branch's continuing failures and refusals to follow statutory direction and court orders.  Binding precedent establishes that the stabilization doctrine applies when a taking is effected by a gradual, continual physical process, rather than a discrete event.—In the case currently before the court, plaintiffs allege that, absent drainage, "wastewater settles beneath [their] lands, resulting in high water tables and the accumulation of saline groundwater.  The higher water tables and increased groundwater salinity make the land unsuitable for farming."  Plaintiffs further allege that "because Plaintiffs' farmlands have been subject and are currently subjected to the adverse affects attendant to the continuous absence of drainage facilities the United States has been obligated to provide, the combined effect of the rising water table and the accumulation of saline groundwater beneath and upon their properties has deprived Plaintiffs of the benefit of the productive use of their farmlands, and the value of their farmlands has been reduced."

The alleged damage to plaintiffs' farmlands does not constitute a straightforward, or typical, physical taking, as it does not involve a condemnation, passage of a regulation, or a single government act which usurped plaintiffs' land.  Nor is this a case in which the plaintiff's property has been slowly eroded or washed away by floodwaters.  The issue presented here is the effect of a failure to act, which has caused gradual physical determent to plaintiffs' property, over a period of time.  Defendant argues that the failure to provide drainage services to the Westlands "is not a gradual physical process like that of flooding," but rather, "is a distinct non-event," and characterizes the failure to provide drainage as a "discrete act" that "cumulated in June 1986 with the closure of Kesterson [Reservoir]."   The court disagrees that the failure to provide drainage, despite a statutory duty imposed, multiple court orders to do so, and myriad reports and plans generated between 1960, when the San Luis Act was enacted, and 2011, when plaintiffs brought this claim, can be characterized as a "discrete event."  The continuing harm to plaintiffs' property was not caused "in one moment in time," but "over a prolonged period via a process of physical events," see Banks v. United States, 76 Fed. Cl. at 691, set in motion by defendant's continuing failure, over five decades, to

comply with a Congressional mandate and court orders that it provide drainage to plaintiffs' property. The court finds, therefore, that the slow, physical degradation of plaintiffs' land constitutes a gradual taking of a physical nature, to which the stabilization doctrine is appropriately applied.

In the above captioned case, plaintiffs argue that there was "justifiable uncertainty" as to the permanency of the their claims, and the claims did not stabilize for statute of limitations purposes until at least 2008 because "[u]p to 2008, the Government has either pursued a solution to the drainage problem, however slowly, or has litigated the issue of its drainage obligation," thus fostering "justifiable uncertainty" about the permanence of plaintiffs' claim. Between 2008 and 2010, according to plaintiffs, defendant did not seek appropriations from Congress to pay for the drainage plan it had promised to implement, and in 2010 stated that local water districts should provide a long-term drainage solution instead of the federal government. When the 2010 Connor Letter was issued, plaintiffs could understand and reasonably foresee, the permanent nature of defendant's refusals to follow the statute and court Orders. Plaintiffs analogize their claim to the facts in <u>Applegate v. United States</u>, 25 F.3d at 1580-81 as well as <u>Northwest Louisiana Fish & Game Preserve Commission v. United States</u>, 446 F.3d at 1291. Plaintiffs argue that, defendant's "own struggle to identify an accrual date" demonstrates that plaintiffs were "justifiably uncertain" about the permanency of their claims. Plaintiffs assert:

> If the United States Government cannot remain clear on an accrual date, then no Westlands landowners can certainly or reasonably be expected to know or have known of their takings claim at any time before the Government made clear – through Commissioner Connor's letter to Senator Diane Feinstein in September 2010 – that the United States no longer intended to pursue the long-term drainage solution owed to their farmlands.

Defendant insists plaintiffs' claims accrued "well before September 2, 2005," which would result in barring this action as beyond the typical six year statute of limitations date, but fails to identify a single, identifiable accrual date or a distinct event which allegedly triggered accrual of plaintiffs' claims. The court has attempted to distill defendant's main arguments as to when plaintiffs' claims did, or did not, accrue and why, but notes the difficulty of that task for the court, and likely for the plaintiffs, as plaintiffs attempted to determine an accrual date, to respond to defendant's arguments.

At various points in its briefs and at oral argument, defendant has put forth different events that occurred before 2005, which defendant claims "reasonably foretold Plaintiffs of the damage the United States' actions – or inactions – were causing to their farmlands and accrued their claim," thereby accruing plaintiffs' claim. These events include:

- 1968: Defendant argues that, because the effects of providing water deliveries to the Westlands without providing drainage "have been

foreseeable since before the Unit [San Luis Unit] was envisioned," "absent drainage, the events giving rise to Plaintiffs' claim were known as soon as irrigation service to their lands began."   Defendant concedes in the next sentence, however, that "[a]dmittedly, the United States' actions during the early years of the San Luis Unit may have obscured the picture for landowners in Westlands.   Up through the 1970s, the United States continued efforts to construct drainage facilities and provide drainage throughout Westlands."   It appears from this and other statements that even defendant acknowledges that plaintiffs' claims likely did not accrue in 1968.

- April 3, 1985: Defendant and Westlands signed an agreement regarding the closure of the Kesterson Reservoir.   Defendant argues that, in the document, defendant stopped taking sole responsibility for drainage and made clear that all interested parties, the federal government, state, and local entities, were equally responsible for finding a drainage solution.

- June 1986: The Kesterson Reservoir was closed.   Defendant argues that plaintiffs acknowledge that, since the closure of the Kesterson Reservoir in June 1986, no drainage service has been provided to the Westlands. Defendant argues: "[f]rom that point forward, there can be little doubt that landowners in Westlands knew that damage was occurring, and would continue to occur, to their farmlands because they continued to irrigate but did not have drainage."   Defendant stated at oral argument that plaintiffs' "claim accrued by 1986 when drainage service ceased here."

- 1990s: Defendant points to the litigation events that took place in the 1990s, particularly Judge Wanger's finding that defendant had made a policy decision not to provide drainage to the Westlands and would not provide drainage unless ordered by the court to do so, to argue that "Plaintiffs' claim accrued no later than the 1990s."   Defendant asserted at oral argument that: "any objective landowner in the 1990s would not think the United States was going to comply with these duties.   They repeatedly said they weren't going to do it.   The courts were saying that they have found the government had a no drainage policy, and even after they were ordered to do it, they did not comply with that order and continued to insist that they were not going to comply with that order all the way up until 2000." Defendant seems to settle on the "1990s" as the accrual date.[32]

- 1991: The <u>Sumner Peck</u> litigation was initiated, in which defendant argues, "landowners similarly situated to Plaintiffs, i.e., putative class members here, filed the same claim as the present one," thus showing plaintiffs' claim was foreseeable in 1991 and accruing plaintiffs' claim.

---

[32] The "1990s" is a decade, not a date.

- May 1993: Judge Wanger stated in the 1993 Memorandum opinion in the Firebaugh/Sumner Peck case that defendant had failed to provide drainage service as required by the San Luis Act.

- December 1994: Judge Wanger issued his Findings of Fact and Conclusions of Law in the Firebaugh/Sumner Peck case, finding that defendant had failed to provide drainage service and would refuse to do so absent a court order, defendant's failure was not excused, and plaintiffs' land has been irreparably harmed.

- February 2000: The Ninth Circuit issued its opinion, "finding that United States had unlawfully withheld drainage service since 1986 while farmlands within Westlands were irreparably injured."

Defendant also articulated four reasons for why plaintiffs' claims accrued before 2005, in addition to their various, different, asserted accrual dates:

(1) landowners in the San Luis Unit have always known that irrigation without drainage causes damage to their farmlands; (2) despite irrigation service beginning in the San Luis Unit in 1967, the named Plaintiffs never received drainage; (3) in June 1986, the United States stopped providing drainage to any landowner in the San Luis Unit (*i.e.*, the putative class); and (4) the United States subsequently made the policy decision to not provide drainage and refused to do so until 2000.

(internal citations omitted).

Despite defendant's varied long list of dates and events which allegedly triggered accrual of plaintiffs' claims for the purposes of applying the statute of limitations to the complaint filed in this court, in its filing with this court, defendant seems primarily to have settled on "the 1990s" as its asserted accrual date. As stated by the defendant, "[t]hroughout the 1990s, the damage to Plaintiffs' farmlands was reasonably foreseeable . . ." and "[u]nder such circumstances, objective landowners in the San Luis Unit would be certain that their claim had accrued." Defendant argues that, even if the court finds that the stabilization doctrine applies in the above captioned case, plaintiffs' claims stabilized by the 1990s. Defendant also acknowledged, however, to the court that it was "arguably the case here up until April 3, 1985" that defendant was trying to mitigate the actions that would otherwise have constituted a takings claim. According to defendant, as of April 1985, however, when defendant and Westlands entered into an agreement regarding the closure of the Kesterson Reservoir, defendant contends, "[a]t that point, the United States stopped taking sole responsibility for providing drainage service as required by the San Luis Act," and instead made clear that providing drainage service to Westlands "would require 'Federal, state, and local agencies, and interested private parties . . . to work together.'" Defendant also argues that the Bureau of Reclamation made a decision not to provide drainage to Westlands sometime shortly

after the closure of the Kesterson Reservoir, and, therefore, made plaintiffs' claims foreseeable to an objective landowner.

> Surprisingly, however, defendant also states in its reply brief that, if the court
>
> finds that the stabilization doctrine does apply, Plaintiffs' claim may not have stabilized prior to September 1990.  While the United States forsook its obligation to solely provide drainage service in 1985, it was not until the issuance of the "Rainbow Report" [in September 1990] by the federal and state interagency program addressing drainage, the San Joaquin Valley Drainage Program, that affected landowners concluded that the United States would not provide drainage service as required by the San Luis Act.

(internal citations omitted).  The preceding are examples of defendant's contradictory positions regarding when plaintiffs' claims accrued.  Another argument offered by the defendant is that between 1991 and 2000, defendant maintained in the Firebaugh/Sumner Peck litigation that defendant "had no obligation to provide drainage."  The Firebaugh/Sumner Peck District Court and the Ninth Circuit decisions, however, rejected the United States' arguments concerning any excuses regarding its duty under the San Luis Act, see Firebaugh Canal Co. v. United States, 203 F.3d at 573-74, with the Ninth Circuit also noting that "lands within Westlands are subject to irreparable injury caused by agency action unlawfully withheld."  Id. at 578. Under such circumstances, defendant contends, there was no "justifiable uncertainty" about the accrual of plaintiffs' claim.  Defendant states:

> [T]he United States' position is that because Plaintiffs knew that their farmlands could be irreparably damaged without drainage when irrigation began, once the United States' drainage service ceased in the 1980s, and when the courts subsequently found that the United States had failed to, and would not, undertake mitigation efforts, Plaintiffs' claim accrued in the 1990s.

Defendant also focuses on two arguments for why various actions by the federal government did not constitute "mitigation efforts" sufficient to delay accrual of plaintiffs' takings claim and why plaintiffs were not "justifiably uncertain" about the permanency of their claims.   First, defendant argues that, to constitute a mitigation effort, the government's action must show "an unwavering commitment to mitigate."  (emphasis in original).  According to defendant, taken together, Applegate, Banks, and Mildenberger establish that the government's actions must go beyond "consideration of potential projects," and must involve a public commitment by the government to take some action that addresses an alleged taking, but do not hold that the government's commitment to mitigate the harm to plaintiff's property must be "unwavering."  Although the Federal Circuit in Mildenberger rejected local newspaper articles, declarations from non-

government employees, and an internal memorandum as "competent evidence of any Corps promises to mitigate damage," <u>Mildenberger v. United States</u>, 643 F.3d at 947, in <u>Applegate</u>, the Federal Circuit determined that an agency's announcement to build a Congressionally-approved project that would mitigate the damage to a landowners' property was a sufficient mitigation effort to support a finding of "justifiable uncertainty," thereby delaying the stabilization, and thus accrual, of a takings claim.  See <u>Applegate v. United States</u>, 25 F.3d at 1580, 1583.

Defendant also argues, by citing to <u>Northwest Louisiana Fish & Game Preserve Commission v. United States</u>, 446 F.3d at 1291, <u>Banks v. United States</u>, 314 F.3d at 1310, and <u>Applegate v. United States</u>, 25 F.3d at 1582, that litigation events cannot contribute to "justifiable uncertainty," as the doctrine has only been applied in circumstances in which "justifiable uncertainty" was caused by a gradual physical process, combined with promises of mitigation on the part of the government.  (citing <u>Nw. La. Fish & Game Pres. Comm'n v. United States</u>, 446 F.3d at 1291; <u>Banks v. United States</u>, 314 F.3d at 1310; <u>Applegate v. United States</u>, 25 F.3d at 1582) According to plaintiffs, however, in <u>Creppel v. United States</u>, 41 F.3d 627 (Fed Cir. 1994), the United States Court of Appeals for the Federal Circuit found that the statute of limitations in a takings cases should be tolled because "litigation and court orders have contributed to the uncertainty as to the permanence of a claim."  <u>Id.</u> at 629.

Defendant responds that plaintiffs cannot rely on <u>Creppel v. United States</u>, 42 F.3d at 627, to establish that ongoing litigation can delay accrual of a physical takings claim, and that, in fact that position has been rejected by this court in <u>Banks</u>.  See <u>Banks v. United States</u>, 102 Fed. Cl. at 142-47.  Defendant is correct that <u>Creppel v. United States</u> is not dispositive for the above captioned case because it involves a challenge to a regulatory taking, not a claim regarding a physical taking.  Moreover, defendant is correct that <u>Creppel v. United States</u> addressed the relationship between the accrual of a temporary taking, an intervening court order, and then the accrual of a permanent taking, <u>Creppel v. United States</u>, 41 F.3d at 631-34, thus making it factually distinguishable from plaintiffs' circumstances.  Defendant's reliance on <u>Banks</u>, however, for the proposition that this court has "rejected application of the stabilization doctrine" when delay is caused by "a legal situation, rather than a factual one" is incorrect.  In <u>Banks v. United States</u>, after the Federal Circuit had ruled on appeal that the stabilization doctrine applied to the plaintiffs' takings claims, the Court of Federal Claims applied the stabilization doctrine to facts established after discovery and found that the plaintiffs' claims had stabilized by 1952, far before the filing of the plaintiffs' 1999 complaint.  See <u>Banks v. United States</u>, 102 Fed. Cl. at 142.  The <u>Banks</u> decision did not address the application of legal proceedings to chronological computations under the stabilization doctrine. In <u>Banks</u>, no claim was made that legal proceedings justified delaying accrual of the plaintiffs' claim, and, contrary to defendant's assertion, the Court of Federal Claims 2011 decision in <u>Banks</u> court did apply the stabilization doctrine to the facts of that case. See <u>id.</u>

The issue of whether litigation events can create "justifiable uncertainty" or delay the accrual date for statute of limitations computations does not appear to have been

directly addressed by the United States Supreme Court, the United States Court of Appeals for the Federal Circuit, nor by this court.  This court notes, however, that in arguing that plaintiffs' claims accrued more than six years before their complaint was filed, defendant tries to use those litigation events to show the opposite: "There are at least five historical litigation events, spanning nearly a decade of well-publicized lawsuits, which undeniably show that there could be no justifiable uncertainty that the United States refused to provide drainage prior to 2000, thus accruing Plaintiffs' claims more than six years before the filing of the Complaint."

### Pre-1986

Plaintiffs argue that defendant has conceded that there was "justifiable uncertainty" regarding the permanence of plaintiffs' claims until at least April 1985, when defendant and Westlands signed an agreement regarding the closure of the Kesterson Reservoir and for defendant to continue to supply water.  Indeed, defendant has stated that, "[a]dmittedly, the United States' actions during the early years of the San Luis Unit may have obscured the picture for landowners in Westlands.  Up through the 1970s, the United States continued efforts to construct drainage facilities and provide drainage throughout Westlands."  Defendant also acknowledges that it was "arguably the case here up until April 3, 1985" that defendant was trying to mitigate the actions that would otherwise have constituted a takings claim.  Defendant, therefore, effectively does not dispute that, until April 3, 1985, defendant acknowledged its obligation to provide drainage services to the Westlands and was working to implement a drainage plan, making the permanency of plaintiffs' claims "justifiably uncertain."  The court will use April 3, 1985 as the starting point for analyzing whether defendant engaged in mitigation efforts sufficient to create "justifiable uncertainty" about the permanence of plaintiffs' claim.

### 1986-1991

In 1986, defendant entered into the Barcellos Judgment, pledging to complete a drainage plan by 1991.  In 1989, plaintiffs argues that defendant formed the San Luis Drainage Program with the stated goal of "implement[ing] a long-term solution to the drainage problem of the [San Luis Unit] . . . ."  The next year, 1990, the Bureau of Reclamation issued the 1990 Plan of Study "that echoed its intent 'to identify and implement a long-term solution to the drainage problem of the [San Luis Unit],' affirmed its commitment to comply with the drainage requirements of the Barcellos Judgment, and set forth a schedule for achieving these tasks."  Plaintiffs assert that each of these actions on the part of defendant undermine defendant's argument that the permanent nature of plaintiffs' claims were certain by April 3, 1985.

Defendant maintains, however, that neither the 1990 Plan of Study nor the 1991 Draft Environmental Impact Statement contained any promises that defendant would provide drainage service to the Westlands, and, thus, neither created "justifiable uncertainty" about the permanence of plaintiffs' claim.[33]  Moreover, defendant asserts,

---

[33] Defendant's counsel stated at oral argument:

that defendant had made a "policy decision" in the late 1980s or early 1990s not to provide drainage "eliminated any alleged uncertainty brought about by the issuance of the 1991 DEIS [Draft Environmental Impact Statement] or 1990 [Plan of] Study."

Plaintiffs respond that defendant's claimed "policy decision" in the wake of the closure of the Kesterson Reservoir in June of 1986 is "nothing more than a litigation posture" and "never triggered Plaintiffs' claim." Moreover, plaintiffs contend that defendant has failed to identify a date, source, or any formal announcement of such a policy by any official policy maker at DOI or the Bureau of Reclamation, "call[ing] into question whether such a policy existed at all." Plaintiffs argue that, "simply because the Government took the position in litigation that it was excused for a legal obligation does not make it so." Plaintiffs contend that the 1991 Draft Environmental Impact Statement, issued after defendant claims it had adopted a "no drainage policy," explicitly stated that defendant had a plan to address drainage needs through 2007 and beyond, in compliance with the Barcellos Judgment's requirements.

The court agrees with plaintiffs that, between 1985 and 1991, defendant took several actions which constituted "mitigation efforts," and no explicit policy statement by a responsible government official denying responsibility for drain construction is in the record, thus creating "justifiable uncertainty" about the permanence of plaintiffs' takings claim and delaying accrual of their claim. See Banks v. United States, 314 F.3d at 1309. While defendant argues that its agreement with Westlands in April 1985 marked a turning point by clarifying that defendant "stopped taking sole responsibility for providing drainage service," subsequent events undermine defendant's position. In 1986, defendant entered into the Barcellos Stipulated Judgment, agreeing to "develop, adopt and submit to the [Westlands] District by December 31, 1991, a Drainage Plan for Drainage Service Facilities," including a plan for completing construction of those facilities. By entering into the Barcellos Judgment, defendant publicly acknowledged its continuing responsibility for construction of drainage facilities in the Westlands and agreed to a court-enforced judgment which promised to do so. The Barcellos Judgment cannot be interpreted as shifting responsibility for providing drainage away from defendant and onto other stakeholders, despite defendant's counsel's claim in this litigation that from 1985 onward, the government took the position that providing drainage "would require 'Federal, state, and local agencies, and interested private parties . . . to work together.'" Instead the Barcellos Judgment unequivocally stated that

---

I know Plaintiffs will point to the 1990 Rainbow Report and the 1991 Draft Environmental Impact Statement as mitigation promises, but I think the caselaw is clear that something more than reports or studies need to be done. There actually has to be a commitment to undertake a mitigating effort, and that commitment wasn't done here at least until 2000.

When asked by the court, "[s]o what would be a typical mitigating effort here? To do what?" Defendant's counsel responded, "[w]ell, I think putting forward a final environmental impact statement, entering a record of decision, taking steps to implement that. That would qualify under Mildenberger as a mitigating effort."

the federal government "shall develop, adopt and submit to the District by December 31, 1991, a Drainage Plan for Drainage Service Facilities" that would be operational by 2007. The Barcellos Judgment gave landowners a reasonable expectation that the government would comply with its statutory and court enforceable promise to provide a drainage plan by a fixed date.   At all points since the 1960s, defendant has been responsible to provide drainage to the Westlands, and in 1986, following the Barcellos Judgment, the responsibility was reconfirmed by a Federal District Court and a Federal Appeals Court.

Between 1986 and 1991, defendant also took multiple steps toward designing and implementing a drainage plan in compliance with the Barcellos Judgment.  In 1989, the Bureau of Reclamation formed the San Luis Unit Drainage Program, the stated purpose of which was "to identify and implement an agricultural drainage plan for the San Luis Unit."  The Bureau of Reclamation then issued the 1990 Plan of Study, which stated that defendant's goal was to "identify and implement a long-term solution to the drainage problem of the SLU [San Luis Unit]" and that defendant intended to comply with the Barcellos Judgment.  The 1990 Plan of Study stated that "it is possible that meeting the schedule of the [Barcellos] judgment will involve planning and implementing facilities that provide only short or intermediate term drainage service, while long-term solutions are being developed."  The 1990 Plan of Study included a schedule of planned work activities for 1990 and 1991, and indicated that the Bureau of Reclamation would issue an Alternative Plans Formulation Report and a Draft Environmental Study by September 1991, with a Final Environmental Impact Study to follow after December 1991.  Defendant issued the 1991 Draft Environmental Impact Statement, on December 20, 1991 which reiterated the federal government's responsibility and commitment to providing a long-term drainage solution for the San Luis Unit service area.   While defendant is correct that the 1991 Draft Environmental Impact Statement did not include any action alternatives that explicitly addressed completion of the San Luis Drain, it did evaluate four action alternatives for providing drainage services to the San Luis Unit, and identified a preferred alternative.

Defendant has failed to point to any evidence in the record of a definitive publicly announced decision not to provide drainage to the Westlands, creating uncertainty for plaintiffs.  Rather, by issuing the 1990 Plan of Study and the 1991 Draft Environmental Impact Statement, defendant appeared to be complying with the Barcellos Judgment by developing a plan to provide a long-term drainage solution for the San Luis Unit service area.  Defendants' actions from 1986 to 1991 are analogous to the Corps' actions in Applegate and distinguishable from the Corps' actions in Mildenberger.  In Applegate, the Corps announced plans to build a sand transfer plant in 1968, and again in 1988 in 1990 and 1991.  See Applegate v. United States, 25 F.3d at 1580-81.  In Mildenberger, however, the plaintiffs tried to rely on newspaper articles, a local newsletter, interviews with members of an environmental group, and one decades-old internal Corps memorandum to establish that the Corps had made multiple promises to mitigate the environmental damage to the St. Lucie River.  See Mildenberger v. United States, 643 F.3d at 943.   The Mildenberger court found, therefore, that the government never "undertook nor committed itself to any mitigation activities."  Id. at 947.  By contrast, in

the above captioned case, defendant committed itself to mitigation activities by entering into the Barcellos Judgment in 1986 and, between 1986 and 1991, adhering to defendant's announced schedule of activities, thereby giving every positive indication that defendant intended to comply with the Barcellos Judgment.  Defendant's actions in the case currently before the court went beyond consideration of "potential projects," as defendant committed itself to mitigation activities by entering into a court-enforceable settlement and judgment, and by publicly issuing documents which put forth specific plans and a timeline for implementing a drainage solution.  For these reasons, the court finds that defendant's actions between 1986 and 1991 constituted mitigation efforts sufficient to create "justifiable uncertainty" about the permanence of plaintiffs' claims and, thereby, delay accrual of plaintiffs' claims until at least 1991.

**1991-2000**

For the remainder of the 1990s, plaintiffs assert that the central issue in the Firebaugh/Sumner Peck litigation was defendant's legal obligation to provide drainage service to the San Luis Unit, "fuel[ing] the uncertainty" about the permanence of the damage to plaintiff's property.  According to plaintiffs, defendant argued in the Firebaugh/Sumner Peck litigation "that 'subsequent changes in the law and environmental compliance made compliance with the San Luis Act impossible, and . . . excused the [United States] from performing th[e] duty [to provide drainage].'"  Plaintiffs, however, point out that rulings by the District Court for the Eastern District of California in 1994 and 1995, and by the Ninth Circuit in 2000, held that defendant was obligated to provide those drainage services.  Plaintiffs argues that "there can be no doubt that from the moment the district court issued its 1995 order, which first recognized the Government's drainage obligation and ordered the Government's compliance," and "that Plaintiffs have had 'reasonable expectations' that their properties would receive such drainage."  Plaintiffs assert:

It is nonsensical to argue that Plaintiffs' takings claim stabilized during the Sumner Peck litigation, and in particular in the wake of Judge Wanger's orders, when that litigation specifically affirmed the Government's statutory duty to provide drainage.  To hold otherwise, would require Plaintiffs to assume that the Government would refuse to comply with a court order directing it to provide drainage under the San Luis Act without any explicit Government refusal to do so.

Defendant asserts that it undertook no actions in the 1990s which could be considered mitigation efforts.  As noted below, however, defendant concedes that the Bureau of Reclamation's actions in the 2000s could be considered promises of mitigation.  Defendant argues that the Bureau of Reclamation had made a "policy decision" not to provide drainage to the San Luis Unit in the late 1980s and that, from 1991 to 2000, throughout the Firebaugh/Sumner Peck litigation, the federal defendants maintained that it had no statutory obligation to provide drainage.  According to defendant, despite the statutory obligation and court decisions, this somehow clarified the permanence of the damage to plaintiffs' property.  Defendant argues that, Judge Wanger's finding in his 1994 Findings of Fact and Conclusions of Law that the federal

defendants had made a "policy decision" not to provide drainage should have made it objectively clear in the 1990s that plaintiffs' land was to be permanently damaged.

As noted above, defendant has failed to point to any evidence in the record of a publicly announced "policy decision" not to provide drainage to the Westlands during the 1990s. Additionally, defendant ignores the crux of Judge Wanger's decision and its effect on the permanence of damage to plaintiffs' land. Judge Wanger held in 1994 that the federal defendants' decision not to complete the San Luis Drain "constitute[d] agency action unlawfully withheld." In his 1995 Partial Judgment, Judge Wanger issued an injunction instructing the federal defendants to "without delay, take such reasonable and necessary actions to promptly prepare, file, and pursue an application for a discharge permit for the San Luis Drain to comply with section 1(a) of the San Luis Act to provide drainage to the San Luis Unit." In 1995, therefore, Judge Wanger rejected the federal defendants' position that it did not have a statutory obligation to provide drainage, found that the federal defendants had been acting contrary to law by not implementing a drainage plan, and ordered the federal defendants to move forward with a plan. This negates defendant's argument that it should have been objectively clear to landowners in the 1990s that the federal government was not going to provide drainage. Moreover, the defendant should not be allowed to rely on its failure to comply with its statutory obligation and disregard court orders to establish certainty regarding an alleged accrual of the statute of limitations. In 1994, based on Judge Wanger's findings, the Westlands community, including plaintiffs, were justified in their reasonable expectation that defendant would comply with its statutory duty and court orders to provide a drainage solution. Following Judge Wanger's rulings, the federal defendants appealed the district court's findings, and a period of five years passed while the parties waited for a decision by the appellate court. During those five years the federal defendants did not move forward with a drainage plan, but the District Court's Order requiring them to do so remained undisturbed and the government's statutory and court ordered obligation to provide drainage remained. Under such circumstances, the court finds that landowners in the Westlands, including plaintiffs, still justifiably anticipated that the defendant eventually would meet its statutory duty and the plaintiffs were "justifiably uncertain" about the permanence of damage to their property until at least 2000.

**2000-2007**

Subsequently, from 2000 to 2007, plaintiffs argue that "under the mandate of the Ninth Circuit and the oversight of the District Court [for the Eastern District of California], the Government devised, scrutinized, and implemented a new drainage plan that was to comply with its statutory duty," and comply with the court orders to correct the environmental damage caused to Westlands' farmlands. Plaintiffs cite to defendant's 2001 Plan of Action and Preliminary Alternatives Report, 2002 Plan Formulation Report, 2004 Plan Formulation Report Addendum, 2005 Draft Environmental Impact Statement, 2006 Final Environmental Impact Statement, and 2007 Record of Decision to demonstrate that the "permanent nature of the environmental harms to Plaintiffs' farmlands was neither reasonably foreseeable nor well-known to Plaintiffs before

September 2, 2005," or six years before plaintiffs' complaint was filed on September 2, 2011.

Defendant, citing to the 2011 Court of Federal Claims decision in Banks v. United States, 102 Fed. Cl. at 134 n.13, however, argues that the events of the 2000s are irrelevant to the accrual argument because the statute of limitations ran in the 1990s, and anything that happened subsequently cannot serve to revive plaintiffs' claims. Defendant contends that plaintiffs' takings theory is at its core an argument that, wherever there is an ongoing statutory duty to act, "a taking claim predicated on a failure to meet that duty would never be untimely – a position soundly rejected by the Federal Circuit," and cites Navajo Nation v. United States, 631 F.3d at 1275-76 and Fallini v. United States, 56 F.3d 1378.  Defendant acknowledges, however, that the Bureau of Reclamation's actions in the 2000s constituted "promises of mitigation" with regard to the damage of farmlands in the Westlands, although defendant emphasizes that those promises were "made only after being court-ordered."

Because the court has determined that the statute of limitations did not run in the 1990s, the events of the 2000s are relevant to the court's analysis of whether the plaintiffs' lawsuit was timely filed and whether mitigation promises were given by the defendant.  The fact that defendant's promises to mitigate the damage to plaintiffs' lands were motivated by orders from both the District Court for the Eastern District of California and the Ninth Circuit only strengthens, not weakens, plaintiffs' argument that they relied on defendant's promises and believed that defendant would comply with the court orders and expeditiously implement a drainage plan mandated by statute. Between 2001 and 2007, defendant issued a 2001 Plan of Action, a 2001 Preliminary Alternatives Report, a 2002 Re-Evaluation Plan Formulation Report, the 2004 Addendum, a 2005 Draft Environmental Impact Statement, a 2006 Final Environmental Impact Statement, and a 2007 Record of Decision.  Each of these documents, issued by the Bureau of Reclamation, acknowledged defendant's responsibility for providing drainage to the San Luis Unit, represented a step toward implementation of a drainage solution, and announced the next steps defendant would take and when those next steps would be completed.  Through 2007, defendant gave every impression that it was in the process of implementing a drainage solution, or at least formulating a plan for a drainage solution, which would have mitigated the damage to farmlands in the Westlands.  The court agrees with plaintiffs that, between 2000 and at least 2007, defendant was engaged in mitigation efforts, as it took multiple steps to develop and implement a drainage solution in compliance with the Ninth Circuit's opinion and the district court's modified, partial judgment in Firebaugh/Sumner Peck.  Justifiable uncertainty regarding the permanence of damage to plaintiffs' land persisted through the issuance of the 2007 Record of Decision, or within six years of the filing of plaintiffs' claim, preventing stabilization and, thereby, accrual of plaintiffs' claims until at least 2007, making plaintiffs' claims timely.  Therefore, plaintiffs' claims are not barred by the statute of limitations.

**2008-2011**

Plaintiffs, however, assert that "the turning point" in this case "began in 2009 with the Government's decision not to pursue the legislation needed to implement a long-term, district-wide drainage solution, and culminated in 2010 with the Government's declaration to Congress [in the form of the 2010 Connor Letter] that it was throwing in the towel." Plaintiffs argue that, in the 2010 Connor Letter, from the Bureau of Reclamation's Michael L. Connor to Senator Dianne Feinstein, defendant publicly rejected the agreed-upon solution for providing drainage services, as described in the 2007 Record of Decision, and instead, "purported to unilaterally transfer responsibility for its drainage obligations to Westlands and other water districts . . . ."

Plaintiffs analogize these events to the facts of <u>Northwest Louisiana Fish & Game Preserve Commission v. United States</u>, 446 F.3d at 1285, in which the Federal Circuit held that the government's refusal to mitigate a gradual physical process set in motion by the government triggered accrual of the plaintiff's claim. The Court of Federal Claims granted defendant's motion to dismiss the claim, finding that the Commission's claim had accrued no later than December 1994, when the planned elevation level for Pool 3 was reached, giving the Commission knowledge "about the damage that was going to occur as a result of raising the pool level." <u>Id.</u> at 1289. The Federal Circuit overruled the Court of Federal Claims, holding that "[t]he events that fixed the Corps' alleged liability occurred, at the earliest, in 1997," when the Corps refused the Commission's request to draw down Black Lake. <u>Id.</u> at 1290. The Federal Circuit indicated that the harm to the Commission was not apparent until the aquatic weeds "had grown, *and* had grown to harmful levels, *and* the Corps refused to drain the lake to alleviate the harm caused by the *overgrowth* of hydrilla [aquatic weeds]." <u>Id.</u> at 1291 (emphasis in original). Applying the stabilization doctrine, the Federal Circuit reasoned that "[i]t did not become clear that the gradual process set in motion by the Corps had effected a permanent taking until the situation, i.e. the overgrowth of hydrilla, 'stabilized' in 1997." <u>Id.</u> Because the permanent nature of the alleged taking did not stabilize until January 1997, the Federal Circuit found that the Commission's July 2001 complaint was not time-barred. <u>Id.</u> at 1292.

Plaintiffs argue that, in the above captioned case, "the turning point analogous to the Army Corps' refusal in <u>Northwest</u> began in 2009 with the Government's decision not to pursue the legislation needed to implement a long-term, district-wide drainage solution, and culminated in 2010 in the 2010 Connor Letter in which the government declared to Congress that it was throwing in the towel." Plaintiffs continue:

> Just as the Army Corps' refusal to allow the drawdown triggered accrual of the <u>Northwest</u> plaintiff's takings claim, Interior's refusal here to implement its Record of Decision marked the point where Westlands landowners, including Plaintiffs, knew of the extent of the harm to their farmlands and all events that fixed the Government's liability had occurred.

Plaintiffs claim "[i]t was not until the Bureau [of Reclamation] washed its hands of the Record of Decision and instead proposed transferring its drainage duty to local water districts in its September 2010 letter," and that "Plaintiffs' claim finally stabilize[d] such

that permanent damage to their property from drainage water was reasonably foreseeable." Plaintiffs, therefore, allege an accrual date of September 2010 when the 2010 Connor Letter was sent to Senator Feinstein.

In <u>Northwest</u>, the Corps' explicitly refused to mitigate the damage it had initiated to Black Lake. <u>See id.</u> at 1287-88. In the case currently before this court, despite defendant's posture in this litigation, defendant has repeatedly come just short of explicitly stating that it will not provide drainage to plaintiffs' land. By informing Congress, via the 2008 Feasibility Report and the 2010 Connor Letter, however, that the Bureau of Reclamation's own plan to provide drainage solution is an inferior plan that does not warrant expenditure of federal funds and that, instead, the federal government should be relieved of its duty to provide drainage, the Bureau of Reclamation made it nearly certain that the 2007 Record of Decision would not be implemented. As in <u>Northwest</u>, in which the Federal Circuit reasoned that it was not clear that the damage to Black Lake was permanent until defendant refused to mitigate that damage, the damage to plaintiffs' land caused by defendant's failure to provide drainage was not evident during the time defendant was actively working toward implementation of a drainage solution between the Ninth Circuit's 2000 ruling and the issuance of the 2007 Record of Decision.

Defendant argues that there is no post-2000 event which could possibly be used as the accrual date for plaintiffs' claim. At oral argument counsel for the defendant stated: "Yes, I would be hard pressed to advocate for any accrual date in the 2000s when we've been found to be compliant with our duty to provide drainage during that time period." At the same time, defendant contends to this court, "there has been no change of circumstances since 2000," meaning that there has been no event since that time which would serve as an accrual date for plaintiffs' claim. According to defendant, the 2010 Connor Letter cannot serve as a trigger for plaintiffs' takings claim because it in no way repudiated defendant's plan to move forward with its plan to provide drainage service to the Westlands, as laid out in the 2007 Record of Decision. Defendant points to Judge Wanger's July 2011 decision, which stated that defendant was complying with its Control Schedule for implementing the Record of Decision, as well as the Ninth Circuit's 2013 opinion, which affirmed Judge Wanger's 2011 Memorandum Decision, to demonstrate that, since 2000, defendant has been complying with its statutory duty to provide drainage, and nothing has occurred that constitutes a trigger for the accrual of plaintiffs' claim. Defendant claims that, "in affirming Judge Wanger's holding that Interior is in compliance with its statutory duty to provide drainage, the Ninth Circuit held 'that Interior is neither withholding nor unreasonably delaying drainage within the [San Luis] Unit.'" <u>Firebaugh Canal Water Dist. v. United States</u>, 712 F.3d at 1303.[34]

Events since the Bureau of Reclamation's issuance of its Record of Decision in 2007 have significantly undermined defendant's commitment to provide a

---

[34] Defendant also cites to the Ninth Circuit's decision for the language that "we repeat <u>Firebaugh I's</u> holding that Interior is obliged to find a solution. We also reaffirm, however, that the contours of the solution lie within Interior's discretion." <u>Firebaugh Canal Water Dist. v. United States</u>, 712 F.3d at 1304.

comprehensive drainage solution for plaintiffs' land.   The 2007 Record of Decision announced the Bureau of Reclamation's decision as to which action alternative the government would implement to provide drainage to the San Luis Unit, the In-Valley/Water Needs Land Retirement Alternative.   The 2007 Record of Decision also indicated that the Bureau of Reclamation was finalizing cost estimates to confirm whether new authorizing legislation was required.   The Bureau of Reclamation's cost estimates showed that the projected cost of providing drainage to the San Luis Unit had multiplied by a factor of ten since the San Luis Act was passed in 1960.   Although the 2007 Record of Decision was supposed to represent the Bureau of Reclamation's decision regarding which action alternative would be environmentally best and implemented, in July 2008, the Bureau of Reclamation delivered the 2008 Feasibility Report to Congress, which evaluated two action alternatives, the In-Valley/Drainage-Impaired Land Retirement Alternative and the In-Valley/Water Needs Land Retirement Alternative, for feasibility.   Because projected costs had risen so high, the Bureau of Reclamation stated in the 2008 Feasibility Report that neither of the action alternatives were economically or financially feasible.

As plaintiffs also argue, this does mark a turning point in the long history of events surrounding implementation of a drainage solution in the San Luis Unit.   As the 2008 Feasibility Report explained, if an action alternative is not feasible, it is not implemented.   The 2008 Feasibility Report indicated that, to be implementable an action "must be feasible as defined by the *Economic and Environmental Principles and Guidelines (Principles and Guidelines).*   The *Principles and Guidelines* require Federal actions contribute to the national economic development (NED)."   The 2008 Feasibility Report continued:

> The San Luis Act of 1960 as amended establishes the Reclamation's Federal interest in the proposed action.  This interest was reaffirmed by the Federal District Court Order dated November 29, 2000.

> However, the requirement for a net positive contribution to the Nation's economy cannot be met by either of the two action alternatives.

The 2008 Feasibility Report revealed that the action alternative selected by the Bureau of Reclamation, after a six-year evaluation process, preceded by more than forty years of inaction and failed efforts on the part of the government to implement a drainage strategy, was extremely problematic because of cost factors.   The Bureau of Reclamation explicitly stated in its 2008 Feasibility Report to Congress that the selected action alternative did not "justify warrant [sic] the expenditure of Federal funds."

In light of the conclusion in the 2008 Feasibility Report, the Bureau of Reclamation revealed its long-awaited legislative proposal to Congress, in the form of the 2010 Connor Letter to Senator Dianne Feinstein.   Through 2009, the federal government had represented to the <u>Firebaugh/Sumner Peck</u> court, and, thus, to the public, that it was working on a legislative proposal that would seek implementation of the action alternative identified in the 2007 Record of Decision.   The 2010 Connor

Letter, however, did not recommend implementation of a federally-led drainage solution, but instead suggested that responsibility for a long-term drainage solution should be shifted to the water districts.  The 2010 Connor Letter stated: "We believe that the best way to accomplish those goals is to transfer responsibility for irrigation drainage to local control, subject to state and local regulation, and to provide corresponding adjustments in financial obligations or otherwise provide financial incentives to the districts."  The 2010 Connor Letter went on to identify thirteen "key elements of a long-term legislative drainage strategy" "that the Administration would support in legislation," the first of which was the idea to "**Transfer irrigation drainage responsibility to local control:** Drainage service should be the responsibility of the individual Unit contractor pursuant to a drainage management plan that complies with applicable state and federal standards." (emphasis in original).  Other key elements included directing the Bureau of Reclamation to stop delivery of Central Valley Project Water to the water districts unless they met certain performance goals, requiring Westlands to retire at least 200,000 acres of land, relieving some of the water districts' remaining repayment obligations to the federal government for existing Central Valley Project facilities, ending the ongoing litigation between the water districts, residents, and the federal government, and transferring title of federally owned water facilities to the water districts.

Viewed in the full context of the long history of failed efforts by the Bureau of Reclamation, the 2008 Feasibility Report and the 2010 Connor Letter together represent a repudiation of defendant's 2007 Record of Decision, the plan that the agency had offered for meeting its statutory duty and court-ordered obligations to provide drainage to the San Luis Unit.  Although the Bureau of Reclamation stopped short of explicitly saying that it refused to provide drainage to the San Luis Unit, the proposal was contrary to the existing Firebaugh/Sumner Peck court orders.  Westlands' General Manager, Thomas Birmingham, observed in his written response to the 2010 Connor Letter, which he also directed to Senator Feinstein:

> Westlands has a judgment against the Secretary [of the Interior] ordering him to provide drainage.  The government estimates that it will cost $2.6 billion to comply with that order.  But as an alternative, Reclamation proposes: (1) that the obligation to provide drainage be transferred to Westlands; (2) that if Westlands does not perform this obligation (something Reclamation has been unable to do for 40 years) its water supply will be reduced; (3) that Westlands must retire 200,000 acres of land at its expense; and, (4) that for the privilege of undertaking these obligations and risks, Westlands will give up 400,000 acre-feet of contract supply.

As discussed above, "the touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable."  Boling v. United States, 220 F.3d at 1372.  Courts have recognized that determining the exact accrual date of a taking that is caused by a gradual physical process, instead of a discrete event, is inherently difficult.  See Mildenberger v. United

States, 643 F.3d at 945 (citing Navajo Nation v. United States, 631 F.3d at 1273–74 ("[T]he stabilization doctrine recognizes that determining the exact point of claim accrual is difficult when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government such as a condemnation or regulation.")); see also Banks v. United States, 314 F.3d at 1309 (citing Boling v. United States, 220 F.3d at 1371 (stating that Dickinson and its progeny recognize that gradual takings present special difficulties and "represent an application of general accrual principles, rather than a broad exception to them")).  Plaintiffs allege that the continuous accumulation of saline groundwater beneath their land has impaired their use of and devalued the land, or, in other words, made such "substantial inroads" into the property.  In the particular circumstances of this case, with a history going back five decades, the court finds that once defendant suggested to Congress, first with the 2008 Feasibility Report, and then with the 2010 Connor Letter, that implementing the Bureau of Reclamation's 2007 Record of Decision does not warrant expenditure of federal funds, and that, instead, responsibility for providing a drainage solution should be transferred to local control, the permanent nature of the damage to plaintiffs' land became evident and the extent of the damage became reasonably foreseeable, thereby stabilizing plaintiffs' claims.

The court recognizes that, since 2010, defendant has been engaged in activities directed at moving forward with constructing drainage facilities in one sub-unit of the Westlands.  By defendant's own admission, however, the northern sub-unit constitutes just 24,000 acres out an estimated 390,000 acres in the Westlands that are "drainage-impaired."  Defendant's submissions to the Firebaugh/Sumner Peck court to date are silent as to what is being done, or planned, for the other 366,000 acres of drainage-impaired land in the Westlands.  The steps defendant has taken since 2010 are minimal when compared to what defendant is required to do, by statute and by court orders, namely to provide drainage services to the entire San Luis Unit.

The court is cognizant of both Judge Wanger's 2011 Memorandum Opinion and the Ninth's Circuits April 5, 2013 opinion in Firebaugh/Sumner Peck, which concluded that the Bureau of Reclamation is not yet unlawfully delaying implementation of the 2007 Record of Decision.  The Firebaugh plaintiffs, however, resided in two water districts which sit outside of the San Luis Unit.  The Firebaugh/Sumner Peck litigation no longer involves any individual landowners in the San Luis Unit.  In addition, the District Court and the Ninth Circuit, never ruled on a takings claim in the Firebaugh/Sumer Peck case.  Although the plaintiffs originally raised an inverse condemnation claim, but it was transferred to the United States Court of Federal Claims, where it was dismissed under 28 U.S.C. § 1500, because the judge decided that the inverse condemnation claim was the "same claim" as the tort claims that were previously brought, and were still pending, in district court.  See Firebaugh Canal Water District, et al. v. United States, No. 03-2790L.  Judge Wanger and the Ninth Circuit, however, were ruling on the Firebaugh/Sumner Peck plaintiffs' motion for summary judgment on a claim of unreasonable delay under APA § 706(1), not any form of a takings claim.  As the Ninth Circuit emphasized, a § 706(1) claim can only proceed in cases in which a defendant "failed to take a *discrete* agency action that it is *required to take*."  Firebaugh Canal

Water Dist. v. United States, 712 F.3d at 1301 (citing Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004)) (emphasis in original).  On the APA claim, Judge Wanger held that the Firebaugh/Sumner Peck plaintiffs were not entitled to summary judgment because the record reflected that defendant was still taking steps toward implementing the 2007 Record of Decision, albeit slowly.  Judge Wanger stated:

> The Department issued its ROD [Record of Decision] in 2007, its Feasibility Report in 2008, and its Control Schedule for implementing the drainage solutions identified in 2009; that a drainage system was not yet in place at the time Plaintiffs' [sic] filed their motion for summary judgment in October 2010 does not, under the totality of the circumstances, constitute unreasonable delay in the context of this case.  It is undisputed that the Department [of the Interior] is complying with the Control Schedule, more than ten years after final judgment was entered in the Court of Appeal and fourteen years after final judgment in the trial court.

Likewise, the Ninth Circuit was reviewing Judge Wanger's ruling on the plaintiffs' APA § 706(1) claim when it stated that "Interior is neither withholding nor unreasonably delaying drainage within the [San Luis] Unit."  Firebaugh Canal Water Dist. v. United States, 712 F.3d at 1303.  Judge Wanger's and the Ninth's Circuit's findings, in separate litigation, involving different parties, claims, and legal theories, that the federal defendants were not liable under the APA are not dispositive with regard to the statute of limitations in the Court of Federal Claims and the timing of the accrual of plaintiffs' takings claim in this matter above captioned case.  If anything, Judge Wanger's and the Ninth Circuit's decisions support plaintiffs' arguments that their case was timely filed.

Similarly, the cases identified by the parties that were previously litigated in this court, or its predecessor, are distinguishable from the above captioned case.  Neither the United States Court of Claims nor the United States Court of Federal Claims decided a takings claim filed by similarly situated plaintiffs on the merits.  Rather, Claus v. United States, No. 270-85L, Schwab v. United States, No. 292-85L, and Freitas v. United States, No. 218-88L, were all settled with respect to particular plaintiffs and do not provide guidance or precedent.  Both of the Firebaugh/Sumner Peck plaintiffs' inverse condemnation cases were dismissed on jurisdictional grounds and not fully litigated.  Moreover, in Westlands Water District v. United States, the most recent of the cases filed in this court, all of the plaintiff's claims hinged on an alleged contractual duty pursuant to the 1963 Contract and 1965 Contract for defendant to provide water services, but the court found that no such contractual duty existed.  See Westlands Water Dist. v. United States, 109 Fed. Cl. at 193-202.  The holding in Westlands Water District v. United States that the plaintiff's breach of contract claims were time-barred because they accrued outside of the six-year statute of limitations does not necessarily mean that plaintiffs' takings claims in the above captioned case is untimely.  In addition, the plaintiff in Westlands Water District was a water district suing the United States for breach of contract, not a case brought by individual landowners alleging takings claims.  The two cases involved different parties, different claims, and, therefore, rely on very different facts and the factual records before the courts are different.

Although <u>Westlands Water District v. United States</u> addressed the 2010 Connor Letter, finding that it did not constitute a "repudiation" of defendant's contractual duty to provide drainage, that conclusion was based on the fact that the plaintiff had failed to show that any contractual duty existed.  <u>See</u> <u>Westlands Water District v. United States</u>, 109 Fed. Cl. at 216.  Moreover, the <u>Westlands</u> decision considered the 2010 Connor Letter in the context of breach of contract claims and did not mention the 2010 Connor Letter's alleged repudiation of defendant's statutory duty to provide drainage to the San Luis Unit and, in fact, did not address defendant's statutory duty at all.   The <u>Westlands</u> court stated

no such contractual drainage obligation existed to be repudiated. Further, plaintiff has not shown that the letter is a distinct, unqualified refusal to perform a contractual duty, made by defendant to plaintiff.  <u>Cf.</u> <u>Dow Chem. Co.</u>, 226 F.3d at 1334. In particular, the letter cannot be characterized as the government's making a repudiation to Westlands because the letter was not addressed to Westlands. Compl. Ex. A (Feinstein Letter) 1. In addition, the letter did not even mention a contractual drainage obligation. Instead, it acknowledged the government's statutory drainage obligation and discussed the steps being taken to comply with that obligation.  <u>See</u> <u>id.</u> at 1–2 (acknowledging the holding in Firebaugh that the "San Luis Act imposes on the Secretary a duty to provide drainage service to the [San Luis] Unit," discussing Interior's inability to implement a 2007 record of decision (the 2007 record of decision), and stating that sufficient appropriations "remained to allow Interior to construct one subunit of drainage facilities within Westlands Water District"). The letter also sought legislative assistance to comply with defendant's statutory drainage obligation, stating that, beyond one subunit of drainage facilities, Interior "will be unable to proceed without additional Congressional authorization." <u>Id.</u> at 2. Finally, the letter requested a legislative response and described "key elements of a long-term legislative drainage strategy" that the Administration would support. <u>Id.</u> at 2–4. These key elements included transferring irrigation drainage responsibility to local control, <u>id.</u> at 2, which plaintiff appears to have misinterpreted as a declaration "that from now on, the drainage obligation falls to the water districts on pain of losing their water." <u>See</u> Pl.'s Resp. 25. Nowhere does the letter say that defendant refuses to perform a contractual drainage obligation.

Plaintiff also contends that "the Government's forty years of failing to provide drainage and temporizing over the last twenty-six years is conduct from which a repudiation can be inferred."  <u>Id.</u> at 26 (citing Restatement (Second) of Contracts § 250). However, for an act to constitute repudiation, it "must be both voluntary and affirmative, and must make it actually or apparently impossible for [the obligated party] to perform." Restatement (Second) of Contracts § 250 cmt. c. The government's failure to provide drainage is not an affirmative act, nor has plaintiff alleged that it

makes it actually or apparently impossible for the government to provide drainage in the future. Cf. id. And plaintiff has not shown any contractual obligation to provide drainage in the first place.

Plaintiff has failed to allege facts sufficient to state a plausible claim for relief based on an anticipatory breach [of contract] theory. Cf. Iqbal, 556 U.S. at 678.

Westlands Water District v. United States, 109 Fed. Cl. at 208. This opinion addresses the accrual date in a taking case, and is not considering whether a breach of the 1963 Contract or 1965 Contract occurred.  Finally, even if the two cases were in the same litigation posture or considering the same theories, this court would not be bound by Westlands.  See Adams v. United States, 99 Fed. Cl. 700, 709 (2011) (quoting Buser v. United States, 85 Fed. Cl. 248, 259 n.12 (2009) ("'[T]he court is not bound by other decisions in the Court of Federal Claims[.]'")); see also Reidell v. United States, 47 Fed. Cl. 209, 212 (2000) ("A decision here is not binding on other judges in this same court." (citation omitted)).   For these reasons, the court finds that the referenced cases previously litigated in this court do not alter the analysis of the accrual date for plaintiffs' takings claims.

This court has the difficult task of deciding when, in the course of a more than fifty-year history of events, broken promises, litigation, endless studies, proposals, and task forces, and government inaction, plaintiffs should have realized that their land was being permanently damaged as a result of the federal government's failure to comply with its statutory duty, and by multiple court orders, reaffirming that duty.  The Supreme Court in Dickinson emphasized that "[t]he Fifth Amendment expresses a principle of fairness" and that "procedural rigidities should be avoided" when a taking is caused by a continuous process.  See United States v. Dickinson, 331 U.S. at 748-49.  This court has, likewise, underscored "'the Supreme Court's mandate in United States v. Dickinson that taking claims "be enforced with an eye toward fairness."'"  Barlow & Haun, Inc. v. United States, 87 Fed. Cl. 428, 438 (2009) (quoting Reed Island-MLC, Inc. v. United States, 67 Fed. Cl. 27, 33-34 (2005) (quoting Forsgren v. United States, 64 Fed. Cl. 456, 460 (2005); citing United States v. Dickinson, 331 U.S. 745)).  Defendant has essentially argued to this court that plaintiffs should be barred from bringing takings claims because plaintiffs should have known much earlier that the damage to their land was permanent, even though defendant unlawfully was ignoring its statutory duty to provide drainage during the late 1980s and early 1990s and, despite numerous court orders which mandated that defendant had a continuing duty to provide a prompt solution to the drainage problem in Westlands.  The court disagrees.  Rather, as plaintiffs' points out, defendant's inability to pinpoint a single accrual date, and defendant's reliance on an entire decade as the time when plaintiff allegedly should have known that its claim had accrued, supports a conclusion that landowners in the Westlands were justifiably uncertain about the permanent nature of the damage to their lands within a timeframe that made plaintiffs' complaint timely filed.  The court recognizes that the drainage and salt accumulation problems in the San Luis Unit are complex, continuous, and that there are no easy solutions.  That does not mean,

however, that the Bureau of Reclamation can use decades of inaction, inconstancy and failures to deliver on its statutory duty and court-ordered responsibilities as an end-run around the statute of limitations regarding plaintiffs' claim.   That would set a very perverse precedent, allowing federal agencies by inaction to avoid statutory duties and ignore court orders.   Fairness directs giving plaintiffs the opportunity to present evidence to the court on whether or not a taking has occurred[35] based on defendant's failure to provide a drainage solution for the Westlands for over fifty years.  Because the court finds that plaintiffs' claims did not accrue before September 2, 2005, plaintiffs' claims are not time-barred by 28 U.S.C. § 2501.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **DENIED**.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[35] To succeed with a takings claim under the Fifth Amendment takings clause, a plaintiff must show that the government took a private property interest for public use without just compensation.   See U.S. Const. amend. V; see also Arkansas Game and Fish Comm'n v. United States, 133 S. Ct. 511, 515 (2012); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006).   To establish a taking, a plaintiff must have a legally cognizable property interest, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)), and then must be able to demonstrate that the governmental action at issue amounted to a compensable taking of that property interest for a public use.   See Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372).   Left to determine in this case is whether plaintiffs had a cognizable property interest at the time of the alleged taking, whether defendant's action constitutes a taking for public use, and, if so, what, if any, just compensation is due to plaintiffs.