# In the United States Court of Federal Claims

No. 11-564 L
(Filed: May 19, 2023)

```
* * * * * * * * * * * * * * * * * * *
                                    *
MICHAEL ETCHEGOINBERRY, II, *et al.*,  *
                                    *
            Plaintiffs,             *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
* * * * * * * * * * * * * * * * * * *
```

*Eric L. Klein*, with whom were *Gus B. Bauman, William Kershaw, Kaitlyn Shannon, Alexander Horning, and Felicia Isaac*, Beveridge & Diamond, P.C., all of Washington, D.C., for Plaintiffs.

*Frank J. Singer*, with whom was *William J. Shapiro*, Trial Attorneys, Environment & Natural Resources Division, Civil Division, Department of Justice, of Washington D.C., for Defendant.

## OPINION AND ORDER

On September 25, 2020, the government moved to dismiss Plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). In its motion to dismiss, the government principally argues that Plaintiff's just compensation claim is based on "inaction" by the United States and that a just compensation claim cannot be based on the government's failure to act. The Court takes no position regarding the government's assertion that Plaintiffs' claim is based on inaction; however, it must nonetheless dismiss Plaintiffs' complaint for another reason: lack of subject matter jurisdiction. Judge Horn previously ruled, in response to an earlier motion to dismiss filed by the United States, that Plaintiffs' claims were filed within the applicable six-year statute of limitation based on the stabilization doctrine. *See Etchegoinberry v. United States*, 114 Fed. Cl. 437 (2013) ("*Etchegoinberry I*"). However, after reviewing the extensive record in this case, applicable case law, and related litigation in this and other federal courts in order to assess fully the government's RCFC 12(b)(6) motion, the undersigned simply cannot concur that the

Plaintiffs' complaint was filed within six years of the date on which Plaintiffs' claims accrued.[1] Accordingly, as is more fully explained below, Plaintiffs' complaint is dismissed pursuant to RCFC 12(h)(3) and the government's previous motion to dismiss.[2]  ECF Nos. 9 and 56.

## BACKGROUND AND PROCEDURAL HISTORY

Because the winding factual and procedural history in this matter were extensively outlined in Judge Horn's prior opinion in this case, the Court will attempt to discuss more briefly the most relevant facts in the background section of this opinion.  For an additional recitation of the facts of this case, *see Etchegoinberry I*, 114 Fed. Cl. at 441–473.  In addition, *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000), *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F. Supp. 715 (E.D. Cal. 1993), and *Firebaugh Canal Water Dist. v. United States*, 70 Fed. Cl. 593 (2006), all discuss many of the facts regarding drainage in the San Luis Unit that are relevant here.

A.      **Factual History Related to the San Luis Unit Drainage Services**

In 1902, to encourage crop farming in the West's drier regions, including California, Congress enacted the Reclamation Act to authorize the construction of water projects from which irrigation water would be sold to farmers at a subsidized price.  *See* Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. §§ 371 *et seq.*).  The Central Valley Project ("CVP") is the nation's largest reclamation project, consisting of "dams and water conveyance facilities [that] span the length of California's Central Valley, from Shasta Dam, in the north, to the Friant–Kern Canal, in the south."  *Firebaugh Canal Co.*, 203 F.3d at 570.  As "an integral part of the Central Valley project," in 1960, Congress authorized the construction of the San Luis Unit, with the principal purpose of furnishing water for irrigation of land in Merced, Fresno, and Kings Counties, California.  *See* San Luis Act, Pub. L. No. 86–488, 74 Stat. 156 (1960).

To effectively farm the land in the San Luis Unit, within which Plaintiffs' land is located, effective drainage is required: when fresh water is brought in to irrigate, salty water

---

[1] The Court further holds that to any extent that Plaintiffs' claims were not untimely when filed on September 2, 2011, they were unripe for adjudication because they had not, and may still not have, accrued.

[2] The undersigned does not take contravening Judge Horn's prior ruling on jurisdiction lightly. However, the Court has an obligation to dismiss an action if it at any time determines that subject matter jurisdiction is lacking, the law of the case notwithstanding.  *See* RCFC 12(h)(3).  Although the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Arizona v. California*, 460 U.S. 605, 618 (1983)), it is a discretionary doctrine that cannot trump the limitations put on the Tucker Act's waiver of sovereign immunity and the mandate of RCFC 12(h)(3).  *Id.* (noting that although the doctrine "directs a court's discretion, it does not limit the tribunal's power").  Moreover, the undersigned is convinced that the prior jurisdictional decision was in error and that continuing this litigation in light of that error would work a manifest injustice on the parties and the resources of the Court in this putative class action with a potential class of up to 650 landowners, who own nearly 400,000 acres of land.  *See Agostini v. Felton*, 521 U.S. 203, 236 (1997) ("[The law of the case doctrine] does not apply if the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice." (internal quotation marks omitted)).

remains and must be removed in order to avoid a build-up of salt in the soil that is detrimental to the production of various crops. *Etchegoinberry I*, 114 Fed. Cl. at 441–442. In 1955, the Department of the Interior ("Interior") apprised Congress of the need to develop a drainage system for the lands serviced by the San Luis Unit:

> Soils of the area which will be served by the San Luis Unit contain salts which will be dissolved and carried by the percolating water into the soils in the lower parts of the service area. If left undrained evaporation and transpiration of the percolating waters would concentrate the salts and make these soils unsuitable for irrigation use. The construction of a drainage system will lower the ground-water table and prevent the concentration of salts. Since the normal summer flows in the natural drainage channels and rivers are insufficient to adequately dilute the saline waste waters which would be discharged by the drains, eventually it will be necessary to provide facilities for disposing of these waters.

*See* ECF No. 50 ("Joint Appendix") at JA00093.[3] Therefore, in 1960, when Congress enacted the San Luis Act, authorizing the construction of the San Luis Unit, it provided not only for the provision of irrigation water but also mandated the establishment of the drainage facilities and services necessary to sustain effective crop farming. *See* San Luis Act § 1(a)(2). Specifically, the Act provides:

> Construction of the San Luis Unit shall not be commenced until the Secretary has . . . received satisfactory assurance from the State of California that it will make provision for a master drainage outlet and disposal channel for the San Joaquin Valley . . . which will adequately serve, by connection therewith, the drainage system for the San Luis unit *or has made provision for constructing the San Luis interceptor drain to the delta designed to meet the drainage requirements of the San Luis unit* . . . .

*Id.* (emphasis added). On June 21, 1961, the State of California notified the Secretary of the Interior that it would not be providing drainage for the San Luis Unit; as a result, in January 1962, the Secretary advised Congress that it would construct the San Luis interceptor drain as set forth in the San Luis Act. *Etchegoinberry I*, 114 Fed. Cl. at 443–44. However, beginning in 1967, water deliveries to lands within the San Luis Unit began without completion of drainage infrastructure. *Id.* at 445.

Although water deliveries began without completion of the interceptor drain, construction of some of the required drainage facilities was nonetheless underway, and by 1975, eighty-three

---

[3] At the request of Judge Horn, *see* ECF No. 42, the parties filed a joint stipulation of facts, which provided a summary of a number of exhibits contained in a joint appendix, *see* ECF No. 50. The parties submitted the Joint Appendix via CD-ROM to the Clerk's Office, and when citing the Joint Appendix, the Court references those bates-stamped documents contained therein. Additionally, Plaintiffs submitted their own proposed findings of fact and supplemental appendix with a CD-ROM containing documents. *See* ECF No. 51 ("Pls.' Appendix"). Likewise, the government filed proposed additional findings of fact, *see* ECF No. 53, but it filed its appendix of documents on the electronic filing system, *see* ECF No. 54 ("Gov. Appendix").

miles of the drain and the Kesterson Reservoir were completed. *Id.* Beginning in 1976, subsurface drainage was provided for property owners in a 42,000 acre area of the Westlands. *Id.* However, the Kesterson Reservoir caused an increased amount of selenium in the water, which raised environmental concerns, especially because it was having a negative impact on the area's wildlife. *Id.* at 447. As a result, the Bureau of Reclamation ("Reclamation"), a sub-agency of Interior, decided to close the Kesterson Reservoir in June 1986, and it has been closed since. *Id.*[4] In addition, beginning in 1965, and nearly every year thereafter through the present, Congress has passed appropriations riders "prohibit[ing] the Secretary of the Interior from establishing the terminus of the drain until environmental concerns regarding the effect of the agricultural effluent on the San Francisco Bay could be addressed . . . ." *Firebaugh Canal Co.*, 203 F.3d at 571.

"Since the late 1970s, Congress has appropriated funds so that the Bureau of Reclamation could, in cooperation with the State, local water districts, and other entities, examine solutions to drainage other than the construction of the master drain." *Id.* at 577. These efforts continued after the closure of the Kesterson Reservoir and, in March 1990, Reclamation suggested an "in-valley" solution to the drainage problem. Pls.' Appendix at PA00029 (explaining that because "there are currently no feasible out-of-valley drainage disposal alternatives, the focus of initial activities will be on in-valley alternatives"). In other words, Reclamation suggested that the construction of the San Luis interceptor drain may not be the appropriate drainage solution. This trend away from the express mandate of the San Luis Act continued. In both a September 1990 report and December 1991 draft Environmental Impact Statement ("EIS"), Reclamation favored in-valley solutions and proposed actions that did not include construction of the interceptor drain. Joint Appendix at JA00719 (September 1990 report concluding that Reclamation should "focus on in-valley management of the drainage and drainage-related problems"); JA00702 (December 1991 draft EIS recommendation focusing on in-valley solution). The September 1990 report and December 1991 draft EIS were endorsed in the 1992 Reclamation Wastewater and Groundwater Study and Facilities Act, which "give[s] the [Interior] Department the authority to pursue alternative options other than the interceptor drain to satisfy its duty under the San Luis Act." *Firebaugh Canal Co.*, 203 F.3d at 577.

As will be discussed further below, the issue of drainage in the San Luis Unit was (and still is) the subject of extensive litigation in the United States District Court for the Eastern District of California and the United States Court of Appeals for the Ninth Circuit. In 1995 and 2000, the Eastern District of California and the Ninth Circuit respectively found that Reclamation had a statutory duty to provide drainage to the San Luis Unit, but the Ninth Circuit clarified that Interior had discretion to determine how to best drain the land in Westlands. *See Firebaugh Canal Co.*, 203 F.3d at 568; *see also* Partial Judgment on Findings of Fact and Conclusions of Law Re Statutory Duty, *Firebaugh Canal Co. v. Bureau of Reclamation*, No. 88–cv–634 (E.D. Cal. Mar. 12, 1995), ECF No. 442.[5]

---

[4] The parties have stipulated that, outside of the 42,000 acres previously mentioned, "no other area in the Westlands has, at any time between 1960 and the filing of [this] case, received drainage services as originally contemplated in the San Luis Act." *Etchegoinberry I*, 114 Fed. Cl. at 447.

[5] The district court's 1995 opinion is included in the Joint Appendix at JA01123–36.

After the rulings, a Reclamation plan of action in April 2001 questioned whether the San Luis drain is environmentally or economically feasible. Joint Appendix at JA01144–67. In the 2002 San Luis Drain Feature Re-Evaluation Plan Formulation Report, Reclamation again identified in-valley solutions as the "proposed action," *id.* at JA01213, and a July 2004 addendum to the report explored land retirement. *Id.* at JA01407. In the May 2005 San Luis Drainage Feature Re-Evaluation draft EIS, Reclamation indicated that it would be moving forward with an in-valley disposal and land retirement plan. *Id.* at JA01465 ("The Preferred Alternative is to be one of the In-Valley/Land Retirement Alternatives or some other combination of In-Valley disposal and land retirement features."). This was confirmed by the May 2006 San Luis Drainage Feature Re-Evaluation Final EIS, *see id.* at JA01745, and a modified version of the plan was formally adopted by Reclamation in the March 2007 San Luis Drainage Feature Re-Evaluation Record of Decision (the "2007 ROD"), *see id.* at JA00405. Although Reclamation seemingly crafted a final plan with the 2007 ROD, the March 2008 San Luis Drainage Feature Re-Evaluation Feasibility Report (the "2008 Feasibility Report") undertaken by Reclamation concluded that the plan was neither economically nor financially feasible. *Id.* at JA00313-16. Nonetheless, the 2008 Feasibility Report recommended implementing one of two in-valley drainage solutions contained in the 2007 ROD. *Id.* at JA00273.

In September 2010, at the request of Senator Dianne Feinstein and as part of negotiations between the Senator's office, Reclamation, and San Luis Unit stakeholders, Reclamation Commissioner Michael L. Connor sent a letter (the "2010 Connor letter") to Senator Feinstein with Reclamation's latest proposal for how to reach consensus on an alternative drainage solution to the interceptor drain or the 2007 ROD plan. *Id.* at JA01875–79. In the letter, Commissioner Connor explained that the 2007 ROD adopted a drainage plan that relied upon in-valley treatment of wastewater and land retirement, *i.e.*, no interceptor drain transporting water to the delta from the San Luis Unit. *Id.* at JA01875. He further explained that the 2008 Feasibility Report provided that implementation of the 2007 ROD would cost $2.7 billion, an amount far exceeding any remaining appropriations for construction of drainage facilities in the San Luis Unit and beyond some of the stakeholders' ability to repay: "[while] technically and environmentally feasible, it is economically and financially infeasible because the costs exceed the national economic benefits and are beyond the ability of the beneficiaries to repay."[6] *Id.* at JA01876. However, Connor also noted that the report nonetheless included recommendations to Congress that would enable full implementation of the 2007 ROD. *Id.* Connor further indicated that without significant additional congressional appropriations, implementation of the 2007 ROD will not be possible. *Id.* As a result, and as part of the ongoing discussions to develop an agreeable alternative solution, Connor proposed as an alternative the possibility of new legislation placing responsibility for a drainage solution with state and local authorities. *Id.* at JA01876–78.

---

[6] Under the San Luis Act, Westlands and other water districts in the San Luis unit are ultimately financially responsible for paying for the San Luis Drain: "[N]o funds shall be appropriated for construction of distribution systems and drains prior to ninety calendar days . . . after a contract has been submitted to the Congress calling for complete repayment of the distribution systems and drains within a period of forty years from the date such works are placed in service." San Luis Act § 8.

In April 2011, Thomas W. Birmingham, General Manager of Westlands Water District, sent a letter to Senator Feinstein responding to the 2010 Connor letter ("2011 Birmingham letter"). *Id.* at JA01897. The 2011 Birmingham letter explained Westlands' vehement opposition to the legislative proposal in the 2010 Connor letter:

> The government estimates that it will cost $2.6 billion to comply with that order. But as an alternative, Reclamation proposes: (1) that the obligation to provide drainage be transferred to Westlands; (2) that if Westlands does not perform this obligation (something Reclamation has been unable to do for 40 years) its water supply will be reduced; (3) that Westlands must retire 200,000 acres of land at its expense; and (4) that for the privilege of undertaking these obligations and risks, Westlands will give up 400,000 acre-feet of contract supply.

*Id.* at JA01902. Despite a plethora of studies, numerous attempts at concocting various plans, and extensive litigation, the drainage infrastructure has still, to date, not been completed.

## B.    Litigation History Related to Drainage Services in the San Luis Unit

The case at bar is far from the first time that drainage in the San Luis Unit has been the subject of litigation. Although arising under different legal claims, theories, and contexts, a number of lawsuits have been filed since 1979 relating to the federal government's failure to provide drainage services to the San Luis Unit, several of which are based on the same operative facts as this case and some of which asserted just compensation claims. Those cases are summarized below.

### 1.    *Barcellos and Wolfsen, Inc. v. Westlands Water Dist.*, No. CV–F–79–106 (E.D. Cal. filed Apr. 26, 1979) and *Westlands Water Dist. v. United States*, No. CV–F–81–245 (E.D. Cal. filed July 24, 1981)

In 1979, landowners and water users within the district sued Westlands, other landowners, and several federal defendants, claiming "priorities, both as to amount of water and price of water, as against other landowners within Westlands." *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 491 F. Supp. 263, 265 (E.D. Cal. 1980). Westlands, in turn, sued the federal government, including Interior and Reclamation, alleging that they had repudiated various annual water contracts. *Westlands Water Dist. v. United States*, No. 81–245 (E.D. Cal. filed July 24, 1981). This latter case was eventually consolidated into the *Barcellos* litigation, and a comprehensive settlement resolving both cases was reached. Although the litigation involved issues pertaining to water contracts, the stipulated judgment provided that the federal defendants, "in consultation and cooperation with the [Westlands], shall develop, adopt, and submit to [Westlands] by December 31, 1991, a Drainage Plan for Drainage Service Facilities . . . ." *See* Joint Appendix at JA00612. The stipulated judgment also provided that, in the event the federal defendants failed to develop a plan by 1991, the remedies available to a party included "the revival of any claim against the United States of the right to drainage service . . . ." *Id.*

2.    ***Firebaugh Canal Co. v. United States***, No. 88–cv–634 (E.D. Cal. filed Dec. 9, 1988) and ***Sumner Peck Ranch, Inc. v. Bureau of Reclamation***, No. 91–cv–048 (E.D. Cal. filed Jan. 31, 1991)

In 1988, two water districts, the Firebaugh Canal Company and the Central California Irrigation District ("*Firebaugh* plaintiffs"), filed claims against Westlands and Reclamation for their failure to provide drainage. The *Firebaugh* plaintiffs alleged tort claims and violations of the Administrative Procedure Act ("APA") against the United States. *See* Joint Appendix at JA00656–61. The *Firebaugh* plaintiffs sought damages and an "injunction compelling the defendants to cease delivery of water to Westlands until adequate drainage facilities were in place and operating." *Etchegoinberry I*, 114 Fed. Cl. at 453. In 1991, various landowners ("*Sumner Peck* plaintiffs") sued Westlands and the United States regarding the failure to provide drainage. *See* Joint Appendix at JA00783–845. The *Sumner Peck* plaintiffs brought claims under a number of legal theories, including breach of contract, tort claims "sounding in negligence, trespass, nuisance, failure to discharge mandatory duties, and dangerous condition of public property." *See Sumner Peck*, 823 F. Supp. at 720. Moreover, the *Sumner Peck* plaintiffs also alleged that the federal defendants' failure to provide drainage constituted a taking for public use without payment of just compensation: "[t]he property alleged to have been taken includes flowage or easements  upon . . . Plaintiffs' lands." *Id.* at 721. Additionally, the *Firebaugh* plaintiffs filed a third amended complaint on February 10, 2003, *see* Third Amended Complaint, *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. 91–cv–048 (E.D. Cal. filed Feb. 10, 2003), ECF No. 801, which the federal defendants moved to dismiss, *id.* at ECF No. 803–04. In that complaint, the *Firebaugh* plaintiffs added a just compensation claim to their lawsuit. *Id.*, ECF 826 at 25.

"In May 1992, the [*Sumner Peck* and *Firebaugh*] cases were partially consolidated to resolve the mutual allegation that Interior was required by law under the San Luis Act to construct facilities to drain subsurface water from [Westlands] farmlands." *See* ECF No. 144 ("Am. Compl.") ¶ 70; *accord Firebaugh*, 203 F.3d at 572. On May 17, 1993, the district court entered partial summary judgment in favor of the *Sumner Peck* and *Firebaugh* plaintiffs, holding that the San Luis Act required the federal government to provide drainage service to areas for which the San Luis Unit was providing water. Am. Compl. ¶ 71 (citing *Sumner Peck*, 283 F. Supp. 715); *Firebaugh*, 203 F.3d at 572. The district court also ordered Interior to apply for a discharge permit, thereby foreclosing other "non interceptor-drain[] solutions to the drainage duty created by the San Luis Act." *Firebaugh*, 203 F.3d at 578.

After the 1993 order granting partial summary judgment and finding that Reclamation and Interior must "provide drainage to lands receiving water through the San Luis Unit," *see id.* at 572; *see also Sumner Peck*, 823 F. Supp. 715, the federal government next argued that "subsequent changes in the law and environmental knowledge made compliance with the San Luis Act impossible, and thereby excused the United States from performing that duty." *Firebaugh*, 203 F.3d at 572. A three-week bench trial was held to assess whether the federal government's "drainage obligation 'had been excused by factual or legal impossibility' and if not, 'the extent of the court's authority to order compliance with that obligation,' as well as 'what non-monetary relief, if any, should be ordered.'" *Id.* (citations omitted). "On March 13, 1995, the district court issued a partial judgment, providing that the San Luis Act established a

mandatory duty to provide drainage that had not been excused.  *Id.*; *see also* the 1995 Opinion. The district court "also rejected the Government's contentions that subsequent action by Congress had implicitly or explicitly repealed the mandatory requirement to construct a drain." *Firebaugh*, 203 F.3d at 572.

The federal government appealed to the Ninth Circuit.  The circuit agreed with the district court, and affirmed its holding that the federal government was not excused from its statutory duty to provide drainage services:

> The Government provides no explanation why the Bureau of Reclamation and the State of California have been unable to establish the requisite environmental standards sometime during the past thirty-four years.  In the meantime, for the past thirteen years [Interior] has been providing water service to the Westlands, but no drainage.  As a result, the lands within Westlands are rapidly becoming sterile. Based on these facts, we agree with the district court that the Secretary of Interior, through the Bureau of Reclamation, has made the policy decision not to provide drainage service, in violation of section 1 of the San Luis Act.

*Id.* at 577.  The circuit also held that "Congressional actions," namely various appropriations bills, have not eliminated Interior's statutory duty to provide drainage, but the actions have given Interior "the authority to pursue alternative options other than the interceptor drain to satisfy its duty under the San Luis Act."  *Id.*

The *Sumner Peck* and *Firebaugh* actions continued into the 2000's, but the *Sumner Peck* plaintiffs settled their claims in 2002.  In 2011, the district court in *Firebaugh* granted the federal defendants' cross-motions for summary judgment, finding that they were not unreasonably delaying the provision of drainage.  *See Firebaugh Canal Water Dist. v. United States*, 819 F. Supp. 2d 1057 (E.D. Cal. 2011), *aff'd in part*, 712 F.3d 1296 (9th Cir. 2013).  Specifically, the district court held that the "'only discrete duty required by law' was to provide drainage within the [San Luis] Unit, and that its actions—though 'frustratingly slow'—did 'not at present constitute unreasonable delay as a matter of law.'"  *Firebaugh*, 712 F.3d at 1301.  Furthermore, the district court stated "Plaintiffs are legitimately frustrated, as is the court, with Federal Defendants' slow progress in implementing measures to comply with their statutory responsibility to provide drainage.  Nevertheless, an ROD [record of decision] has been completed and Federal Defendants are complying with the Control Schedule."  *Firebaugh*, 819 F. Supp. 2d at 1075.  The Ninth Circuit affirmed the district court ruling on that issue:

> We agree with the district court that Interior is neither withholding nor unreasonably delaying drainage within the Unit.  Its "in-valley" solution has been in place since 2007. And while Firebaugh's frustration with the pace of implementation is quite understandable, that pace is determined by the scope and cost of the project.  Those obstacles are not, by and large, a product of Interior's inaction.  For example, Interior can seek appropriations for drainage projects—and, indeed, has done so—but it is ultimately up to Congress to provide funds.  Likewise, it is for Congress to decide whether to lift the current cap on construction costs or to excuse in-Unit districts from their obligation to eventually repay those costs.

*Firebaugh*, 712 F.3d at 1303.  The *Firebaugh* litigation is still ongoing today.

> **3.**      **Early Cases in the Claims Court: *Claus v. United States*, No. 270-85 L (Cl. Ct. filed May 9, 1985); *Schwab v. United States*, No. 892-85 L (Cl. Ct. filed May 16, 1985); and *Freitas v. United States*, No. 88-218 L (Cl. Ct. Apr. 5, 1988)**

As described in *Etchegoinberry I*, multiple plaintiffs filed complaints between 1985 through 1988 "regarding leakage of drain water from the Kesterson Reservoir before it was shut down."  114 Fed. Cl. at 471–72; *see also* Gov. Appendix at D2–D4.

> In *Claus v. United States*, No. 270-85L, landowners in Ventura County, whose property abutted the Kesterson Reservoir, alleged that water from the Kesterson Reservoir had leaked onto their property causing a permanent taking of their property interest without just compensation.  In *Schwab v. United States*, No. 292-85L, another group of landowners filed a claim for reverse condemnation based on leakage of waters from the Kesterson Reservoir, and in *Freitas v. United States*, No. 218-88L, still other landowners alleged that the United States had allowed dangerous chemical and other contaminants to flow onto the plaintiffs' property, as well as caused other property damage.

*Etchegoinberry I*, 114 Fed. Cl. at 471–72.  In all of these cases, plaintiffs in the same geographic area as Plaintiffs alleged that the government's actions caused water, chemical, and contaminant leakage onto their property resulting in a taking and monetary damages.  *See id.* According to the United States, the three suits eventually settled.  *Id.* at 472.

> **4.**      ***Firebaugh Canal Water Dist. v. United States*, No. 03–cv–2790 (Fed. Cl. filed January 27, 2004)**

After the Ninth Circuit's decision affirming the district court's holding that Reclamation has an unexcused statutory duty to provide drainage in Westlands, the *Sumner Peck* plaintiffs settled with the United States on December 12, 2002.  Notice of Settlement, *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. 91–cv–048 (E.D. Cal. filed December 12, 2002), ECF No. 771.  However, the *Firebaugh* plaintiffs filed a third amended complaint on February 10, 2003, Third Amended Complaint, *id.* (No. 801), which the federal defendants moved to dismiss, *id.* at ECF No. 803–04.  In that complaint, the *Firebaugh* plaintiffs brought an inverse condemnation claim based on the failure to provide drainage.  *Id.* at ECF 826 at 25.  The district court, in addressing the federal defendant's motion to dismiss, found that "[n]o jurisdiction exists in this District Court to address Federal Defendants' statute of limitations argument as to this claim. The authority lies in the Court of [Federal] Claims."  *Id.* at 26.  Then, pursuant to 28 U.S.C. § 1631, the district court transferred the inverse condemnation claim to the Court of Federal Claims.  *Id.*

The transfer was completed on December 16, 2003, and the transfer complaint was filed on January 27, 2004.  *See* Transfer Order and Complaint, *Firebaugh Canal Water Dist. v. United States*, No. 03–cv–2790 (Fed. Cl. filed Dec. 16, 2003 and Jan. 27, 2004, respectively), ECF Nos. 1 and 7.  The complaint alleged that the "delivery of [Central Valley Project] water by the United

States to the San Luis Unit . . . without providing drainage, or mitigating the damage caused by transferring increased drainage requirements onto lands within Plaintiffs' service area has resulted in . . . property taken includ[ing] [] usage, flowage and seepage easements." Complaint, *id.*, ECF No. 7 ¶ 35. On March 26, 2004, the government moved to dismiss the transfer complaint pursuant to RCFC 12(b)(1), contending that the court lacked subject matter jurisdiction under 28 U.S.C. § 1500. *See* Motion to Dismiss, *id.*, ECF No. 9. Specifically, the government claimed that 28 U.S.C. § 1500 operated as a bar because the *Firebaugh* plaintiffs' claims "in the district court arose out of the same operative facts and sought the same relief, *i.e.*, monetary relief, as their claim here." *See* Order and Opinion, *id.*, ECF No. 16 at 4. The *Firebaugh* plaintiffs "concede[d] that the same operative facts underlie their claims, which are based on different legal theories, but seek to differentiate the claims based on the allegedly different relief requested." *Id.* at 6. Judge Sypolt found that the inverse condemnation claims were barred by section 1500 because they "arise from the same operative facts and seek the same relief . . . ." *Id.* at 7. As a result, she dismissed their inverse condemnation claim without prejudice and suggested the *Firebaugh* plaintiffs could re-file their claim. However, Judge Sypolt presciently took note that "there appears to be a genuine question of whether the six-year statute of limitations under 28 U.S.C. § 2501 would bar plaintiffs' re-filed takings claim." *Id.* at 8.

### 5.      *Firebaugh Canal Water Dist. v. United States*, 70 Fed. Cl. 593 (2006)

The *Firebaugh* plaintiffs re-filed their inverse condemnation complaint in the Court of Federal Claims on February 28, 2005. Again, the United States moved to dismiss for lack of subject matter jurisdiction because the *Firebaugh* plaintiffs' claims were still "pending" in the Eastern District of California for purposes of 28 U.S.C. § 1500 or, alternatively, because their inverse condemnation claim was not filed within the statute of limitations. *See* 70 Fed. Cl. at 594. Judge Bruggink found that "[b]oth the tort claims alleged in the district court action and the inverse condemnation claim alleged here arose from the government's failure to provide drainage to the [San Luis Unit]" and that "[t]he present action is therefore the 'same claim' as the tort claims brought in the district court." *Id.* at 597. As a result, he again dismissed the *Firebaugh* plaintiffs' inverse condemnation claim pursuant to § 1500. *See generally Firebaugh*, 70 Fed. Cl. 593.

### 6.      *Westlands Water District v. United States*, No. 12–12 (Fed. Cl. filed Jan. 6, 2012)

Drainage again became the subject of litigation in the Court of Federal Claims when Westlands brought suit against the United States for allegedly breaching its contractual obligation to provide drainage facilities and services. *See Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 183–84 (2013). The United States moved to dismiss for lack of jurisdiction and for failure to state a claim. *Id.* at 184. Judge Hewitt took note of Westlands' "protean" arguments, finding that

> it is difficult to discern whether plaintiff is discussing the nature of a claim or how the claim accrued. In particular, jurisdictional analysis with respect to the statute of limitations is hindered by plaintiff's variable assertions. For example, plaintiff asserts—on the same page of its Response—both that defendant has "continuously

breached" its purported drainage obligation "since at least 1986 by providing no drainage facilities or service at all" and that "no cause of action accrued until the Government made clear its intent to abandon its drainage obligation in September of 2010."

*Id.* at 192 (internal citations omitted). As a result, Judge Hewitt first addressed the United States' RCFC 12(b)(6) arguments. *Id.* She found first that "plaintiff has failed to show a contractual duty to provide drainage arising out of any of the 1963 Contract, the 1965 Repayment Contract, the 2007 Interim Contract, the 2010 Interim Contract or any implied contract." *Id.* at 205.

Westlands, like Plaintiffs here, also alleged that the "2010 letter from the Commissioner of the Bureau of Reclamation to United States Senator Diane Feinstein 'abandoned Westlands to its own devices, stating that if the local water district did not come up with a drainage solution themselves, the [Bureau of Reclamation] would cut off their water.'" *Id.* (alterations in original) (internal citations omitted). Westlands suggested this was a clear repudiation of the United States' drainage obligation. *Id.* at 208. Judge Hewitt dismissed the contract repudiation claim because there was no contractual obligation to repudiate and because the 2010 Connor letter simply "sought legislative assistance to comply with defendant's statutory drainage obligation, stating that, beyond one subunit of drainage facilities, Interior 'will be unable to proceed without additional Congressional authorization.'" *Id.* In dismissing Westlands' anticipatory breach claim, Judge Hewitt concluded that although Westlands misinterpreted the 2010 Connor letter as a repudiation, "[n]owhere does the letter say that defendant refuses to perform a contractual drainage obligation." *Id.*

### 7.    *Etchegoinberry v. United States*, No. 11-564 L (Fed. Cl. filed September 2, 2011)

And of course, in the present lawsuit, Plaintiffs filed a complaint on September 2, 2011, alleging that the federal government's failure to provide drainage effected a physical taking. *See generally* Am. Compl. On December 8, 2011, the government filed a motion to dismiss for lack of subject matter jurisdiction, arguing Plaintiffs' complaint was time barred because "events giving rise to the United States' alleged liability occurred years before September 2, 2005." ECF No. 9 at 22–26. Judge Horn, in 2013, denied the government's motion, finding the complaint was timely filed. *See generally Etchegoinberry I*, 114 Fed. Cl. 437.

Judge Horn held that the federal government's decades of inaction to implement a permanent drainage solution caused landowners to be "justifiably uncertain about the permanent nature of the damage to their lands within a timeframe that made plaintiffs' complaint timely filed." *Id.* at 498. In addition, she found that the 2008 Feasibility Report, combined with the 2010 Connor letter, amounted to the federal government repudiating its statutory duty to provide drainage; therefore, Plaintiffs' claims accrued within the statute of limitations. *Id.* at 494 ("Viewed in the full context of the long history of failed efforts by the Bureau of Reclamation, the 2008 Feasibility Report and the 2010 Connor Letter together represent a repudiation of defendant's 2007 Record of Decision, the plan that the agency had offered for meeting its statutory duty and court-ordered obligations to provide drainage to the San Luis Unit.").

11

C.      **Developments Since** *Etchegoinberry I*

After the issuance of the decision in *Etchegoinberry I*, this litigation was stayed on October 25, 2013, because the parties "expressed some optimism about the prospects for settlement." ECF No. 82. After nearly seven years, the stay was lifted on July 20, 2020, *see* ECF No. 139, and Plaintiffs filed an amended complaint, *see* Am. Compl. The government moved to dismiss for failure to state a claim pursuant to RCFC 12(b)(6), *see* ECF No. 145, and oral argument was held before the undersigned, *see* ECF No. 162.

Also, since *Etchegoinberry I*, the *Firebaugh* litigation in the Eastern District of California has remained active. Despite the 2008 Feasibility Report concluding that the 2007 ROD was neither economically nor financially feasible, Reclamation began implementation, which involved the retirement of some land and creation of certain drainage facilities. 712 F.3d at 1300. However, implementation of the 2007 ROD "is subject to existing authorities and the existing appropriations ceilings . . . and further subject to applicable law and the availability of funds appropriated by Congress and the Office of Management and Budget." Status Report, *Firebaugh Canal Co. v. United States*, No. 88–cv–634, (E.D. Cal. filed Oct. 1, 2022), ECF 1048 at 2. Given the lack of funding, Reclamation's 2009 control schedule set forth a limited use of funds to provide limited drainage in the Westland's northern sub-unit. *See* Defendant(s) Status Report *id.*, ECF No. 743-1 at 3–6.[7]

Several years later, on September 16, 2015, the federal defendants and Westlands reported that they had reached a settlement agreement in the *Firebaugh* case "concerning drainage within Westlands' boundaries." Status Report, *id.*, ECF No. 1048 (citing ECF No. 1001). Under the terms of the agreement, "Westlands shall agree to be responsible for management of drainage water within Westlands' boundaries, in accordance with federal and state law, and at its own expense and sole liability . . . ." Notice of Settlement, *id.*, ECF No. 1001 at 8. In Section 9(a)(iii) of the agreement, the parties also agreed to take steps to resolve the case at bar and even delineated some settlement terms, including "the payment of compensation by Westlands to owners of land within Westlands' service area affected by the alleged failure of the United States to provide drainage service . . . ." *Id.* at 7–8; *see also* Morgan B. McGill, *A Battle Between Farmers and Environmentalists: Exploring the Implications of the Westlands Water District Drainage Settlement*, 23 HASTINGS W-NW ENV'T. L. & POL'Y 25, 38–39 (explaining that included in "[t]his settlement is an agreement to settle *Etchegoinberry* . . . . The settlement includes the provision for payment of compensation by Westlands to owners of land within Westlands' service area impacted by the failure of the United States to provide drainage service. All claims asserted or that could have been asserted in *Etchegoinberry* will be judged and dismissed with prejudice. Westlands must use best efforts to obtain a release, waiver and abandonment of all past, present, and future claims of each landowner within its service area against the United States arising from the (alleged) failure of the United States to provide drainage service (including but not limited to those in *Etchegoinberry*)."). However, for the

_____

[7] Later, on November 4, 2011, Reclamation submitted a revised control schedule, reallocating limited funding for drainage in the northern sub-unit to a portion of the Westland's central sub-unit. *See* Nov. 4, 2011 Status Report & Mar. 30, 2012 Status Report, *Firebaugh Canal Co. v. United States*, No. 88–cv–634, ECF Nos. 921, 921-1, 946 at 2-3.

settlement agreement to take effect, Congress has to enact authorizing legislation. Various status reports filed in *Firebaugh* have detailed the steps that Interior and Reclamation have taken to secure the enactment of such legislation, but Congress has yet to take any action.

After the parties reported to the district court that a tentative settlement agreement had been reached, the district court stayed the litigation until January 15, 2017. *See* Order Granting Joint Motion for Partial Stay, *Firebaugh Canal Co. v. United States*, No. 88–cv–634 (E.D Cal. filed Oct. 27, 2015), ECF No. 1010; *see also* Order Granting Joint Motion for Extension of Partial Stay, *id.*, ECF No. 1024 (extending stay to January 15, 2018). In a January 19, 2018, status report, the United States advised that "a bill to authorize the Westlands Settlement (H.R. 1769) was introduced in the 115th Congress, in the House, and was reported successfully out of the Committee on Natural Resources." Status Report, *id.*, ECF No. 1027 at 2. The United States further advised that "Reclamation will resume work under a control schedule while efforts to secure enactment of authorizing legislation continues." *Id.*

Once the stay was lifted, Reclamation submitted a new 2018 revised control schedule "for the implementation of Phase 1 of drainage service for Westlands' Central sub-unit." *Id.* Reclamation's drainage solution, as outlined in the 2007 ROD, is now estimated to cost approximately $3.5 billion based on 2015 cost indices, money that it has yet to secure without increased appropriations from Congress. *See* United States Bureau of Reclamation, *Westlands v. United States Settlement* (Oct. 2015), https://wwd.ca.gov/wp-content/uploads/2015/10/westlands-vs-united-states-settlement.pdf. Nothing has disturbed the Ninth Circuit's holding in *Firebaugh* and *Sumner Peck* that Reclamation has a duty to provide drainage services to the San Luis Unit, including Westlands, but Interior still has the discretion to determine the appropriate solution. *See generally* 203 F.3d 568. On April 1, 2023, in the parties' most recent update to the district court in *Firebaugh*, they advised that "[a] bill introduced in the House during the 115th Congress failed to advance, and the Senate took no action regarding the Westlands settlement." Status Report, *Firebaugh Canal Co.*, No. 88–cv–634 (E.D. Cal. filed Apr. 1, 2023), ECF No. 1051 at 3. Although the settlement agreement is voidable, the parties indicated that neither the United States nor Westlands has exercised their right to void the settlement. *Id.* Reclamation continues to implement the revised 2018 control schedule, and there in fact exists a "comprehensive control schedule for the entire drainage obligation within both the Westlands and the Northerly Area Districts," but "Reclamation's ability to successfully implement the control schedule will be based on the availability of appropriations from Congress." *Id.* at 5. In the meantime, Reclamation continues to provide limited drainage facilities and services in accordance with the control schedules. *Id.* at 4–6.

## DISCUSSION

### A.    Statute of Limitations in Just Compensation Cases

The Fifth Amendment ensures that the United States does not take private property for public use without providing just compensation. The amendment thus places two limitations on the government's exercise of eminent domain: it must be for public use and the government must provide the property owner with just compensation. If the United States fails to provide just compensation for the taking of private property, the Tucker Act provides this Court with

jurisdiction to adjudicate a property owner's claim.  28 U.S.C. § 1491.  However, an action brought pursuant to the Tucker Act must be filed within six years of the claim's accrual. 28 U.S.C. § 2501.  This six-year window is "a jurisdictional requirement attached by Congress as a condition on the government's waiver of sovereign immunity . . . ."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988); *accord John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008).  As such, it "can never be forfeited or waived."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

In order to demonstrate that a just compensation claim is within the statute of limitations, a property owner must demonstrate: (1) that his or her claim has accrued (*i.e.*, it is ripe for litigation); and (2) that the claim's accrual took place within six years of the date of the filing of the complaint.  In general, a claim against the government accrues, and thus, the statute of limitations begins to run, "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence."  *Hopland*, 855 F.2d at 1577 (citing *Kinsey v. United States*, 852 F.2d 556, 557 n.* (Fed. Cir. 1988) ("[A] claim does not accrue unless the claimant knew or should have known that the claim existed.")).  Thus, "the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken."  *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000).  For purposes of determining whether property has been clearly and permanently taken, and thus whether the statute of limitations has been triggered, the Court looks to constructive, rather than actual, knowledge.  *Patton v. United States*, 64 Fed. Cl. 768, 775 (2005).  "Ignorance of a claim that a plaintiff 'should have been aware of is not enough to suspend the accrual of a claim.'"  *Whiteland Holdings, L.P. v. United States*, 141 Fed. Cl. 702, 711 (2019) (quoting *Ingrum v. United States*, 560 F.3d 1311, 1314–15 (Fed. Cir. 2009)).  Moreover, "the "proper focus, for statute of limitations purposes, 'is upon the time of the [defendant's] *acts*, not upon the time at which the *consequences* of the acts became most painful . . . .'"  *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995) (alteration in original) (quoting *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).  However, "in cases where the government leaves the taking of property to a gradual physical process, rather than utilizing the traditional condemnation procedure, determining the exact moment of claim accrual is difficult."  *Boling*, 220 F.3d at 1370.

To address this difficulty, the Supreme Court provided a framework for such cases in *United States v. Dickinson*, in which it considered application of the statute of limitations to a taking caused by a government-induced increase in flooding.  331 U.S. 745, 748 (1947).  In *Dickinson*, the Supreme Court reasoned that when the source of the claim is gradual and imperceptible, a plaintiff should be able to "postpone[e] suit until the situation becomes stabilized."  *Id.* at 749.  It further found, more generally, that "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort to either piecemeal or premature litigation to ascertain the just compensation for what is really 'taken.'"  *Id.*  The Supreme Court discussed the *Dickinson* holding several years later in *United States v. Dow*, explaining that "[t]he expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated for public use."  357 U.S. 17, 27 (1958).  Since *Dickinson*, the stabilization doctrine has been extended beyond flooding cases to other situations in which a gradual, physical process put in motion by government action delays accrual.  *See, e.g.*, *Boling*,

220 F.3d 1365. In such cases, "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Id.* at 1370–71. However, "[t]he stabilization doctrine was not created to be applied to every situation in which damages have not yet been written in stone," *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 189 (1997), *aff'd sub nom. Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed. Cir. 1998), because to interpret the stabilization doctrine more broadly would lead to an "unending conflict with the statute of limitations," *Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 656 (1966).

The critical factor for finding that a claim has stabilized is that the "permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." *Boling*, 220 F.3d at 1371; *accord Fallini*, 56 F.3d at 1382 (holding that a claim stabilizes when the "permanent nature" of the taking is evident)). However, "[t]he stabilization doctrine 'does not permit a claimant to delay bringing suit until any possibility of further damage has been removed.'" *Whiteland Holdings, L.P.*, 141 Fed. Cl. at 711 (quoting *Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011)). The focus is on the taking's permanency, "not the taking's damages quantum." *Id.* As a result, "application of the doctrine means that stabilization often occurs before 'the damages are complete and fully calculable.'" *Riverview Farms v. United States*, No. 18–1099, 2019 WL 6211224, at *2 (Fed. Cl. Nov. 20, 2019) (quoting *Mildenberger*, 643 F.3d at 946).

In addition, in *Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994), the Federal Circuit "analyzed the stabilization doctrine set forth in *Dickinson* as it applied to situations in which the government was attempting to mitigate actions that would otherwise constitute a permanent taking." *Banks v. United States*, 314 F.3d 1304, 1308 (Fed. Cir. 2003). According to the circuit in *Applegate*, if property owners "remain justifiably uncertain about the permanency of the . . . taking," that justifiable uncertainty will "stay[] accrual of the claim." 25 F.3d at 1583. In other words, "[c]onsistent with other post-*Dickinson* cases, the [*Applegate*] court emphasized that it is the uncertainty surrounding the permanent nature of the taking, and not the uncertainty surrounding the ultimate extent of the erosion damage, that is critical in determining whether the situation has stabilized." *Boling*, 220 F.3d at 1372.

**B.    Analysis**

The motion pending before the Court is a motion under RCFC 12(b)(6) to dismiss Plaintiffs' complaint for failure to state a claim. According to the government, the Court must dismiss Plaintiffs' claims because they are based on government inaction and "'takings liability does not arise from government inaction or failure to act.'" *See* ECF No. 145 at 3 (quoting *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1361 (Fed. Cir. 2018)). Previously, the government moved under RCFC 12(b)(1) to dismiss Plaintiffs' claims for lack of subject matter jurisdiction because the government argued Plaintiffs' claims were untimely. ECF Nos. 9 and 56. As noted above, Judge Horn denied the government's RCFC 12(b)(1) motion. *Etchegoinberry I*, 114 Fed. Cl. 437. However, the undersigned, in trying to better understand Plaintiffs' protean allegations as to exactly what action by the government caused the alleged

taking, has become convinced that Plaintiffs' claims are barred by the statute of limitations.[8] Accordingly, because the Tucker Act's statute of limitations is jurisdictional, the Court must dismiss Plaintiffs' complaint despite the fact that an RCFC 12(b)(1) motion is not currently pending before it, the law of the case notwithstanding. *See* RCFC 12(h)(3).[9]

In response to the government's motion to dismiss for lack of subject matter jurisdiction, ECF Nos. 9 and 56, Plaintiffs asserted that their claims were not untimely because the stabilization doctrine delayed accrual of their claims. According to Plaintiffs, their complaint "clearly alleges that the Government has taken and befouled their properties through the inundation of water, and that such a process has been continuous and gradual over time[, and] [b]oth the Supreme Court and this Court have ruled the application of the stabilization doctrine entirely appropriate in these circumstances." ECF No. 58 at 18 (internal citations omitted). Moreover, Plaintiffs contended that "the facts alleged in Plaintiffs' Complaint . . . demonstrate justifiable uncertainty all the way through 2008, well within the limitations period." *Id.* at 23. Plaintiffs argued that it was not until the 2010 Connor letter, which according to Plaintiffs was a repudiation by the United States of its statutory obligation to provide drainage, that their uncertainty ended and their claims accrued. *See id.* at 31–36. The government disagreed with Plaintiffs and argued that any justifiable uncertainty ended well before September 2, 2005. *See generally* ECF No. 59. In disagreeing with Plaintiffs' alleged uncertainty, the government challenged the jurisdictional facts alleged in Plaintiffs' complaint.[10]

As explained in more detail below, there are several problems with Plaintiffs' attempted application of the stabilization doctrine and justifiable uncertainty to delay the accrual of their claims. First, it is not clear that the stabilization doctrine even applies to Plaintiffs' just compensation claim. That is to say, it does not appear that Plaintiffs are alleging a taking by an intermittent and gradual, physical process. Rather, it appears that the "process" at issue here is not intermittent (in the stabilization-sense), gradual, or physical. Instead, the alleged taking here results from the failure to remove excess irrigation water from regularly scheduled releases that

---

[8] And to any extent that Plaintiffs' claims could conceivably not be beyond the statute of limitations that they are not ripe for adjudication. *See infra* Section B.2.

[9] Because "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction," *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2002), "a [federal] court has a duty to inquire into its jurisdiction to hear and decide a case," *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed. Cir. 2001). In other words, "it is the duty of the court to determine *sua sponte* whether it has jurisdiction of any claim before it, and this may be done *anytime during the pendency of the case*." *Fincke v. United States*, 230 Ct. Cl. 233, 247 (1982) (emphasis added); *see also* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject–matter jurisdiction, the Court must dismiss the action.").

[10] Although the Court is normally limited to the four corners of the complaint in determining whether subject matter jurisdiction exists, if subject matter jurisdiction is controverted, "the court may consider all relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge." *Benchmark Res. Corp. v. United States*, 64 Fed. Cl. 526, 531 (2005); *accord Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) ("If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction. In such a case, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion." (citation omitted)).

then occupied (or "inundated" to use Plaintiffs' terminology) and damaged (or "befouled") Plaintiffs' property.  The physical occupation (excess irrigation water the United States was obligated to remove) has existed in the form of a flowage or seepage easement since delivery of irrigation water began for each property.  Thus, there does not seem to exist in this case the same type of intermittent, gradual, physical process that existed in flooding and erosion cases in which the stabilization doctrine has been applied in the past.  Plaintiffs themselves are literally putting the irrigation water on their properties that ultimately results in the wastewater that is causing the alleged taking in the form of a flowage or seepage easement.  This is not the incremental (and thus difficult to perceive) erosion that exists in stabilization-erosion cases or the intermittent (and thus possibly not permanent) flooding that exists in stabilization-flooding cases.

Second, even if the occupation of Plaintiffs' land by excess irrigation water is akin to those takings for which the stabilization doctrine has been applied, the event that Plaintiffs claim stabilized the taking—the 2010 Connor letter, which, according to Plaintiffs, repudiated the United States' obligation to provide drainage—could not have stabilized their claims because it does not contain a repudiation of the United States' statutory drainage obligation.  Instead, a plain reading of the 2010 Connor letter clearly indicates that rather than repudiating the United States' obligation, the letter actually reaffirms that obligation while suggesting a possible alternative to provide drainage as part of an ongoing discussion between stakeholders.  In other words, if Plaintiffs' claims still had not stabilized at the time the letter was written and the letter was insufficient to stabilize Plaintiffs' claims, then Plaintiffs' claims were not ripe (to the extent the 2010 Connor letter was necessary for their accrual) at the time they filed suit.  Indeed, if Plaintiffs are correct that their claims were not stale when filed, Plaintiffs' claims may still be unripe today as other courts that have examined the drainage issue have determined that the United States is complying with that obligation.  *See Firebaugh Canal Water Dist.*, 819 F. Supp. 2d at 1075 ("Nevertheless, an ROD has been completed and Federal Defendants are complying with the Control Schedule."); *see also Firebaugh Canal Water Dist.*, 712 F.3d at 1304.

Finally, even if what is contained in the 2010 Connor letter did, in fact, constitute a repudiation of the United States' drainage obligation, there were many more events that occurred prior to September 2, 2005, that should have put Plaintiffs on notice that their claims had stabilized and ending any uncertainty that the taking was permanent.

### 1.  It is unclear that the stabilization doctrine applies to Plaintiffs' claims

In conducting a statute of limitations analysis in a just compensation case, the Court must first determine what property Plaintiffs allege was taken.  *See State of Alaska v. United States*, 32 Fed. Cl. 689, 698 (1995) ("In order to ascertain that point in time when the alleged taking occurred, we must first define plaintiff's claim.").  "To that end, the court necessarily must identify the property allegedly taken, the governmental action which allegedly effected said taking, and the time of such compensable act."  *Id.*  As far as the actual property taken, Plaintiffs allege that Reclamation has physically taken "flowage and seepage easements."  Am. Compl. ¶ 111.  They allege that the taking is "[s]ubstantial, intermittent, frequent[,] and inevitably recurring, and the interference and physical invasion by way thereof has stabilized and become permanent in nature."  *Id.* ¶ 112.  As a result of Reclamation's physical invasion of their properties, Plaintiffs contend that their properties have been damaged by a "high water table and

saline groundwater," which has caused "limited crop rotations, decreased crop yields, stunted or retarded crop growth, decreased crop yields, sterile land precluding any crop growth, poor soil quality and conditions . . . ." *Id.* ¶ 66.  In short, according to Plaintiffs, their complaint "clearly alleges that the Government has taken and befouled their properties through the inundation of water, and that such a process has been continuous and gradual over time."  ECF No. 58 at 18 (citing ECF No. 1 ("Compl.") ¶¶ 106–08).

There is no question that irrigation of Plaintiffs' land without drainage has occurred for decades.  Am. Compl. ¶¶ 42–66.  But does the physical invasion Plaintiffs allege constitute the taking of an easement by a "gradual physical process"?  *Id.* ¶ 112.  Likewise, Plaintiffs' claim is premised on Reclamation's taking of flowage and seepage easements based on the failure to remove irrigation water that they admit has been frequent and inevitably occurring for decades. *Id.*  The allegations here do not appear to be in the same vein as a flooding or erosion case in which it may take several years—possibly decades—to determine whether the government's actions are permanent or even causing the flooding or erosion in the first place.  Here, the provision of irrigation water was regular, consistent, and recurring, and not a slow, gradual, physical process that may (or may not) eventually lead to a taking.

As the Federal Circuit has explained, "[i]n *United States v. Dickinson*, the Supreme Court allowed a party to delay filing suit until the frequency of the flooding caused by a newly constructed dam determined whether the taking of the plaintiff's property was permanent or temporary."  *Ariadne Fin. Servs.*, 133 F.3d at 879.  Thus, "[t]he taking in *Dickinson* resulted from the government's construction of a dam that intermittently inundated the property of nearby landowners."  *Fallini*, 56 F.3d at 1381.  Because "the landowners were uncertain at first how frequently the dam would result in flooding (and thus whether an actual permanent taking had occurred), the Court in *Dickinson* held that the plaintiffs' cause of action in such a case does not accrue until 'the situation becomes stabilized.'"  *Id.* (quoting *Dickinson*, 331 U.S. at 749).  Here, this type of uncertainty does not exist.  Plaintiffs cannot claim that they were uncertain as to how frequently irrigating their land without proper drainage would result in the taking of an easement—Plaintiffs' properties simply will not properly drain without the required drainage facilities.  *See, e.g.*, Am. Compl. ¶ 24 (describing the 1955 government report "acknowledging an anticipated drainage problem in the area that would make soils unsuitable for irrigation use if no drainage system were provided"), ¶ 2 ("Absent [] drainage, wastewater settles beneath these lands, resulting in high water tables and the accumulation of saline groundwater.  The higher water tables and increased groundwater salinity make the land unsuitable for farming.").  Yes, there was for some period uncertainty about whether drainage facilities would be built (and the Court will address that uncertainty and whether it was justifiable later in this opinion), but the alleged physical occupation here is not the failure to build drainage facilities—it is the flowage or seepage easement that resulted from that failure.

In other words, there is nothing gradual or hidden about the "process" at issue here, nor is it a government made structure—like a dam that causes flooding or a jetty that causes erosion—contributing to an otherwise occurring physical (*i.e.*, natural) process.[11]  Rather, as Plaintiffs plainly admit, "[t]he United States' affirmative acts and policies regarding drainage in the

---

[11] This is not to say that the damage to the land has not increased over time.  It may have.  But it is not imperceptible like in an erosion case.  Joint Appendix at JA00070.

Central Valley have resulted in the high water tables and saline groundwater that had *long been recognized* as a threat to the agricultural productivity of . . . Plaintiffs' properties [and] [t]he adverse impacts characteristic of high water table and saline groundwater . . . have been the direct and *inevitable result* of these affirmative acts and policies." Am. Compl. ¶ 66 (emphasis added). Stated differently, unlike construction of a dam that will not necessarily cause flooding, or construction of a jetty that will not necessarily cause erosion, here the lack of drainage has "long been recognized" to cause damage, and that damage was the "inevitable result" of the United States' actions. This set of facts does not appear to be a *Dickinson*-style taking.

Several years after the *Dickinson* ruling that created the stabilization doctrine, the Supreme Court explained that "[t]he expressly limited holding in *[Dickinson]* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use." *Dow*, 357 U.S. at 27. Additionally, in a 2006 case, the Federal Circuit "conclude[d] that the Court of Federal Claims erred by extending the *Dickinson* stabilization doctrine outside the realm of gradual physical processes caused by government action, such as flooding or plant overgrowth, into the area of direct government entry onto property." *John R. Sand & Gravel Co. v. United States,* 457 F.3d 1345, 1360 (Fed. Cir. 2006); *accord Ariadne Fin. Servs.*, 133 F.3d at 879 ("The *Dickinson* stabilization principle, however, does not apply outside its context."). Further expansion of the stabilization doctrine is of particular concern because 28 U.S.C. § 2501 imposes a limit on the United States' waiver of sovereign immunity. *See MacLean v. United States*, 454 F.3d 1334, 1336 (Fed. Cir. 2006) (quoting *Hopland*, 855 F.2d at 1576–77) ("In the Court of Federal Claims, the statute of limitations is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." (internal citations omitted)). Because a waiver of sovereign immunity is to be "strictly construed, in terms of its scope, in favor of the sovereign," *Lane v. Pena*, 518 U.S. 187, 192 (1996), the Court is hesitant to further extend the stabilization doctrine here in a case in which the effects of the taking have been known even before irrigation was provided by the federal government.

Regardless, over time, the stabilization doctrine has been applied in contexts beyond flooding and erosion, *see Etchegoinberry I*, 114 Fed. Cl. at 476–77 (collecting cases), and because the Court concludes below that Plaintiffs' claims stabilized prior to 2005, it need not affirmatively decide whether the stabilization doctrine is appropriately applied to the facts of this case and will analyze Plaintiffs' statute of limitations argument premised on the stabilization doctrine for ripeness and timeliness.

### 2. Even assuming that the taking alleged here is the result of a gradual, physical process, any justifiable uncertainty as to the permanence of the alleged taking ended well before September 2, 2005

Even if the Court assumes that the alleged taking here is the result of a gradual, physical process such that the stabilization doctrine applies, Plaintiffs' claims are nonetheless untimely because they have not established that they remained justifiably uncertain regarding the permanency of the alleged taking within six years of the filing of their complaint. Plaintiffs' complaint was filed on September 2, 2011; accordingly, in order for their claims to be timely,

they must establish that their claims were both ripe on that date and did not accrue at some point prior to September 2, 2005.  In other words, even assuming that Plaintiffs have alleged a taking by a gradual, physical process in the same vein as a flooding or erosion case, they must still establish that the uncertainty regarding whether the government would provide drainage ended at some point between September 2, 2005, and September 2, 2011.

In support of their stabilization argument, Plaintiffs assert that justifiable uncertainty about whether Reclamation would provide drainage prevented them from realizing that the alleged taking was permanent until the 2010 Connor letter.  According to Plaintiffs, "Interior's rejection of its own Record of Decision expressed in [the] September 2010 [Connor letter] marked the point where the extent of the harm to Plaintiffs' farmlands became reasonably foreseeable.  It was then that Plaintiffs' takings claim became readily susceptible to adjudication . . . ."  ECF No. 73 at 4; *see also* Am. Compl. ¶ 98 ("Upon information and belief, the Bureau's letter to Senator Feinstein was a reflection of a deliberate, affirmative, and authorized choice by the United States to defy its legal obligations under statutory law and court order, and to assign the responsibility to provide drainage to Plaintiffs' lands to local water districts.").

Thus, there are three possibilities regarding justifiable uncertainty here.  First, the uncertainty regarding whether the government would provide drainage ended prior to September 2, 2005, making Plaintiffs' case untimely because it was not filed within the statute of limitations.  *See* 28 U.S.C. § 2501.  Second, the uncertainty had not ended by the time Plaintiffs filed their complaint making their claims not yet ripe.  *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1282 (Fed. Cir. 2008) (holding that "claims for damages that had not yet accrued when the complaint was filed were not ripe for consideration by the trial court").  Or, finally, the uncertainty ended sometime between September 2, 2005, and September 2, 2011, making Plaintiffs' claims both ripe and timely filed.  Plaintiffs, of course, argue that this third possibility is, as a result of the 2010 Connor letter, the reality of what occurred here.

Judge Horn in *Etchegoinberry I* concurred with Plaintiffs and found that "[v]iewed in the full context of the long history of failed efforts by the Bureau of Reclamation, the 2008 Feasibility Report and the 2010 Connor Letter together" finally ended the long period of justifiable uncertainty and accrued Plaintiffs' claim.  114 Fed. Cl. at 494.  However, the undersigned finds that neither the 2008 Feasibility Report nor the 2010 Connor letter constituted a repudiation of Reclamation's statutory duty to provide drainage.  Therefore, the issuance of either document, separately or together, cannot serve as the point in time at which the uncertainty ended and Plaintiffs' just compensation claim accrued.  This leaves two possibilities on the table regarding the timeliness of Plaintiffs' claims.  First, even if the uncertainty regarding the provision of drainage continued as long as Plaintiffs suggest, the Court's conclusion regarding the content (*i.e.*, the lack of repudiation) of the 2008 Feasibility Report and the 2010 Connor letter would mean that Plaintiffs' claims remained uncertain, and thus unripe, at the time their complaint was filed.  Second, alternatively, even assuming that the 2008 Feasibility Report and the 2010 Connor letter were sufficient to end uncertainty regarding the permanency of the alleged taking, the Court finds that Plaintiffs' claims stabilized before September 2, 2005; accordingly, the complaint was untimely when filed in 2011.[12]

---

[12] Because the Supreme Court has held that 28 U.S.C. § 2501 is jurisdictional and thus not amenable to tolling, *see John R. Sand & Gravel Co.*, 552 U.S. 130, the stabilization doctrine and any

> **a.** *The 2008 Feasibility Report and the 2010 Connor letter did not repudiate the government's statutory obligation and thus could not have ended any uncertainty regarding whether the government would provide drainage*

As noted above, in *Etchegoinberry I*, Judge Horn held that the 2008 Feasibility Report and the 2010 Connor letter amounted to the federal government "repudiating its drainage obligation, thereby stabilizing and accruing Plaintiffs' claims and placing the filing of their 2011 complaint within the six-year statute of limitations. However, the undersigned cannot concur with Judge Horn's assessment of these documents. Simply put, neither the 2008 Feasibility Report nor the 2010 Connor letter constituted a repudiation of the federal government's obligation to provide drainage to the San Luis Unit.

First, the 2008 Feasibility Report did not repudiate Reclamation's drainage obligation under the San Luis Act. It assessed the feasibility of two alternatives for implementation of the 2007 ROD: 1) an "In-Valley/Drainage-Impaired Area Land Retirement Alternative," which would retire 298,000 acres of drainage-impaired lands in Westlands; and 2) an "In-Valley/Water Needs Land Retirement Alternative," which was the preferred alternative for implementation, and would retire 184,000 acres of drainage-impaired lands within Westlands. *See* Joint Appendix at JA00254, JA00257. Both plans included the construction of various facilities, such as a drainage collection system to bring water to regional reuse facilities, a conveyance system, reverse osmosis treatment plants, selenium biotreatment facilities, evaporation ponds, and mitigation facilities. *Id.* at JA00258. The 2008 Feasibility Report estimated that implementation of the two alternatives would be $2.24 billion for the Drainage-Impaired Area Land Retirement Alternative and $2.69 billion for the Water Needs Land Retirement Alternative. *Id.* at JA00255. Reclamation concluded that both action alternatives were technically and environmentally feasible. *Id.* at JA00260. However, Reclamation found that "neither alternative generates a positive net [national economic development] benefit. Under typical water resource project planning procedures, such results indicate that neither of the alternatives is economically justifiable and do not [] warrant the expenditure of federal funds." *Id.* at JA00263. Reclamation also found that "[n]either action alternative is financially feasible for implementation." *Id.* at JA00271–72. Nonetheless, Reclamation *recommended* implementation of the In-Valley/Water Needs Land Retirement Alternative, noting that Congress would have to raise the project's appropriation ceilings and amend some statutory language. *Id.* at JA00273, JA00315 ("Implementation of either action alternative would require the Congress to increase the construction cost ceiling for the San Luis Unit by over $2 billion.").

While perhaps pessimistic about the eventual success of the drainage alternative proposed in the 2007 ROD, the 2008 Feasibility Report merely lays out the economic and financial difficulties Reclamation faces in accomplishing its drainage obligations. *See generally*

---

justifiable uncertainty can only serve to delay accrual of a claim. Here, this means that it is possible to have a situation in which the claims could be viewed as unripe on the one hand (not enough has occurred to stabilize them) or untimely on the other. As is explained below, the Court has determined that Plaintiffs' claims were time-barred when filed; however, the Court also finds that even if the events that it believes accrued Plaintiffs' claims well before September 5, 2005, did not, in fact, accrue the claims, then Plaintiffs have not pointed the Court to anything that as a matter of fact did accrue their claims.

JA00246–318.  The 2000 decision from the Ninth Circuit in *Firebaugh* confirmed that Interior and Reclamation have a statutory duty to provide drainage, the 2007 ROD identified a plan to meet that duty, and the 2008 Feasibility Report indicated problems with the cost-benefit assessment.  Yet, in the 2008 Feasibility Report, Reclamation *still recommended* implementation of the In-Valley/Water Needs Land Retirement Alternative.  *Id.* at JA00273.  How could this recommendation in favor of a drainage plan constitute a repudiation?

Moreover, the Court cannot find that the United States could repudiate a statutory obligation based on statements in an objective feasibility report assessing options for addressing that obligation (in this case, providing drainage).  The 2008 Feasibility Report did not dictate agency action on its own; it was simply an evaluation leading to a recommendation to Congress.  *See Nat'l Wildlife Fed. v. Clark*, Civ. A. No. 84–2272, 1987 WL 19220, at *3 (D.D.C. Oct. 19, 1987) (stressing that when an agency evaluates a plan under the *Economic and Environmental Principles and Guidelines for Water and Related Land Resources Planning*, "whatever plan is recommended, it must, to have any effect, receive Congressional authorization and appropriation.").  Furthermore, the 2008 Feasibility Report was not the first time in which Reclamation indicated that additional appropriations would be needed to address the drainage problem.  *See, e.g.*, Joint Appendix at JA00700 (December 1991 Draft EIS noting that *Barcellos* judgment provided that "[t]he Drainage Plan shall contain a schedule . . . [that] will be contingent upon approvals within the executive branch and authorization and appropriations by the Congress").  Perhaps Congress is less likely to authorize and provide appropriations for a plan with a negative net economic benefit as the feasibility report found, but Reclamation's mere compiling of information and making an evaluation pursuant to its administrative guidelines cannot serve as the point in time at which Reclamation ended any uncertainty about the provision of drainage.  But most importantly, the 2008 Feasibility Report actually recommends providing the needed drainage despite its cost and need for additional appropriations.  That can hardly be labeled a repudiation.  Simply put, the 2008 Feasibility Report was not a repudiation of Reclamation's statutory obligation to provide drainage and thus could not have stabilized, or even contributed to the stabilization of, Plaintiffs' claims.

What is more, the 2008 Feasibility Report clearly explains why the two alternatives were not feasible: because of a 1986 amendment to section 8 of the San Luis Act, the capital costs of drainage facilities that the water districts were unable to repay themselves could no longer be assigned to Central Valley Project power customers.  *See* Continuing Appropriations Act, 1986, §101(e), Pub. L. No. 99–500 (1986) (adding section 8(b) to the San Luis Act).  Thus, according to the 2008 Feasibility Report, as of October 18, 1986, section 8(b) of the San Luis Act "prohibits the Secretary [of the Interior] from directly or indirectly recovering from CVP power contractors the costs of drainage service."  Joint Appendix at JA00273.  In other words, it is not the 2008 Feasibility Report that makes the two alternatives unfeasible, it was a change to the San Luis Act in 1986 that made it not financially feasible "because the charges that the San Luis Unit contractors are unable to pay [can no longer] be assigned to power contractors."  *Id.*  Therefore, if the non-feasibility of proposed drainage alternatives is a repudiation, then the statutory change in 1986 is the culprit (not the 2008 Feasibility Report), and Plaintiffs' claims should have been filed within six years of the enactment of the October 1986 Continuing Appropriations Act to have been timely.

All of this is likely why Plaintiffs themselves do not appear to contend that the 2008 Feasibility Report constituted a repudiation: "[i]n fact, from the moment the Ninth Circuit affirmed that obligation *through at least July 2008*, the Government continued a concerted process to meet its obligation of providing drainage to the farmers of the San Luis Unit." ECF No. 58 at 12 (emphasis added); *see also* ECF No. 58 at 3 ("As recently as July 2008, the Government announced that it would implement a drainage service plan."); Am. Compl. ¶¶ 89– 91. Instead, Plaintiffs contend that the 2010 Connor letter ended uncertainty about whether Reclamation was going to provide the required drainage and thus accrued Plaintiffs' claims. *See, e.g.*, ECF No. 64 at 3 ("Michael Connor's letter to Senator Diane Feinstein in September 2010 in which the Government rejected the agreed-upon drainage solution embodied in the 2007 Record of Decision simply confirm[s] accrual within the six-year limitations period and the timeliness of Plaintiffs' claim.").

The 2010 Connor letter, however, could not have accrued Plaintiffs' claims. As an initial matter, the letter was sent by Reclamation to Senator Feinstein "in response to a request from the Senator that it provide the outlines of a drainage plan that it could support as an *alternative* legislative approach." ECF No. 59 at 16 n.13 (emphasis added). In other words, the 2010 Connor letter does not reject an approach that Plaintiffs admit "would implement a drainage service plan"; rather, it is providing an *additional alternative* to that plan as part of what appears to be an ongoing effort by Senator Feinstein to negotiate a solution to the drainage problem that satisfies all sides. The letter notes that, "[a]s you know, [Interior] and affected parties attempted, *with your assistance*, to craft an alternative legislative approach to drainage during 2007 and 2008. Unfortunately, that process did not result in a consensus draft bill." Joint Appendix at JA01876 (emphasis added). Thus, the 2010 Connor letter was part of an ongoing process to devise a different approach to addressing drainage that did not run into the decades old problem of Reclamation not receiving sufficient appropriations to satisfy its statutory duty to provide drainage. The letter is not a repudiation of a statutory duty; it is part of Reclamation's effort to "continue to work with [Senator Feinstein's] staff and provide assistance in [Senator Feinstein's] efforts to secure a long-term resolution of drainage issues for the Unit." *Id.* at JA01878. In fact, the letter acknowledges that there is a "mandatory duty on the Secretary to provide drainage service to the Unit," *id.* at JA01875, and that Reclamation was continuing to attempt to meet that duty by constructing the one subunit of drainage facilities in Westlands that it was able to construct under current appropriations ceilings:

> As part of the on-going litigation, Interior advised the court in November 2009 that, while it could not implement the entire [2007] ROD, sufficient appropriation ceiling remained to allow Interior to construct one subunit of drainage facilities within Westlands Water District. Commitments will be held within the existing ceiling but are expected to allow construction of a fully functional self-sufficient subunit. Beyond that subunit, however, the Department will be unable to proceed without additional Congressional authorization.

*Id.* at JA 01876.

In short, the undersigned cannot conclude that Reclamation repudiated its statutory drainage obligations via the 2010 Connor letter. A letter from Reclamation to *one* Senator,

written in response to a request from that Senator, as part of an ongoing effort by that Senator, Reclamation, and affected parties to reach an alternative to the decades-long failure of the United States to comply with its obligation to provide drainage, cannot serve as a repudiation of that obligation. The letter is not evidence of an abdication of Reclamation's duty to provide drainage, but an appraisal of the difficulties of the situation and a statement of Reclamation's position on a plan that may work if an alternative solution to providing the required drainage is pursued.

Judge Hewitt came to a similar conclusion when she considered, in a contract dispute, whether the 2010 Connor letter represented Reclamation's repudiation of an alleged contractual drainage obligation for the San Luis Unit:

> [Westlands] has not shown that the letter is a distinct, unqualified refusal to perform a contractual duty, made by defendant to plaintiff . . . . The letter [] sought legislative assistance to comply with defendant's statutory drainage obligation, stating that, beyond one subunit of drainage facilities, Interior "will be unable to proceed without additional Congressional authorization." Finally, the letter requested a legislative response and described "key elements of a long-term drainage strategy" that the Administration would support. These key elements included transferring irrigation drainage responsibility to local control, which plaintiff appears to have misinterpreted as a declaration "that from now on, the drainage obligation falls to the water districts on pain of losing their water." *Nowhere does the letter say that defendant refuses to perform a contractual drainage obligation.*

*Westlands Water Dist.*, 109 Fed. Cl. at 208 (emphasis added) (citations omitted).

Moreover, statements and actions from Reclamation after the issuance of the 2010 Connor letter only further confirm that the 2008 Feasibility Report and the 2010 Connor letter were not Reclamation's repudiation of its statutory duty to provide drainage in the San Luis Unit. First, in 2009, Reclamation submitted a control schedule to the district court in the *Firebaugh* case "describing the actions Reclamation intended to take to comply with the 2007 [Record of Decision]." 819 F. Supp. 2d at 1062. Additionally, an April 1, 2011, *Firebaugh* status report confirmed that there were "actions currently underway in connection with provision of drainage to the San Luis Unit." *Id.* Furthermore, the district court and the Ninth Circuit both found that Reclamation was complying with the district court's order, which mandated that Reclamation, "without delay, provide drainage to the San Luis Unit pursuant to the statutory duty imposed by section 1(a) of the San Luis Act." *Firebaugh Canal Water Dist.*, 712 F.3d at 1299. The Ninth Circuit observed:

> We agree with the district court that Interior is neither withholding nor unreasonably delaying drainage within the Unit. Its "in-valley" solution has been in place since 2007. And while Firebaugh's frustration with the pace of implementation is quite understandable, that pace is determined by the scope and cost of the project. Those obstacles are not, by and large, a product of Interior's inaction. For example, Interior can seek appropriations for drainage projects—and,

24

indeed, has done so—but it is ultimately up to Congress to provide funds. Likewise, it is for Congress to decide whether to lift the current cap on construction costs or to excuse in-Unit districts from their obligation to eventually repay those costs.

*Id.* at 1303.

*Etchegoinberry I* suggested that those opinions were of no moment because they were issued "in separate litigation, involving different parties, claims, and legal theories . . . ." and the fact "that the federal defendants were not liable under the APA is not dispositive with regard to the statute of limitations in the Court of Federal Claims and the timing of accrual of plaintiffs' takings claim in the above captioned case." 114 Fed. Cl. at 496. The undersigned has a different view. Of course, whether the federal defendants are liable under the APA does not have bearing on the merits of the just compensation claim here, but they absolutely do have bearing on Plaintiffs' stabilization argument. The 2011 and 2013 opinions support the conclusion that Reclamation did not abandon its promise to provide drainage via either the 2008 Feasibility Report or the 2010 Connor letter. Indeed, as of 2022, Reclamation and Interior have "been implementing the 2007 [ROD] in accordance with schedules and cost estimates contained in control schedules provided to the Court and the parties." *Firebaugh Canal Water Dist.*, No. 88–cv–634 (E.D Cal. filed Oct. 1, 2022), ECF No. 1048 at 2. Additionally, Reclamation has prepared and continues to refine, a "comprehensive control schedule for the entire drainage obligation within both the Westlands and the Northerly Area Districts, . . . [but] Reclamation's ability to successfully implement the control schedule will be based on the availability of appropriations from Congress." *Id.* at 5.

Finally, the conclusion that the 2008 Feasibility Report and the 2010 Connor letter did not end the uncertainty about whether drainage would be provided comports with Federal Circuit cases that have established and developed what constitutes justifiable uncertainty. In those cases, the refusal to further pursue promised mitigation efforts has been explicit and unequivocal and has served as the trigger for claim accrual. For example, in *Banks*, the government was attempting to mitigate the erosion caused by the jetties built by the Army Corps of Engineers, but several reports from the Corps "indicated that erosion was permanent and irreversible" despite the mitigation efforts.[13] 314 F.3d at 1310. As a result, the Federal Circuit concluded that the "statute of limitations did not begin to run until the Corps issued the . . . reports." *Id.* In other words, the government concluded that its mitigation efforts did not work; therefore, the taking was permanent. Likewise, in *Northwest Louisiana Fish & Game Preserve Commission v. United States*, the circuit found the just compensation claim timely when the Corps specifically refused to carry out any further mitigation efforts to stop the overgrowth of hydrilla: "[t]hus, it was not until January of 1997 that the Corps, for the first time, refused a drawdown, and instead suggested that the Commission attempt to control the weed growth . . . ." 446 F.3d 1285, 1288 (Fed. Cir. 2006). As a result, the circuit concluded that "the accrual of the [plaintiff's] claim could not have occurred before January 2, 1997," and held that the plaintiff's claim was not

---

[13] In *Banks*, the mitigation efforts continued even after the Corps' concluded that the mitigation was ineffective. In other words, if it is evident that the taking is permanent—as in, the mitigation not working in *Banks* or the viability of the land becoming "seriously diminished" or "completely sterile" here—continued mitigation or promises of mitigation will not necessarily continue a landowner's justifiable uncertainty.

barred by the statute of limitations.  *Id.* at 1292.[14]  The 2008 Feasibility Report and the 2010 Connor letter are not the equivalent of the government "repudiations" of mitigation efforts that caused justifiable uncertainty in either *Banks* or *Northwest Louisiana Commission*.

Accordingly, neither the 2008 Feasibility Report nor the 2010 Connor letter could have stabilized, and thus accrued, Plaintiffs' claims.  Therefore, *assuming* that Plaintiffs' claims were not stale when brought in 2011, they were also, at best, not ripe.  As discussed below, the Court believes Plaintiffs' claims accrued well before September 2, 2005; however, because the stabilization doctrine does not toll the statute of limitations—it delays accrual of the claim entirely—in a case in which stabilization is applicable, the claim must stabilize/accrue before it can be brought.  *See, e.g.*, *Mildenberger*, 643 F.3d at 947 ("[T]he Government's promises to mitigate damages caused by a continuous physical process *delays accrual of a takings claim*.") (emphasis added); *Prakhin v. United States*, 122 Fed. Cl. 483, 488 (2015) ("[The plaintiff's] justifiable uncertainty doctrine argument does not toll the statute of limitations; instead it delays accrual of its Fifth Amendment takings claim.").  This has to be the case because the Supreme Court has held that the relevant statute of limitations, 28 U.S.C. § 2501, is jurisdictional and may not be tolled.  In *John R. Sand & Gravel*, the Supreme Court distinguished between statutes of limitation that seek to protect defendants, which typically permit tolling in certain circumstances, and other more stringent statutes of limitations designed "to achieve a broader system-related goal, such as . . . limiting the scope of a governmental waiver of sovereign immunity . . . ."  552 U.S. at 133 (citations omitted).  For the latter, such as 28 U.S.C. § 2501, the Supreme Court held that they are more absolute, "forbidding a court to consider whether certain equitable considerations warrant extending a limitations period."  *Id.* at 134.  The Court found that it "has long interpreted the court of claims limitations statute as setting forth this . . . more absolute[] kind of limitations period."[15]  *Id.*

---

[14] In *Applegate*, it is true that there was not a clear end of the justifiable uncertainty as the plaintiffs there filed suit while the Army Corps of Engineers was still working on mitigation efforts.  However, the Federal Circuit only held that "the statute of limitations does not bar these landowners from bringing this suit," and it remanded to the Court of Federal Claims for further proceedings without addressing any potential ripeness concerns.  *Applegate*, 25 F.3d at 1584.  Additionally, the Corps filed an answer once the case was remanded, and it does not appear that the issue of ripeness was ever raised or considered before the parties reached a settlement agreement in 1999.  *See* Answer & Order Granting Motion to Stay Pending Entry of Final Judgment *Applegate*, No. 92–832 (Fed. Cl. filed Nov. 11, 1994, and Nov. 8, 1999, respectively), ECF Nos. 12 and 295.

[15] To the extent there was any concern about the continued viability of the stabilization doctrine after *John R. Sand & Gravel*, the Federal Circuit applied it in *Mildenberger* and judges of this Court have applied it in numerous cases since the *John R. Sand & Gravel* ruling.  *See, e.g.*, *Mildenberger*, 643 F.3d 938.  Furthermore, *Dickinson* was issued after earlier Supreme Court cases similarly interpreted earlier versions of the Tucker Act's statute of limitations as preventing tolling, at least tacitly supporting the conclusion that the doctrine does not run afoul of *John R. Sand & Gravel*.  *See, e.g.*, *Kendall v. United States*, 107 U.S. 123, 125–26 (1883) (finding that the Court of Claims' statute of limitations was "jurisdiction[al]" and "it [was] the duty of the court to raise the [timeliness] question."); *Finn v. United States*, 123 U.S. 227, 232–33 (1887) ("The general rule that limitation does not operate by its own force as a bar, but is a defense, . . . has no application to suits in the court of claims against the United States . . . [s]ince the government is not liable to be sued, as of right, by any claimant, and since it has assented to a judgment being rendered against it only in certain classes of cases . . . .").

This distinction between tolling versus delayed accrual is important because, whereas tolling pauses the running of a statute of limitations, the stabilization doctrine delays the accrual of the claim itself (and thus the limitations period never starts running until the claim finally accrues). Because uncertainty delays claim accrual instead of tolling or pausing an already-running statute of limitations on an already accrued claim, without being able to rely on the 2008 Feasibility Report or the 2010 Connor letter, Plaintiffs' claims are at best unripe as pled. *See Martin v. Constr. Laborer's Pension Tr. for S. Cal.*, 947 F.2d 1381, 1385 n.7 (9th Cir. 1991) ("If plaintiff's cause of action has not accrued, then his claim is not yet ripe for review."); *Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 201 (2020) ("[H]aving a ripe claim necessarily means that it accrued prior to the filing of the Complaint."). "While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, [courts] will not infer such an odd result in the absence of any such indication in the statute." *Reiter v. Cooper*, 507 U.S. 258, 267 (1993). Certainly, there is no indication in section 2501, the just compensation clause, or the Tucker Act that anything other than normal claim accrual rules apply, and "[u]nless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (citing *Reiter*, 507 U.S. at 267). Therefore, because the Court concludes that neither the 2008 Feasibility Report nor the 2010 Connor letter could have accrued Plaintiffs' claims, if the Court were to accept Plaintiffs' argument that its claims were not untimely when they were filed in 2011, the Court would have to dismiss this action as being unripe. Plaintiffs do not point the Court to any event other than the 2010 Connor letter for accrual purposes.

But the larger point is that even if either the 2008 Feasibility Report or the 2010 Connor letter were sufficient to stabilize Plaintiffs' claims, there are numerous other events that occurred in the long saga of whether the United States was going to provide drainage to the San Luis Unit that are equally, or, for lack of a better term, "more stabilizing" than either the 2008 Feasibility Report or the 2010 Connor letter. Plaintiffs were not permitted to put their heads in the sand allowing the statute of limitations to run and then pop them up and run to court claiming the 2010 Connor letter somehow was *the event* that stabilized their claims. As discussed below, throughout the history of the San Luis Unit numerous events stabilized Plaintiffs' claims and numerous parties brought suit against the United States claiming these very events were breaches of the United States' drainage obligations under contract or the APA or effected a taking under the Fifth Amendment.

### b. Plaintiffs' claims stabilized before September 2, 2005, and are, therefore, time-barred

The Court finds that numerous events prior to the 2010 Connor letter ended any justifiable uncertainty regarding the permanent nature of the alleged taking at issue here and caused Plaintiffs' claims to accrue before September 2, 2005. Plaintiffs themselves actually point to many of these events in their amended complaint; they simply fail to acknowledge the significance of these events for accrual purposes.

Plaintiffs contend that "[s]ince June 1986, no drainage service has been provided by the United States to any landowner in the [Westlands Water] District," Am. Compl. ¶ 64, and they further allege that the "United States' affirmative policy to not provide drainage through the present day has resulted in high water tables and in saline groundwater beneath and upon Plaintiffs' properties, which have been the direct, natural and inevitable result of the United States' shirking of its drainage obligation." *Id.* ¶ 7. Although Plaintiffs have seemingly always hoped the government would provide drainage to their properties, Plaintiffs also represent that they have never received drainage for any amount of time, all the while water deliveries have continued. *See id.* ¶ 64; *see also Etchegoinberry I*, 114 Fed. Cl. at 447–48 ("[P]laintiffs' properties have never received drainage service from the federal government as originally contemplated in the San Luis Act."). Despite never receiving drainage to their properties and the fact that no property within Westlands has received drainage since 1986, Plaintiffs still assert that their claims did not stabilize until the 2010 Connor letter. In other words, according to Plaintiffs, it was only the 2010 Connor letter that alerted them to the permanence of the taking and ended their justifiable uncertainty. The Court cannot concur with Plaintiffs' assertion.

Simply put, numerous actions and decisions by the United States related to drainage in the San Luis Unit and litigation brought by multiple parties related to drainage over several decades (including litigation alleging the very taking at issue here and brought by some of the members of the putative class in this case[16]) should have alerted Plaintiffs to the permanency of the alleged taking and ended any uncertainty that they purportedly had about the accrual of their claims. Some of these events include:

- In 1967, water deliveries began, and have continued since, and property in Westlands was irrigated, without drainage in violation of the San Luis Act. These regular deliveries of irrigation water to Plaintiffs' properties, without any drainage being supplied by the federal government, have continued unabated through the present day with the full knowledge that, as mentioned in the 1955 Report on the Feasibility of Water Supply Development, without drainage their soil would become "unsuitable for irrigation use." Joint Appendix at JA00093.

- The 1965 Public Works Appropriation Act, Pub. L. No. 88–511, 78 Stat. 778, 782 (1964), contained a provision prohibiting selection of a final point of discharge for the San Luis interceptor drain until certain conditions were met. An appropriations rider with similar, but not identical language, has been included in nearly all annual appropriations acts since 1965. These appropriations riders prohibited the Secretary of the Interior from establishing the terminus of the drain until environmental concerns regarding the effect of

---

[16] The proposed class is comprised of:

All landowners located within the Westlands Water District ("Westlands" or "District") and served by the San Luis Unit of the Central Valley Project whose farmlands have not received the necessary drainage service the United States is required to provide under the San Luis Act (Pub. L. No. 86-488, 74 Stat. 156 (1960)).

Am. Compl. ¶ 15. This proposed class would include plaintiffs in the *Sumner Peck* litigation. *See* Joint Appendix at JA00789–99.

the agricultural effluent on the San Francisco Bay could be addressed jointly by Reclamation and the State of California. No environmental standard has been established in the years since the first appropriations rider.[17]

- In 1975, the Secretary of the Interior suspended construction of the interceptor drain, citing "questions" and "concerns" raised by the public. *Firebaugh Canal Co.*, 203 F.3d at 571; *accord* Am. Compl. ¶ 46.

- Despite halting construction of the main interceptor drain, a subsurface drainage collector system was constructed and drainage service to a small portion of Westlands began in 1978. The subsurface collector drainage system carried the drainage water to the Kesterson Reservoir, which had become the temporary terminus of the drain. *Id.* However, this drainage system only "serve[d] an area of approximately 42,000 acres in the northeastern part of Westlands . . . . [, which] was only a fraction of the nearly 400,000-acre, drainage-impaired area that was to be served by the complete drainage collector system." *Id.* ¶ 47.

- Prior to the completion of the subsurface drainage collector system that drained water into the Kesterson Reservoir, "the United States advertised for bids for the construction of the second phase of the drainage collector system, which would have expanded the drainage service area to the south to serve an additional area of approximately 57,000 acres, another fraction of the overall drainage-impaired area that the drainage collector system was intended to reach. But the United States rejected all bids and did not award the proposed second-phase construction contract . . . ." *Id.* ¶ 48. "[N]o construction of drainage facilities was completed beyond the first phase of construction . . . ." *Id.* ¶ 51.

- On March 15, 1985, the Secretary of the Interior announced the closure of the Kesterson Reservoir, which resulted in the plugging of the San Luis Drain. *Firebaugh Canal Co.*, 203 F.3d at 572. The Kesterson Reservoir was fully closed in 1986 and "no drainage service has been provided by the United States to any landowner in the [Westlands]" since its closure. Am. Compl. ¶ 64.

- As a result, "[a]ffected landowners, both inside and outside the San Luis Unit service area, sued the Interior, seeking completion of the master drain . . . ." *Firebaugh Canal Co.*, 203 F.3d at 572. In that partially consolidated lawsuit, which was filed over *twenty*

---

[17] For example, the Consolidated Appropriations Act for fiscal year 2023 contains the following language:

> None of the funds appropriated or otherwise made available by this Act may be used to determine the final point of discharge for the interceptor drain for the San Luis Unit until development by the Secretary of the Interior and the State of California of a plan, which shall conform to the water quality standards of the State of California as approved by the Administrator of the Environmental Protection Agency, to minimize any detrimental effect of the San Luis drainage waters.

Consolidated Appropriations Act, 2023, Pub. L. No. 117–328 (2022).

*years* prior to the filing of this case and included some members of the putative class in the instant action, the plaintiffs alleged that "[their] soil has been rendered barren by excess salt. Plaintiffs' crops have been killed by water inundating the root zone." *Sumner Peck*, 823 F. Supp. at 722.

- In the *Firebaugh* and *Sumner Peck* litigation, in which the consolidated cases were filed in 1988 and 1991 respectively, the United States took the affirmative litigation position that it did not owe a statutory duty to provide drainage or that it was otherwise excused from complying with that duty. *See Sumner Peck*, 823 F. Supp. at 748 ("Federal Defendants have also denied that any statutory duty exists to provide drainage . . . . Federal Defendants [also] advance an alternate theory: a statutory duty was created, but subsequent events (such as the events surrounding the closing of the Kesterson Reservoir and the restrictions placed on appropriations riders each year) have either excused or extinguished performance of that duty."). In addition, the plaintiffs asserted that their land had been damaged or destroyed.

- Plans and proposals in the early 1990s that were clearly a part of the public record altered and amended the government's original drainage obligation. Recall, the San Luis Act required that the government build an "*interceptor drain* . . . to meet the drainage requirements of the San Luis Unit." San Luis Act § 1(a) (emphasis added). But the March 1990 plan of study, *see* Pls.' Appendix at PA00023–40, and the September 1990 report, *see* Joint Appendix at JA00707–82, each suggested exploration of an "in-valley" solution, *i.e.*, drainage accomplished via mechanisms other than the required interceptor drain. *See Etchegoinberry I*, 114 Fed. Cl. at 450 ("While the 1990 Rainbow Report was initially supposed to look at all possible drainage solutions, the study ended up looking solely at in-valley solutions."). In the December 1991 Draft EIS, *see* Joint Appendix at JA00665–706, Reclamation, put forth four action alternatives, none of which included construction of the San Luis Drain, finding that the "Delta Disposal Alternative" was no longer considered an option. *See Etchegoinberry I*, 114 Fed. Cl. at 451 ("None of the four action alternatives, nor the no action alternative, addressed completion of the San Luis Drain.").

- Furthermore, in October 1992, Congress passed the Reclamation Wastewater and Groundwater Study and Facilities Act, Pub. L. No. 102–575, §§ 1601–1617, 106 Stat. 4600, 4663, which the Ninth Circuit held "indicate[d] that the Department of the Interior can meet its drainage obligations through means other than the interceptor drain." 203 F.3d at 577. Specifically, that Act required Reclamation to consider only drainage solutions identified in the September 1990 report, *see* Joint Appendix at JA00707–82, if Reclamation "intended to reclaim and reuse agricultural wastewater generated in the service area of the San Luis Unit." *See* 43 U.S.C. § 390h(d). The September 1990 report and the Reclamation Wastewater and Groundwater Study and Facilities Act are critical because up to that time, and indeed up until the Ninth Circuit's 2000 ruling recognizing that Congress had given Reclamation more leeway in addressing the drainage problem, it was understood that Reclamation had a statutory obligation to provide drainage solely via the interceptor drain. *Firebaugh*, 203 F.3d at 577 ("[T]he district court concluded [that] the interceptor drain was the only method though which [Interior] could meet its drainage

obligation . . . . [The Ninth Circuit] h[e]ld that the subsequent Congressional action has not eliminated the Department's duty to provide drainage, but that it has given the Department the authority to pursue alternative options other than the interceptor drain to satisfy its duty under the San Luis Act."). As a result, Reclamation's early studies and exclusive consideration of in-valley alternatives would have been a repudiation of the San Luis Act's requirement to provide the interceptor drain.

- The *Firebaugh* plaintiffs, in filing their third amended complaint in the Eastern District of California, added a just compensation claim that is nearly identical to the just compensation claims here, and argued that the claim was ripe as of the Ninth Circuit's 2000 decision affirming Reclamation's statutory duty to provide drainage pursuant to the San Luis Act. *See* Memorandum Decision and Order at 25–26, *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. 91–cv–48 (E.D Cal. filed May 7, 2003), ECF No. 826 (explaining that the *Firebaugh* plaintiffs represented that "while colorable in the earlier phase of this action, [the taking claim] was not truly ripe for adjudication until such time as the District Court's ruling was upheld by the Ninth Circuit").

- After the just compensation claim was transferred to this Court, the *Firebaugh* plaintiffs filed their transfer complaint on January 27, 2004. *See* Complaint, *Firebaugh Canal Water Dist.*, No. 03-2790 (Fed. Cl. filed Jan. 27, 2004), ECF No. 7. And after that case was dismissed pursuant to 28 U.S.C. § 1500, the *Firebaugh* plaintiffs filed another complaint alleging an inverse condemnation in the Court of Federal Claims on February 28, 2005. *See* Complaint, *Firebaugh Canal Water Dist.*, No. 05-262 (Fed. Cl. filed Feb. 28, 2005), ECF No. 1.

- The dissent in the Ninth Circuit's decision also recognized a problem that has continued throughout the entirety of this saga, which is that "[w]hen push comes to shove it is the *appropriations* bills that count, and here, Congress has blocked construction in nearly every appropriations bill for [Reclamation] for thirty years." *Firebaugh*, 203 F.3d at 579 (Trott, J. Dissenting). The dissent found that these "explicit actions on this subject over a thirty-year period are very revealing." *Id.* Furthermore, Reclamation still cannot gather the necessary appropriations to satisfy its statutory duty. Status Report, *Firebaugh Canal Co.*, 88–634, (E.D. Cal. filed Apr. 1, 2023), ECF No. 1051 at 5 ("Reclamation continues to review and refine the comprehensive control schedule for the entire drainage obligation within both Westlands and the Northerly Area Districts . . . With that said, Reclamation's ability to successfully implement the control schedule will be based on the availability of appropriations from Congress.").

The above events, especially when considered altogether, should have ended Plaintiffs' uncertainty, well before to September 2, 2005, that the alleged taking here was permanent. Whether Plaintiffs themselves had actual knowledge of all or even some of these events is irrelevant to the inquiry: "[t]he question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all of the relevant facts in order for the cause of action to accrue." *Fallini*, 56 F.3d at 1380. Moreover, it is not necessary for this Court to determine which of these events in particular accrued Plaintiffs' claims in order to dismiss the complaint as untimely; Plaintiffs "bear the

31

burden of establishing subject matter jurisdiction . . . [and] must demonstrate that they could not have reasonably known the facts fixing the Government's alleged liability prior to [September 2, 2005]." *Mildenberger*, 643 F.3d at 945. "Properly understood, stabilization as discussed in *Dickinson* is not deferred until the progressive environmental damage stops, but occurs when the environmental forces have substantially and permanently invaded the private property such that the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." *Boling*, 220 F.3d at 1371. The above-outlined events demonstrate that the permanent nature of the taking here was evident and that the extent of the damage was reasonably foreseeable prior to September 2, 2005.

What is more, even if later events, such as the Ninth Circuit's 2000 decision or the 2007 ROD, somehow reignited any uncertainty, they did not reignite Plaintiffs' claims. Once a claim has accrued, it has accrued; post-accrual uncertainty regarding whether the government was finally going to provide drainage does not restart the timeliness clock. Allowing this type of starting and re-starting of the statute of limitations clock as part of the stabilization doctrine would eviscerate the jurisdictional limitation on the United States' waiver of sovereign immunity set forth in 28 U.S.C. § 2501 and "put the *Dickinson* doctrine in unending conflict with the statute of limitations, [which] was never the purpose of the decision." *Gustine Land & Cattle*, 174 Ct. Cl. at 656. Once the limitations period has been triggered, a plaintiff has six years to file a claim—there is no provision for reviving stale claims. *See Banks v. United States*, 102 Fed. Cl. 115, 134 n.13 (2011) ("Plaintiffs cite no case in which untimely takings claims were revived by promises made by the government after the statute of limitations had run and the court is not aware of any such case." (internal citations omitted)). Furthermore, "a plaintiff cannot toll limitations by waiting for other cases to be litigated and decided . . . [because those] cases did not create a new claim for the plaintiff . . . ." *Copenhaver v. United States*, 225 Ct. Cl. 619, 620 (1980) (citing *Sharp v. United States*, 207 Ct. Cl. 975, 976–77 (1975)).

The fact is government actions regarding drainage prior to September 2, 2005, ended any justifiable uncertainty regarding Plaintiffs' claims, and the extensive litigation prior to September 2, 2005, related to the government's failure to provide drainage objectively demonstrates this. Indeed, it appears that by the time Plaintiffs filed suit in 2011, they must have been among the few landowners in the San Luis Unit who were both willing to bring suit and failed to realize the permanence of the drainage situation. Although the government did make, and continues to make, promises to provide some form of a solution to the drainage problem in the San Luis Unit, those promises must be viewed in the proper context. Irrigation water became available starting in 1967 without the required drainage. At some point thereafter, as irrigation water became available, Plaintiffs or their predecessors-in-interest purposely irrigated their land fully aware that no drainage was in place and that without drainage their soil would become "unsuitable for irrigation use." Joint Appendix at JA00093. During most fiscal years over this period, and even a few before irrigation water became available, appropriations riders prevented any expenditure of federal funds on the interceptor drain that was to provide drainage to Plaintiffs' properties. In addition, the government repeatedly and affirmatively failed to provide the required drainage, including by closing the partial drainage provided through the Kesterson Reservoir and cancelling construction of additional drainage facilities because of both environmental concerns and lack of appropriations. In litigation over the drainage obligation, the government took the affirmative position that it was not legally required to provide drainage or, alternatively, even if

it was required to provide drainage, that requirement no longer applied because of factual or legal impossibility. *See Sumner Peck*, 823 F. Supp. at 748. Moreover, the 1992 Reclamation Wastewater and Groundwater Study and Facilities Act, by providing an alternative means for Reclamation to fulfill its drainage obligation, amended the San Luis Act's requirement that the federal government provide drainage through the interceptor drain. *See Firebaugh*, 203 F.3d at 577–78.

While all of the above was occurring, other property owners (including members of the putative class in this litigation), were bringing suit well before 2005 regarding the United States' failure to provide drainage and the concomitant destruction of their land. *See supra* Section B. Indeed, twenty years prior to the filing of this case, some members of the putative class in this action brought suit alleging that: "Plaintiffs' soil has been rendered barren by excess salt. Plaintiffs' crops have been killed by water inundating the root zone." *Sumner Peck*, 823 F. Supp. 715. Therefore, the plaintiffs claimed, *inter alia*, that the federal government had "taken, and damaged, Plaintiffs' property for public use, but has failed to pay them just compensation," and that "[t]he property alleged to have been taken includes flowage or easements upon . . . Plaintiffs' lands. . . by causing it to be inundated with drainage water." *Id.* at 721, 749. In addition, Firebaugh Canal Company and Central California Irrigation District, brought suit in the Court of Federal Claims in both 2003[18] and 2005[19] claiming that the government's failure to meet its obligation to provide drainage to the San Luis Unit effected a taking of their property. Both the 2003 and the 2005 lawsuits were dismissed pursuant to 28 U.S.C. § 1500 because, at the time those lawsuits were filed in the Court of Federal Claims, the plaintiffs had lawsuits arising out of the same operative facts pending in district court. These Court of Federal Claims lawsuits further show that not only should Plaintiffs have been aware of the permanence of the alleged taking prior to September 2, 2005, but also that Plaintiffs' drainage-based just compensation claims arise out of the same operative facts as the APA and contract claims brought decades before in district court.

Plaintiffs' jurisdictional claim is essentially that: while all of these other entities and landowners (who would be part of the putative class here) were aware of the United States' failure to provide drainage and were openly litigating that failure in various federal courts in several different cases (none of which were found to be unripe), Plaintiffs were simply uncertain as to whether the United States had permanently taken their land. Plaintiffs would have the Court believe that they alone were somehow justifiably uncertain. Yet, somehow that uncertainty ended because of *one* letter sent to *one* United States Senator that proposed an *alternative solution* to the drainage situation as part of long-running attempt to negotiate a fix to the problem? This simply cannot be the case.

The Court need look no further than the findings of the district court and the Ninth Circuit in the *Firebaugh* and *Sumner Peck* litigation to see that, by September 2, 2005, Plaintiffs' claims had well since accrued:

---

[18] The 2003 case was the result of the just compensation claim being transferred to the Court of Federal Claims from the Eastern District of California pursuant to 28 U.S.C. § 1631. The just compensation claim was added to the district court suit on February 10, 2003, by the plaintiffs' third amended complaint.

[19] The 2005 lawsuit was filed on February 28, 2005.

- "Since the mid–1980s, the Bureau has not undertaken any efforts to complete the San Luis Drain in order to physically remove saline subsurface agricultural drainage water from the drainage service area."  Findings of Fact and Conclusions of Law, *Firebaugh Canal Co. v. United States*, Nos. 88–cv–634 and 91–cv–048 (E.D. Cal. filed Dec. 16, 1994), ECF No. 426 at 15.[20]

- "The Federal defendants have failed to take necessary steps to provide drainage service for a number of years. The Bureau is unlikely to undertake efforts to provide drainage service unless ordered to do so by the Court."  *Id.* at 16.

- "Since May 1993, when the Court issued its order declaring that Section 1(a) of the San Luis Act required completion of a drain, the Bureau has not undertaken activities to complete the drain."  *Id.*

- "The Court finds that the federal agencies that have responsibility for providing drainage to the San Luis United have not effectively addressed the serious problems of water-logging and salt accumulation that are destroying the plaintiffs' ability to farm their lands in the San Luis Unit."  *Id.*

- "Litigation by plaintiffs over San Luis Unit drainage was settled around 1983.  By that settlement, the government had until 1993 to provide its plan for San Luis Unit drainage. It did so only in a December 1993 Report that further defers providing drainage."  *Id.* at 39–40.

- "[The plaintiffs are suffering] actual, extensive, and continuing harm . . . in the loss of productivity and value of their farmlands."  *Id.* at 41.

- "The Secretary of the Interior through the Bureau of Reclamation has made the policy decision not to complete the San Luis Drain, in violation of Section 1 of the San Luis Act.  This action constitutes agency action unlawfully withheld."  *Id.* at 47.

- "The evidence establishes the Bureau will not undertake mandated efforts to provide needed drainage service without order of the Court."  *Id.*

- "By failing to provide drainage for the San Luis Unit in violation of law plaintiffs have been caused irreparable injury. . . ."  *Id.*

- "[T]he Department has been providing water service to the Westlands, but no drainage. As a result, the lands within Westlands are rapidly becoming sterile.  Based on these facts, we agree with the district court that the Secretary of Interior, through the Bureau of

---

[20] The findings of fact and conclusions of law are dated December 2, 1994, and were filed on December 16, 1994, as ECF No. 426 in the consolidated *Sumner Peck* and *Firebaugh* cases.  *See* Joint Appendix at JA01076–01122.

Reclamation, has made the policy decision not to provide drainage service, in violation of section 1 of the San Luis Act."  203 F.3d at 576.

- "The Bureau of Reclamation has studied the problem for over two decades. In the interim, lands within Westlands are subject to irreparable injury caused by agency action unlawfully withheld."  *Id.* at 578.

- "Since 1986, the Department of Interior has withheld drainage service from the Westlands Water District, in violation of section 1 of the San Luis Act. The lack of drainage service has seriously diminished the viability of agricultural land within Westlands, including certain locations where the land is completely sterile."  *Id.*

Each of these bullet points (taken from the opinions in the partially consolidated cases that were filed in *1988* and *1991* respectively) shows that Plaintiffs' claims accrued well before September 2, 2005.  And taken together they show this conclusively.  Take just the second sentence of the last of the above-quoted passages: "[t]he lack of drainage service has seriously diminished the viability of agricultural land within Westlands, including certain locations where the land is completely sterile."  *Firebaugh*, 203 F.3d at 578.  Thus, as of at least 2000, when the Ninth Circuit wrote those words, the property at issue here had already suffered "seriously diminished" viability and some of the land in the San Luis Unit was already "completely sterile."  In other words, it was clear in 2000 that the lack of drainage had "substantially and permanently invaded" Plaintiffs' property "such that the permanent nature of the taking [was] evident and the extent of the damage [was] reasonably foreseeable."  *Boling*, 220 F.3d at 1371.  Because "the *Dickinson* doctrine does not permit a plaintiff to wait 'until any possibility of further damage [has] been removed,'" *Nadler Foundry & Mach Co. v. United States*, 143 Ct. Cl. 92, 95 (1958) (quoting *Columbia Basin Orchard v. United States*, 116 Ct. Cl. 348, 357 (1950)), Plaintiffs were not permitted to wait over twenty years after the *Firebaugh/Sumner Peck* litigation was filed, and another eleven years after the damage observed in the Ninth Circuit opinion to file their claims.

In other words, to paraphrase the findings of the district court and the Ninth Circuit, well before September 2, 2005, the United States had "failed to take necessary steps to provide drainage service for a number of years," creating "serious problems of water-logging and salt accumulation [that were] destroying the [property owners'] ability to farm their lands in the San Luis Unit," resulting in "actual, extensive, and continuing harm . . . in the loss of productivity and value of . . . farmlands" and "irreparable injury," all because "the Bureau of Reclamation . . . made the policy decision not to provide drainage service, in violation of section 1 of the San Luis Act."  Simply put, Plaintiffs' assertion that they could not have brought a just compensation claim until the 2010 Connor letter lacks merit because, as the *Sumner Peck/Firebaugh* litigation makes clear, the damage to the land in the San Luis Unit as a result of the lack of drainage was both "quantifiable and present," in the decades before Plaintiffs brought suit.  *See Nw. La. Fish & Game Preserve Comm'n*, 446 F.3d at 1291; *see also Jackson-Greenly Farm, Inc. v. United States*, 144 Fed. Cl. 610, 625 (2019), *aff'd*, 857 F. App'x 1021 (Fed. Cir. 2021) ("*Northwest Louisiana Fish & Game* is inapposite because Plaintiffs here suffered damage before August 3, 2012; for example, when the levee was breached or overtopped in 2011, 2008, 1993, and several earlier years.  Such damage was 'quantifiable and present' by 2011 at the latest.").

Given the extensive litigation history regarding the failure of the United States to provide drainage to the San Luis Unit, Plaintiffs should have been aware, prior to September 2, 2005, that their claims had stabilized.  That similarly-situated plaintiffs, including members of the putative class in this case, brought suit decades before Plaintiffs, forecloses this case.  *Ram Energy, Inc. v. United States*, 94 Fed. Cl. 406, 411–12 (2010) ("[T]hat the breach was not inherently unknowable at the time is evidenced by the fact that other lessees brought suit in 2002"); *id.* ("[B]oth cases involve claims for breach of the same offshore oil and gas lease.  Nothing precluded [plaintiff] from joining the other lessees in the [] litigation or even brining its own claim."); *accord Nadler Foundry & Mach Co.*, 143 Ct. Cl. at 96 ("The very same suit, on the same grounds and for the same damages, could have been brought by the plaintiff at least as long ago as 1934.").  Plaintiffs or their predecessors-in-interest could have joined the *Sumner Peck* plaintiffs in their litigation or brought suit on their own within six years of the accrual of the just compensation claims at issue here.  Unfortunately, they must have chosen not to.

In *Etchegoinberry I*, in concluding that Plaintiffs' claims were justifiably uncertain, Judge Horn appears to have been particularly concerned with "defendant's inability to pinpoint a single accrual date, and defendant's reliance on an entire decade as the time when plaintiff allegedly should have known that its claims had accrued," finding that this "supports a conclusion that landowners were justifiably uncertain about the permanent nature of the damage to their lands within a timeframe that made plaintiffs' complaint timely filed."  114 Fed. Cl. at 498.  However, the burden is not on the United States to establish jurisdiction for Plaintiffs' benefit; rather, the jurisdictional onus is on the Plaintiffs.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[Plaintiffs] bear[] the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").  Thus, the government had no obligation to "pinpoint" or specify a precise date on which Plaintiffs' claims accrued; the multiple events before September 2, 2005, that the government cited relating to the lack of drainage services in the area was enough to demonstrate that Plaintiffs did not meet *their* jurisdictional burden.

The Court cannot reasonably find that the Plaintiffs were justifiably uncertain about the permanency of the taking.  There have been a number of events over the years that accrued Plaintiffs' claims well before September 2, 2005.  Moreover, numerous other plaintiffs (including some members of the putative class in this case) brought suit against the United States and other entities based on those events.  As a result, the Court finds that Plaintiffs have failed to meet their burden to demonstrate that their complaint was filed within the statute of limitations.  Accordingly, the Court must dismiss this action.

## CONCLUSION

Although the Court is sympathetic to the damage to Plaintiffs' lands caused by the United States' failure to fulfill its statutory drainage obligation, it cannot allow this case, which is clearly beyond the Court's jurisdiction, to proceed.  Accordingly, pursuant to RCFC 12(h)(3) and

the arguments made by the government in its previously denied RCFC 12(b)(1) motion, Plaintiffs' complaint is hereby **DISMISSED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge